# EXHIBIT D

**To Notice of Removal**

Andrew A. August (SBN 112851)
Kevin F. Rooney (SBN 184096)
PINNACLE LAW GROUP, LLP
425 California Street, Suite 1800
San Francisco, California 94104

Telephone: (415) 394-5700
Facsimile: (415) 394-5003

Attorneys for Plaintiffs Matthew C. Kilgore, William Bruce Fuller and Kevin Wilhelmy

ENDORSED
FILED
ALAMEDA COUNTY
JUN 1 1 2008
CLERK OF THE SUPERIOR COURT
By KMED DHILLON Deputy

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF ALAMEDA**

**UNLIMITED JURISDICTION**

MATTHEW C. KILGORE, individually and on behalf of all others similarly situated; WILLIAM BRUCE FULLER, individually and on behalf of all others similarly situated; KEVIN WILHELMY, individually and on behalf of all others similarly situated;

Plaintiffs,

vs.

KEYBANK, NATIONAL ASSOCIATION, a national banking association organized under the laws of the United States of America and successor in interest to KeyBank USA, N.A.; KEY EDUCATION RESOURCES, a division of KEYBANK, NATIONAL ASSOCIATION; GREAT LAKES EDUCATIONAL LOAN SERVICES, INC., a Wisconsin corporation; STUDENT LOAN XPRESS, a Delaware corporation; AMERICAN EDUCATION SERVICES, form of entity unknown, and Does 1-25,

Defendants.

**CASE NO. RG08386980**

**CLASS ACTION**

**SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF**

1. **UNFAIR COMPETITION (Bus. & Prof. Code § 17200 *et seq.***
2. **AIDING AND ABETTING FRAUD**
3. **R.I.C.O. (18 USC 1962)**

## I. INTRODUCTION

1. This class action seeks to remedy an ongoing scheme of unconscionable, predatory lending practices perpetrated by the Defendants who, purporting to hide behind the shield of

Pinnacle Law Group LLP
425 California Street
Suite 1800
San Francisco, CA 94104
(415) 394-5700

Ohio's staunchly pro-bank/anti-consumer laws, team up with operators of private, unlicensed and unregulated sham vocational schools and dupe prospective students into accepting loans from Defendants, the funds of which are paid directly to the school long before the education is completed thereby fueling the schools' enrollment Ponzi schemes. When the schools shutter their doors because the scheme collapses, the students are left with no education, no accreditation and no employment prospects but still obligated to repay the loans.

2. This pattern of unfair, unlawful and deceptive conduct has been the subject of very recent congressional investigation and extensive journalistic reporting (See collective Exhibit A hereto). Because the laws of Ohio exempt Ohio-domiciled banks from that state's consumer protection laws, the defendants, in complicity with the sham schools, have prayed on unsuspecting, socio-economically vulnerable California resident students with legally repugnant adhesive loan documents containing Ohio choice of law, forum selection, and anti-class action arbitration clauses. Using these perceived impenetrable "shields", defendants have repeatedly and *intentionally* flaunted both federal and California consumer protection laws.

3. As to defendant KeyBank, National Association, successor in interest to KeyBank USA, N.A. ("KeyBank") in particular, for years it has engaged in this pervasive pattern and practice of fraudulent conduct in California and elsewhere with numerous vocational schools. Because KeyBank perpetrated its fraud through the use of the U.S. mail and wire carriers in this instance, its actions constitute racketeering activity and violates the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq*.

4. This particular action is brought by and on behalf of only those California residents who 1) enrolled in Silver State Helicopters vocational school ("SSH"), 2) either borrowed their SSH tuition from one of the defendant lenders or co-signed on behalf of such a borrower, 3) executed a "Master Student Loan Promissory Note" or "Application/Master Promissory Note" (or similarly titled agreement – the "Note" or "Notes") that failed to contain certain notices required by the Federal Trade Commission's consumer protection regulations, 4) failed to complete their educational program prior to SSH filing bankruptcy, and 5) remain obligated on their Note in a principal amount less than $75,000.

Firestone Law Group LLP
425 California Street
Suite 1900
San Francisco, CA 94104
(415) 394-5300

5. The sole remedy Plaintiffs seek on behalf of themselves and the proposed classes is an injunction prohibiting defendants from contacting credit agencies regarding the Notes and prohibiting them from taking any action to enforce the Notes. The injunctive relief sought by this action is based on the Defendants' 1) knowing and intentional violation of 16 C.F.R. 433.2 (the so-called "FTC Holder Rule" or "Holder Rule Notice") which constitutes a predicate violation under California's Unfair Competition Law (California Business and Professions Code Section 17200, et. seq.), and 2) aiding and abetting SSH's Ponzi scheme as described below.

6. As the materials in Exhibit A reflect, in recent years there has been a proliferation of unlicensed and unaccredited trade schools that do not participate in the federal student aid programs and therefore are largely unregulated. Their growth has been fueled by unscrupulous lenders that have willingly and irresponsibly "partnered" with these sham operations to provide expensive private loans to the high-risk students these schools tend to attract. The lenders have then turned around and, like subprime mortgage lenders, securitized the loans, shifting the risk of the loans onto unsuspecting investors. Defendants have been major players in these schemes that have ensnared hundreds if not thousands of California students in the past several years. In this particular case, Defendants partnered with SSH as the latter's "preferred" lenders and followed the usual script from which they have reaped millions of dollars. As with previous failed vocational school "partners" of Defendants, SSH was unregulated and unaccredited and, when its Ponzi scheme collapsed, SSH filed bankruptcy leaving its students with nothing but Defendants' threats to enforce the loans.

7. By 2005, SSH had become the largest private helicopter flight academy and one of the fastest growing companies in any industry in the United States. From 2002 to 2005, it grew at an astounding *2,786 percent*. Tuition for the school – which promised commercial helicopter pilot certification within 18 months of enrollment – was nearly $70,000 per student. The school targeted second career, limited income individuals who, but for the Defendants' loan, lacked the personal financial wherewithal to pay the tuition. Thus, the Defendants' willingness to loan money without question, qualification or restriction was the fundamental catalyst for SSH's exponential growth.

Pinnacle Law Group LLP
425 California Street
Suite 1800
San Francisco, CA 94104
(415) 394-5700

8. As described in greater detail below, the Defendants worked intimately with SSH employees to solicit its loans in California during the course of SSH's "application" process. By providing SSH with the loan proceeds in the manner they did, the Defendants, in violation of federal consumer protection regulations and state consumer protection laws, aided and abetted SSH in a Ponzi scheme that enabled its owner and CEO (Jerry Airola – "Airola") and his partners to siphon off millions of dollars for their own personal use. As a result, SSH was unable to provide the equipment, instructors or maintenance necessary to enable the students to attain their pilot ratings. SSH perpetrated its fraudulent scheme by, among other things, misrepresenting through standardized and scripted marketing and advertising and/or uniformly concealing 1) anticipated tuition costs, 2) its capability to provide adequate equipment, proper training and sufficient maintenance, 3) the time frame for receiving ratings, 4) its intended and actual use of the loan proceeds, and 5) employment opportunities. In reliance on these false and deceptive representations and omissions, Plaintiffs and other members of the proposed class entered into written Service Contract Agreements[1] pursuant to which SSH was obligated to provide educational services.

9. SSH further induced its students to enroll in the school by pre-arranging with Defendants to have them finance the student's tuition and remit all of the loan proceeds directly to SSH (or to the student who was then obligated to immediately transmit the tuition to SSH under threat of expulsion), well before any possible date of completion for the students' education program. Because Defendants had previously partnered with other failed private vocational schools, enforced the student loans even though the fully paid for education was not delivered, and either sued or were sued by the students, Defendants knew exactly what they were doing here: They took great pains - in violation of the FTC Holder Rule which is intended to apply to consumer credit transactions such as the ones at issue – to ensure that their Notes and SSH's Service Contract Agreements omitted the required Holder Rule Notice thereby enabling

[1] Plaintiffs are informed and believe and thereon allege that in 2003 and 2004 SSH referred to their agreements with students as Service Contracts and in 2005 and 2006 as Training Agreements. Although the Service Contracts and Training Agreements are not identical, they do contain the same material terms complained of here, and will hereinafter sometimes be collectively referred to as Service Contracts.

Pinnacle Law Group LLP
425 California Street
Suite 1800
San Francisco, CA 94104
(415) 394-5700

the Defendants to argue that SSH's students have no rights under the Holder Rule to assert defenses against them that the students could assert against SSH for failing to deliver the bargained-for educational services. Defendants funding of the loans unlawfully, unfairly and fraudulently facilitated SSH's violation of the Holder Rule by enabling SSH to 1) take or receive consumer credit contracts without the Holder Rule Notice, and/or 2) accept as full or partial tuition, the proceeds of purchase money loans (as that term is defined in the Holder Rule) without including the required Holder Rule Notice in the consumer credit contracts made in connection with the students' enrollments and loan.

10. Because the Defendants paid most, if not all, of the students' tuition to SSH directly shortly after a student's registration and well before the students could possibly complete their education and because Airola and SSH's senior executives were stealing the tuition payments, SSH was dependent on recruiting ever-larger pools of new students to finance the training of earlier ones. And that recruitment was, in turn, dependant on the Defendants' deliberate and calculated willingness to turn its eye from the bright red flags of SSH's Ponzi scheme.

11. Plaintiffs are informed and believe and thereon allege that the Defendants' willingness to fund SSH's fraudulent scheme was driven by the enormous profits the Defendants were able to realize from the high interest rates on the Notes, from selling the Notes into the secondary market, and from servicing the Notes through its co-defendant subsidiaries. The Defendants knew of or acted in reckless disregard for the fact that SSH's scheme would collapse, but drafted its Note specifically to make it as difficult as possible for its borrowers to assert any defense against the Defendants' loan collection efforts. Plaintiffs are informed and believe and thereon allege that the Defendants accomplished this by, among other things:

a. Circumventing the regulatory purpose of the FTC Holder Rule by knowingly and intentionally omitting the required notice from the Note, requiring that SSH do the same with its Service Contract Agreements, thereby enabling the Defendants to argue in Ohio courts that the Holder Rule does not apply because it was not included in the Note or Service Contract Agreement;

Pinnacle Law Group LLP
425 California Street
Suite 1800
San Francisco, CA 94104
(415) 394-5700

b. Facilitating SSH's knowing and intentional violation of the Holder Rule by enabling SSH to take and/or receive consumer credit contracts and accept purchase money loan proceeds without making the disclosure required by the Holder Rule;

c. Purporting to impose on California residents a patently unreasonable and unjust Ohio choice of law provision in a clear adhesion contract[2] despite Plaintiffs' lack of any constitutionally mandated contacts with Ohio, other than a forum selection clause (and in Student Loan Express' case, even though it is headquartered in California);

d. In KeyBank's case, purporting to impose on California residents an Ohio forum selection provision in an adhesion contract, despite knowing the students would effectively be barred from having their day in court because of the time and expense of traveling to Ohio and having California resident witnesses appear in Ohio;

e. In KeyBank's case, imposing an anti-class action arbitration clause that violates California public policy, both substantively and procedurally;

f. In KeyBank's case, including an attorneys fee clause in the Notes that enables only KeyBank to recover fees from the students if KeyBank sues to enforce the Note with no complimentary provision benefitting the student if he or she is the prevailing party (there is no reciprocity of fee allocation under Ohio law as there is under California law).

12. Plaintiffs are informed and believe and thereon allege that the Defendants have engaged in this pattern and practice throughout the country with a variety of unregulated vocational schools. This action seeks to end that practice in California.

[2] Ohio law is decidedly anti-consumer and pro-lender. For example, lenders are exempt from liability for fraudulent conduct under Ohio's consumer protection statutes whereas the California Court's have long embraced such actions under the UCL and Consumer Legal Remedies Act. Ohio also prohibits the recovery of attorneys fees based on the private attorney general doctrine, even where the plaintiffs have enforced important public policy considerations on behalf of the general public. California Code of Civil Procedure 1021.5, of course, has long been a backbone of California consumer protection.

## II. PARTIES and NON-PARTY AIDERS AND ABETTORS

### A. Representative Plaintiffs

13. Plaintiff Matthew C. Kilgore ("Kilgore") is an individual over the age of 18 and is, and at all relevant times was, a resident the State of California. Kilgore brings this action pursuant to Cal. Bus. & Prof. Code §§17203, 17204 and Cal. Code Civ. Pro. §1021.5, on behalf of himself and all members of the proposed class as defined in paragraph 25 below. In or about November 2004, Kilgore entered into a Service Contract Agreement and KeyBank Note at SSH's facility in Oakland, California.

14. Plaintiff William Bruce Fuller ("Fuller") is an individual over the age of 18 and was, at all relevant times, a resident the State of California. Fuller brings this action pursuant to Cal. Bus. & Prof. Code §§17203, 17204 and Cal. Code Civ. Pro. §1021.5, on behalf of himself and all members of the proposed class as defined in paragraph 25 below. In or about October 2004, Fuller executed a Service Contract Agreement and KeyBank Note at SSH's facility in Oakland, California. Kilgore and Fuller shall sometimes be collectively referred to as Kilgore/Fuller.

15. Plaintiff Kevin Wilhelmy ("Wilhelmy") is an individual over the age of 18 and is, and at all relevant times was, a resident the State of California. Wilhelmy brings this action pursuant to Cal. Bus. & Prof. Code §§17203, 17204 and Cal. Code Civ. Pro. §1021.5, on behalf of himself and all members of the proposed class as defined in paragraph 25 below. In or about September 2006, Wilhelmy executed a Training Agreement and Student Loan Xpress Note at SSH's facility in California.

### B. Defendants KeyBank, Key Education Resources and Great Lakes

16. Plaintiffs are informed and believe and thereon allege that at all relevant times, defendant KeyBank, National Association, successor in interest to KeyBank USA, N.A., was and is a national banking association organized under the laws of the United States of America engaged in commerce throughout the United States, including the State of California. Plaintiffs are further informed and believe and thereon allege that KeyBank was and is in the business of processing and/or making education loans to students in the State of California.

Pinnacle Law Group LLP
425 California Street
Suite 1800
San Francisco, CA 94104
(415) 394-5700

17. Plaintiffs are informed and believe and thereon allege that at all relevant times, defendant Key Education Resources, a division of KeyBank, National Association, successor in interest to KeyBank USA, N.A., engaged in commerce throughout the United States, including the State of California. Plaintiffs are informed and believe and thereon allege that Key Education Resources knowingly and intentionally participated in the acts complained of herein.

18. Plaintiffs are informed and believe and thereon allege that defendant Great Lakes Educational Services, Inc. ("Great Lakes") is, and at all material times was, a Wisconsin corporation authorized to do business, and in fact doing business in the State of California. Plaintiffs are informed and believe and thereon allege that Great Lakes knowingly and intentionally participated in the acts complained of herein. Plaintiffs are further informed and believe and thereon allege that Great Lakes was and is in the business of servicing KeyBank loans for SSH students and in fact serviced loans to Kilgore/Fuller and members of the proposed KeyBank class. Hereinafter, KeyBank, Key Education Resources and Great Lakes shall be collectively referred to as "KeyBank."

**C. Defendants Student Loan Xpress and American Education Services**

19. Plaintiffs are informed and believe and thereon allege that defendant Student Loan Xpress ("SLX") is, and at all material times was, a Delaware corporation with its principal place of business in the State of California, authorized to do business, and in fact doing business in the State of California. Plaintiffs are further informed and believe and thereon allege that SLX was and is in the business of processing and/or making education loans to students in the State of California.

20. Plaintiffs are informed and believe and thereon allege that defendant American Education Services ("AES") is, and at all material times was, a business entity form unknown authorized to do business, and in fact doing business in the State of California. Plaintiffs are informed and believe and thereon allege that AES knowingly and intentionally participated in the acts complained of herein. Plaintiffs are further informed and believe and thereon allege that AES was and is in the business of servicing SLX loans for SSH students and in fact serviced loans to Wilhelmy and members of the proposed SLX/AES Class. Hereinafter, SLX and AES

Pinnacle Law Group LLP
425 California Street
Suite 1800
San Francisco, CA 94104
(415) 394-5700

shall be collectively referred to as "SLX/AES." KeyBank and SLX/AES shall sometimes be collectively referred to as "Defendants."

**D. Non-Party Aider and Abettor - SSH**

21. Plaintiffs are informed and believe and thereon allege that Silver State Helicopters, LLC ("SSH") is a limited liability company organized under the laws of the state of Nevada, having its principal place of business at 500 E. Cheyenne Avenue, Clark County, North Las Vegas, Nevada 89030-8030, and which did business within the State of California. Plaintiffs are further informed and believe and thereon allege that SSH and its owners, officers and directors knowingly and intentionally sought and obtained the aid and assistance of Defendants in perpetrating the fraudulent scheme alleged herein. On or about February 4, 2008, SSH filed bankruptcy in United States Bankruptcy Court, District of Nevada (Las Vegas – Bankruptcy Petition No. 08-10936). Because of the effect of the automatic stay under 11 U.S.C. §362, SSH cannot properly be made – and is not – a party to this case. However, SSH and Defendants aided and abetted each other in the unlawful, fraudulent and deceptive activities alleged herein.

**E. Doe Defendants**

22. The true names and capacities (whether individual, corporate, or otherwise) of Defendants Does 1 through 25, inclusive, are unknown to plaintiff. Therefore, plaintiffs sue those Defendants by such fictitious names pursuant to Code Civ. Proc. § 474. Plaintiffs further allege that each fictitious Defendant is in some manner responsible for the acts and occurrences alleged herein. Plaintiffs will seek leave of this Court to amend this Complaint to state the true names and capacities of said fictitiously named Defendants when the same have been ascertained. Plaintiffs are further informed and believe and thereon allege that the fictitiously named Defendants proximately caused their damages.

23. Defendants, and each of them, are sued both based upon their individual liability under the UCL and as participants, aiders and abettors of SSH in the wrongful activities complained of herein, and their liability arises from the fact that each has engaged in all or part of the improper acts, plans, schemes, or transactions complained of herein.

24. Each of the Defendants named herein acted as the co-conspirator, agent, joint

venturer or alter ego of or for the other Defendants and SSH with respect to the acts, violations, and common course of conduct alleged herein or is otherwise liable.

## III. CLASS ALLEGATIONS

25. This action is brought by Plaintiffs pursuant to California Code of Civil Procedure Section 382 on behalf of the two following proposed classes ("Proposed Classes"):

**KeyBank Proposed Class**

Only California residents who 1) enrolled in SSH, 2) either borrowed their SSH tuition from KeyBank or co-signed on behalf of such a borrower, 3) executed a "Master Student Loan Promissory Note" (or similarly titled agreement) that failed to contain the "Holder Rule Notice" required by 16 C.F.R. § 433.2, 4) failed to complete their SSH educational program prior to SSH filing bankruptcy, and 5) remain obligated to KeyBank on their Note in a principal amount (i.e., exclusive of interest and costs) less than $75,000.

**SLX/AES Proposed Class**

Only California residents who 1) enrolled in SSH, 2) either borrowed their SSH tuition from SLX/AES (or their predecessors in interest) or co-signed on behalf of such a borrower, 3) executed a "Application/Master Promissory Note" (or similarly titled agreement) that failed to contain the "Holder Rule Notice" required by 16 C.F.R. § 433.2, 4) failed to complete their SSH educational program prior to SSH filing bankruptcy, and 5) remain obligated to SLX/AES on their Note in a principal amount (i.e., exclusive of interest and costs) less than $75,000.

26. Plaintiffs and the Proposed Classes seek certification of claims against Defendants for injunctive relief pursuant to the section 17204 of the UCL.

27. This action is brought as a class action and may properly be so maintained pursuant to the provisions of California Code of Civil Procedure section 382. Plaintiffs reserve the right to modify each Proposed Class definition and the class period pursuant to discovery that

Pinnacle Law Group LLP
425 California Street
Suite 1800
San Francisco, CA 94104
(415) 394-5700

is conducted hereafter.

28. **Numerosity of the Proposed Classes:** Plaintiffs are informed and believe and thereon allege that each Proposed Class, while being comprised of less than 100 individuals, is nevertheless sufficiently numerous that their individual joinder is impractical. The precise identities, numbers and addresses of members of each Proposed Class is unknown to the Plaintiffs, but may and should be known with proper and full discovery of Defendants, third parties, and their respective records.

29. **Existence of Common Questions of Fact and Law.** There is a well-defined commonality and community of interest in the questions of fact and law involved affecting the members of each Proposed Class. The common questions of law and fact as to each Proposed Class include, but are not limited to:

a) Whether Defendants engaged in "commerce" in making the Loans to the Proposed Class;

b). Whether Defendants and SSH were affiliated with each other or had a business arrangement in connection with SSH's solicitation of prospective students and offering of tuition financing from Defendants;

c) Whether Defendants and SSH intentionally violated FTC regulations by knowingly and intentionally omitting the required Holder Rule Notice from the Notes and insisting SSH omit the language from the Service Contract Agreements thereby enabling Defendants to argue in litigation with California residents that the Holder Rule is inapplicable to it as a matter of law because the Notice is in neither the Service Contract Agreements nor the Note;[3]

d) Whether California or Ohio Choice of Law rules apply;

e) Whether Defendants' fraudulent and deceptive acts in violation of 16 C.F.R. 433.2 (i.e., by failing to include the required language in the Note ) constitute a predicate

[3] In numerous reported and unreported cases, KeyBank has argued the oxymoron that the FTC's Holder Rule Notices *requirement* is "voluntary", such that if KeyBank or SSH chose to not include the prescribed language in their respective documentation, the Rule cannot be applied to KeyBank. This, of course, is completely contrary to the language and remedial purpose of the Holder Rule.

PRIVACY LAW GROUP LLP
425 CALIFORNIA STREET
SUITE 1000
SAN FRANCISCO, CA 94104
(415) 394-5700

unlawful, unfair or deceptive act or practice under the UCL;

f) Whether the Defendants and SSH aided and abetted each other in carrying out their conduct alleged herein.

30. **Typicality**: Plaintiffs claims are typical of the claims of the members of each Proposed Class because 1) Plaintiffs satisfy each of the criteria of each Proposed Class; 2) all other members of each Proposed Class have suffered or will suffer the identical harm as each Proposed Class' plaintiff representative as a result of Defendants' violations of law as alleged herein; 3) the sole remedy sought by Plaintiffs, injunctive relief, is also sought by each of the other members of each Proposed Class and is directed towards Defendants' conduct perpetrated on each Proposed Class as a whole.

31. **Adequacy**: Plaintiffs are adequate representatives of each Proposed Class because their interests do not conflict with the interests of the members of each Proposed Class they seek to represent. Plaintiffs have retained competent counsel for this class action and Plaintiffs intend to prosecute this action vigorously. Plaintiffs and its counsel will fairly and adequately protect the interests of the members of each Proposed Class.

32. **Predominance and Superiority**. This suit may also be maintained as a class action under Code of Civil Procedure section 382 because questions of fact and law common to each Proposed Class predominate over the questions affecting only individual members of the classes and a class action is superior to other available means for the fair and efficient adjudication of this dispute. The injury suffered by each individual class member may be disproportionate to the burden and expense of individual prosecution of complex and extensive litigation to proscribe Defendants' conduct and practices. Additionally, effective redress for each and every class member against Defendants may be limited or even impossible where serial, duplicitous, or concurrent litigation occurs on these disputes. Even if individual class members could afford or justify the prosecution of their separate claims, the court system may not be up to the task. Individualized litigation may lead to incongruous and conflicting judgments against Defendants. To the contrary, a class action procedure involving all class members, Defendants and the court present fewer management difficulties, and provide the

Pinnacle Law Group LLP
425 California Street
Suite 1800
San Francisco, CA 94104
(415) 394-5700

benefit of a single adjudication, economy of scale, and judicial efficiency and fairness.

33. Defendants have created and seek to enforce an unlawful, unfair and deceptive contract through unfair and deceptive acts and practices in violation of both federal and California State consumer protection law as set forth further herein. This action is therefore appropriate and necessary under California Code of Civil Procedure section 1021.5 to enforce an important public interest and to deter and enjoin future illegal activity by Defendants.

## IV. GENERAL ALLEGATIONS

### A. SSH's Fraudulent Scheme

34. SSH lured its students, including Plaintiffs and members of each Proposed Class, into its Ponzi scheme through the use of carefully orchestrated mass media advertising, CDs, and "Career Opportunity Seminars" (the "Seminars") conducted throughout California. The Seminars were advertised on radio and in print media and were designed to draw hundreds of prospective students to each Seminar. At the Seminars, SSH executives and employees used prepared videos and standardized marketing materials that promised prospective students a lucrative and exciting career piloting commercial helicopters within 18 months, fully financed by Defendants. SSH conducted the Seminars at their flight school locations (in Plaintiffs' cases, in Oakland) flanked by helicopters and flight simulators which prospective students were invited to "touch and feel" so they could experience the excitement of being a commercial helicopter pilot.

35. During the Seminars, SSH executives and employees used standardized infomercial-type sales pitches such as enticing Plaintiffs with sweeping promises of glorious careers as helicopter pilots while also empathizing with their unhappiness with their current careers. SSH went to great lengths to convince prospective students that there was a shortage of helicopter pilots in the United States and the future demand would be great. SSH provided purported job statistics for the helicopter pilot market showing that the number of pilots had shrunk dramatically and that the "helicopter pilot shortage" was only going to worsen in the coming years. SSH also preached how attainable a career was for each Plaintiff, giving examples such as how even a 63 year old woman SSH student was hired as a pilot.

36. Because SSH knew that most of the prospective students had limited income and

Pinnacle Law Group LLP
425 California Street
Suite 1800
San Francisco, CA 94104
(415) 394-5700

financial resources, SSH also knew that most of the attendees were unable to afford the nearly $70,000 per student tuition. But in each of the Seminars SSH specifically and expressly addressed this concern by explaining that those chosen to be students would be provided with low interest loans through an arrangement SSH had established with Defendants. Plaintiffs are informed and believe and thereon allege that Defendants created, reviewed, approved and/or ratified SSH's sales presentation as it related to Defendants' loan program.

37. Plaintiffs are informed and believe and thereon allege that during the "interview" process, SSH made the members of each Proposed Class believe they were among a select few "Top Guns" chosen for admission to SSH. Plaintiffs are further informed and believe and thereon allege, however, that in reality SSH accepted practically anyone who was willing to pay the tuition fee, either on their own or with a loan from Defendants (and who could qualify for a loan based upon a cursory credit check).

38. During the Seminars, SSH disseminated uniform enrollment materials, including application forms, exemplar Service Contract Agreements and loan information materials provided to it by Defendants. Plaintiffs are informed and believe and thereon allege that Defendants provided SSH employees with Defendants' business cards to disseminate to interested prospective students.

39. SSH represented during the Seminars and in the Service Contract Agreements that the tuition would cover the cost of education to enable the student to obtain their Private Rating, Commercial Rating, Certified Flight Instructor Rating, External Load, Instrument Rating, and Turbine Transition (collectively "Promised Education"). The Service Contract Agreements expressly required that all training be completed within 18 months of the start of class. Therefore, SSH expressly and impliedly represented to prospective students that there would be adequate training equipment, sufficient instructors and maintenance personnel to enable a reasonably diligent student to complete the Promised Education within the contractually required timeframe.

40. Plaintiffs are informed and believe and thereon allege that because SSH's executives were stealing and misusing company funds – including the Proposed Classes' loan

Pinnacle Law Group LLP
425 California Street
Suite 1800
San Francisco, CA 94104
(415) 394-5700

proceeds obtained from Defendants – for their own personal benefit and enjoyment, SSH knew it did not have and never would have sufficient equipment, trainers or maintenance personnel to meet its obligations under the Service Contract Agreements. Thus, although the Service Contract Agreements provided that students were to complete their training within 18 months, when that time period expired for each student, the student was told to request an extension from Defendants, give Defendants another estimated date of completion and SSH would provide the signature of someone from SSH verifying that Plaintiffs were still currently enrolled. This further reinforced the appearance of a collaborative relationship between SSH and Defendants.

**B. The F.T.C. Holder Rule**

41. In 1976, the Federal Trade Commission promulgated 16 C.F.R. part 433, intended to address the problem of consumer liability to financial institutions that finance the purchase of defective goods in consumer credit transactions. As explained in the FTC's *Staff Guidelines on Trade Regulation Rule Concerning Preservation of Consumers' Claims and Defenses*, the purpose of the regulation was to make it impossible "for a seller to arrange credit terms for buyers which separate the consumer's legal duty to pay from the seller's legal duty to keep his promises." The Holder Rule provides:

> In connection with any sale or lease of goods or services to consumers, in or affecting commerce as "commerce" is defined in the Federal Trade Commission Act, **it is an unfair or deceptive act or practice** within the meaning of section 5 of that Act for a seller, directly or indirectly, to:
>
> (a) Take or receive a consumer credit contract which fails to contain the following provision in at least ten point, bold face, type:
>
> NOTICE
>
> ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.
>
> or
>
> (b) Accept, as full or partial payment for such sale or lease, the proceeds of any purchase money loan (as purchase money loan is defined herein), unless any consumer credit contract made in connection with such purchase money loan contains the following provision in at least ten point, bold face, type:

///

Pinnacle Law Group LLP
425 California Street
Suite 1800
San Francisco, CA 94104
(415) 394-5700

NOTICE

ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER. [Emphasis Added]

42. The Notes and Service Contract Agreements are "Consumer Credit Contracts" under Section 433.1(i) of the Holder Rule and the loans made by Defendants to Plaintiffs and the Proposed Classes evidenced by the Notes are "Purchase Money Loans" under Section 433.1(d).

43. In enacting the Holder Rule, the FTC noted that loans pertaining to vocational schools, in particular, were an arena where the rule was needed. In its Statement of Basis and Purpose, the FTC declared that "the rule expressly applies to credit contracts arising from sales of services, such as trade or vocational school agreements..." *Guidelines on Trade Regulation Rule concerning Preservation of Consumers' Claims and Defenses*, 41 Fed. Reg. 20022, 20024. The FTC has repeatedly stated that the Holder Rule applies to student loans.

**C. KeyBank's Complicity in SSH's Fraudulent Scheme**

44. Kilgore/Fuller are informed and believe and thereon allege that KeyBank was SSH's preferred lender during 2003 and 2004.

45. Kilgore/Fuller are informed and believe and thereon allege that KeyBank not only deliberately ignored the red flags of SSH's fraudulent scheme but actively participated in that scheme by facilitating the loans, enabling SSH to violate the Holder Rule and insulating both SSH and itself from liability by omitting and causing SSH to omit the Holder Rule Notice from the relevant consumer credit transaction documents. KeyBank did so through an arrangement with SSH perpetrated on Kilgore/Fuller and the KeyBank Proposed Class that entailed using SSH to solicit the prospective students, refer those students to KeyBank and process the students' loan applications on behalf of KeyBank, all the while knowing that if SSH failed to deliver the contracted for educational services, the students would nevertheless remain obligated to KeyBank and would be unable to assert defenses against KeyBank that it had against SSH.

46. Kilgore/Fuller are informed and believe and thereon allege that KeyBank specifically conspired with Airola and other SSH executives to insure that the students' entire tuition was disbursed to SSH in short order.

47. Kilgore/Fuller are informed and believe and thereon allege that KeyBank and SSH

Pippacle Law Group LLP
425 California Street
Suite 1800
San Francisco, CA 94104
(415) 394-5700

entered into a formal contract as defined in Section 433.1(f) or, alternatively, an informal understanding, procedure, course of dealing, or arrangement (hereinafter, collectively "Business Arrangement") that was designed to aid and assist SSH in signing up students who would then finance their tuition through KeyBank. SSH's Flight Academy Application contains the following provision that indentified KeyBank as SSH's preferred lender:

> Finance Preference: There are student loans available to those who do not have the means to pay for their education in full. These loans are available OAC to qualified applicants. A full disclosure of the terms and conditions for student loans is available at ww.key.com/aviation or 1-800-KEY-LEND [Key Education Resources, a division of KeyBank]. **By signing this application, you give Silver State Helicopters permission to apply for a student loan on your behalf [Emphasis added].** Loan approval alone does not guarantee you enrollment in our Flight Academy Program, nor does it obligate you to any debt if you do not attend the Program. If you do not want a loan application processed on your behalf, please initial here . You can often expedite the financing process by indicating your credit situation.
>
> Please Check One. (optional) **Primary (Good Credit History)** ______ **Secondary (May Not Qualify)** ______ **Not Sure** ______
>
> **By adding a qualified co-signer to your loan application you may increase your chances of being approved and/or lower the cost of your loan, If you wish to add a co-signer, please provide the following information:**

48. Kilgore/Fuller are informed and believe and thereon allege that as part of the Business Arrangement, KeyBank reviewed, approved and/or ratified the Flight Academy Application and agreed that SSH would act as its agent for processing prospective SSH student loan applications including, but not limited to: i) promoting KeyBank as the preferred provider of tuition loans, ii) disseminating KeyBank's credit applications and related documents and information to prospective students, (iii) permitting SSH to apply for the loans on the prospective student's behalf, (iv) receiving credit information from prospective students and transmitting that information to KeyBank, and (v) overseeing execution and transmission to KeyBank of the Notes.

49. Kilgore/Fuller are informed and believe and thereon allege that SSH/KeyBank's Business Arrangement was generally carried out by, among other means, the following:

a. During the Seminars, SSH would have an "enrollment person" solicit students to apply for loans from KeyBank at the time they completed their SSH application;

b. Prospective students would complete their SSH application and loan application,

Firestone Law Group LLP
425 California Street
Suite 1900
San Francisco, CA 94104
(415) 391-5700

both of which would be faxed by either the enrollment person or the prospective student to SSH's corporate offices in Las Vegas, Nevada. SSH would, after weeding out those applicants with unacceptable credit, transmit the application(s) to KeyBank;

c. KeyBank would approve the loan, prepare the Note and transmit it to SSH which upon receiving the Note would give it to the prospective student. Kilgore/Fuller are further informed and believe and thereon allege that KeyBank required and directed SSH to use only its form of the Note and refused to accept any Note which contained the Holder Rule notice;

d. The prospective Student would sign note either at their local SSH California facility or at home and return it to the local SSH office;

e. The local SSH office would, after taking or receiving the Note, then send the executed Note to SSH's corporate offices in Las Vegas which would then send it to KeyBank in Ohio.

50. Kilgore/Fuller are informed and believe and thereon allege that at the request of KeyBank and on KeyBank's behalf, SSH employed "student finance managers" whose responsibility was to interact with Kilgore/Fuller and members of the KeyBank Proposed Class regarding financing tuition through KeyBank.

51. Kilgore/Fuller are informed and believe and thereon allege that neither KeyBank nor SSH informed any members of the KeyBank Proposed Class of the existence of, purpose for or terms of the Holder Rule.

52. Kilgore/Fuller are informed and believe and thereon allege that with respect to themselves and each member of the KeyBank Proposed Class, KeyBank fully funded the entire Loan amount to SSH before the students could possibly have completed or did actually complete their education with SSH.

53. Kilgore/Fuller are informed and believe and thereon allege SSH has only graduated a small percentage of students from its California schools, none of which are members of the KeyBank Proposed Class in this action.

54. On or about February 4, 2008, after receiving the entirety of Kilgore/Fuller's and members of the KeyBank Proposed Class' tuition, directly or indirectly, from KeyBank, SSH

Pirrancez Law Group LLP
425 California Street
Suite 1800
San Francisco, CA 94104
(415) 394-6700

ceased doing business and filed for bankruptcy. Kilgore/Fuller and the KeyBank Proposed Class have valid defenses against SSH and against KeyBank, but KeyBank failed and refused and continues to fail and refuse to discharge Kilgore/Fuller and the KeyBank Proposed Class' obligations on the Notes.

**i. <u>KeyBank's Pattern and Practice of Partnering with Sham Vocational Schools</u>**

55. Kilgore/Fuller have ascertained through investigation that the manner in which they were referred from SSH to KeyBank is part of a pattern of generating business engaged in by KeyBank, and that KeyBank has also disclaimed responsibility for the claims of other consumers whose transactions were financed in the same manner and who have claims arising from their enrollment at vocational schools.

56. KeyBank's involvement with SSH and its treatment of the SSH students is part of a pattern and practice of fraudulent conduct by KeyBank that it has engaged in for many years. Using the U.S. mails and wires, KeyBank has been involved in a deliberate pattern and practice of aiding and abetting fraudulent vocational schools that aggressively induce students into obtaining loans with KeyBank. In fact, Kilgore/Fuller are informed and believe and thereon allege that KeyBank has been involved in numerous *nearly identical scenarios* with other failed vocational schools throughout the country, including but not limited to Makarion Institute of Aeronautics in Chino, California; TABS Express Flight school based in Florida; Sierra Academy of Aeronautics in Oakland, California; Airman Flight School based in Norman, Oklahoma (which trained terrorists involved with 9/11) ; and Excelsior Student Nurses based in Utah (collectively "Failed Vocational Schools").

57. In every instance, KeyBank facilitated and enabled the Failed Vocational Schools to solicit students to enter into student loans with KeyBank and take or receive consumer credit contracts and/or accept payment of purchase money loans for tuition without including the Holder Rule Notice in the consumer credit contract documentation. As with SSH, the Failed Vocational Schools closed their doors prior to providing the agreed upon services and/or filed for bankruptcy. As is the case here, the students of the Failed Vocational Schools failed to receive the bargained-

Freeman Law Group LLP
425 California Street
Suite 1800
San Francisco, CA 94104
(415) 394-6700

for consideration but KeyBank nonetheless demanded payment of the entire loan.

58. Kilgore/Fuller are informed and believe and thereon allege that KeyBank has engaged in a pattern and practice of unfairly and deceptively issuing consumer credit contracts that do not contain the Holder Rule Notice to students for loans used to finance the students' education with KeyBank's partner vocational schools. Kilgore/Fuller are further informed and believe and thereon allege that KeyBank unlawfully, unfairly and fraudulently facilitates its partner vocational schools' violation of the Holder Rule by enabling the schools to 1) take or receive consumer credit contracts without including the Holder Rule Notice, and/or 2) accept as full or partial tuition, the proceeds of purchase money loans (as that term is defined in the Holder Rule) without including the required Holder Rule Notice in the consumer credit contracts made in connection with the students' enrollments and loan.

59. Kilgore/Fuller are informed and believe and thereon allege that KeyBank insures that the partner vocational schools also omit the Holder Rule Notice from agreements with their students. KeyBank has engaged in this pattern and practice of disbursing funds to vocational schools that are legally obligated to refrain from accepting the funds because of the absence of the Holder Rule Notice. Despite this knowledge, KeyBank nonetheless distributes funds to the vocational schools and/or the students, thereby facilitating the schools' violation of federal law.

60. Kilgore/Fuller are informed and believe and thereon allege that KeyBank has also engaged in a pattern and practice of disbursing the students' entire tuition before the schools could possibly provide the educational services to the student borrower and knowing that the school could go out of business. Kilgore/Fuller are further informed and believe and thereon allege that KeyBank did this because once the student was obligated on the loan, KeyBank could package the loan and sell it into the secondary market. KeyBank knew that if it contractually agreed to disburse the funds in relation to the schools' providing educational services, or if it permitted the Holder Rule Notice to be included in the consumer credit transaction documentation, KeyBank would be unable to sell the loans into the secondary market and would necessarily be obligated to return those unused funds to the students if the school closed prior to the students obtaining all of the promised education.

61. Kilgore/Fuller are informed and believe and thereon allege that KeyBank has

Finnegan Law Group LLP
425 California Street
Suite 1000
San Francisco, CA 94104
(415) 394-5700

engaged in the same pattern and practice complained of with numerous other unregulated vocational schools throughout the country.

**ii. KeyBank's Use of Mails and Interstate Wires**

62. Kilgore/Fuller are informed and believe and thereon allege that beginning in or about September 2003 KeyBank used and continues to use the U.S. mail to send to and receive from Kilgore/Fuller and the KeyBank Proposed Class the Notes and other documentation and information concerning the Notes and to communicate with Kilgore/Fuller and the KeyBank Proposed Class about their outstanding "obligations" on the Notes. Kilgore/Fuller are further informed and believe and thereon allege that KeyBank used the U.S. mails and wires to establish its relationship with SSH and to facilitate its communications with SSH's employees who were directed by KeyBank to mail and fax loan applications, enrollment applications, the Notes and other documents to KeyBank for processing. Kilgore/Fuller are further informed and believe and thereon allege that numerous students within the KeyBank Proposed Class used the U.S. mails in communicating with KeyBank through SSH.

63. Kilgore/Fuller are informed and believe and thereon allege that KeyBank funded SSH with Kilgore/Fuller's and the KeyBank Proposed Class' tuition through the use of interstate wires. Kilgore/Fuller are further informed and believe and thereon allege that KeyBank invited students in the KeyBank Proposed Class to make payments on their loans through the use of U.S. mails and/or wires.

64. Kilgore/Fuller are informed and believe and thereon allege that, based on normal bank practices with respect to the origination of consumer credit transactions, KeyBank used interstate wire transmissions with credit reporting agencies in order to select the consumers with respect to which it engaged in the conduct complained of. The use of wire communications with credit reporting agencies was material, if not essential, to the commission of the scheme complained of herein, because the object of the scheme was to get the consumer's money, and KeyBank therefore had to determine if the consumer was creditworthy and able to pay money.

**D. SLX/AES's Complicity in SSH's Fraudulent Scheme**

65. Wilhelmy is informed and believes and thereon alleges that SLX/AES was SSH's

preferred lender in California between 2005 and 2006.

66. Wilhelmy is informed and believes and thereon alleges that SLX/AES not only deliberately ignored the numerous red flags of SSH's fraudulent scheme but purposefully facilitated that scheme by directly soliciting SSH students to enter into loans with SLX/AES to fund their SSH tuition. Wilhelmy is further informed and believes and thereon alleges that in violation of federal consumer protection regulations and California consumer protection laws SLX/AES intentionally, unfairly and deceptively omitted the Holder Rule Notice from its loan documents and directed SSH to do the same with its Service Contract Agreements.

67. Wilhelmy is further informed and believes and thereon alleges that SLX/AES' funding of the SSH loans unlawfully, unfairly and fraudulently facilitated SSH's violation of federal and state consumer protection laws by enabling SSH to 1) take or receive consumer credit contracts without the Holder Rule Notice, and/or 2) accepting as full or partial tuition, the proceeds of purchase money loans (as that term is defined in the Holder Rule) without including the required Holder Rule Notice in the consumer credit contracts made in connection with the students' enrollments and loan.

68. Wilhelmy is informed and believes and thereon alleges that SLX/AES disbursed the students' entire tuition before SSH could possibly provide the educational services to the student borrower and knowing that SSH could go out of business. Wilhelmy is further informed and believes and thereon alleges that SLX/AES did this because once the student was obligated on the loan, SLX/AES could package the loan and sell it into the secondary market. SLX/AES knew that if it contractually agreed to disburse the funds in relation to the schools' providing educational services, or if it permitted the Holder Rule Notice to be included in the consumer credit transaction documentation, SLX/AES would be unable to sell the loans into the secondary market and would necessarily be obligated to return those unused funds to the students if the school closed prior to the students obtaining all of the promised education.

69. Wilhelmy is informed and believes and thereon alleges that SLX/AES aided and assisted SSH in its fraudulent scheme by, among other things, having SLX/AES employees, known as Financial Aid Managers, attend the Seminars for the sole purpose of soliciting students to enter into SLX/AES promissory notes at the SSH seminars. The SLX/AES Financial Aid Managers handed SLX/AES loan documents to the students at the SSH seminars and personally counseled students regarding the SLX/AES loans. SLX/AES engaged in this activity knowing

Pinnacle Law Group LLP
425 California Street
Suite 1800
San Francisco, CA 94104
(415) 394-5700

that if SSH failed to deliver the contracted for educational services, the students would nevertheless remain obligated to SLX/AES and would be unable to assert defenses against SLX/AES that it had against SSH.

70. Wilhelmy is informed and believes and thereon alleges that SLX/AES and SSH entered into a formal contract as defined in Section 433.1(f) or, alternatively, an informal understanding, procedure, course of dealing, or arrangement (hereinafter, collectively "Business Arrangement") that provided SLX/AES exclusive access to the students at the SSH seminars in order to entice the students to enter into SLX/AES "Application/Master Promissory Notes."

71. Wilhelmy is informed and believes and thereon alleges that SSH-SLX/AES' Business Arrangement was generally carried out by, among other means, the following:

a. During the Seminars, SSH would grant SLX/AES Financial Aid Managers exclusive access to solicit students to apply for loans from SLX/AES to fund their SSH tuition at the time they completed their SSH application;

b. Prospective students would complete their SSH application and SLX/AES Application/Master Promissory Note at the SSH California facility with the joint assistance of both SLX/AES employees and SSH employees working in concert. The complete documents would then be faxed by either an SSH employee or the prospective student to SSH's corporate offices in Las Vegas, Nevada. SSH would, after weeding out those applicants with unacceptable credit, transmit the application(s) to SLX/AES;

c. SLX/AES would approve the loan, prepare the Note and transmit it to SSH which, in turn, would give it to the prospective student. Wilhelmy is further informed and believes and thereon alleges that SLX/AES required and directed SSH to use only its form of the Note and refused to accept any Note which contained the Holder Rule notice;

d. The prospective student would sign the note either at their local SSH California facility or at home and return it to the local SSH office;

e. The local SSH office would then send the executed Note to SSH's corporate offices in Las Vegas which would then send it to SLX/AES.

72. Wilhelmy is informed and believes and thereon alleges that neither SLX/AES nor

Pinnacle Law Group LLP
425 California Street
Suite 1800
San Francisco, CA 94104
(415) 394-5700

SSH informed any members of the SLX/AES Proposed Class of the existence of, purpose for or terms of the Holder Rule.

73. Wilhelmy is informed and believes and thereon alleges that with respect to his loan and that of each member of the SLX/AES Proposed Class, SLX/AES fully funded the entire Loan amount to SSH before the student could possibly have completed or did actually complete their education with SSH.

74. Wilhelmy is further informed and believes and thereon alleges that SSH has only graduated a small percentage of students from its California schools, none of which are members of the SLX/AES Proposed Class in this action.

75. On or about February 4, 2008, after receiving the entirety of Wilhelmy's and members of the SLX/AES Proposed Class' tuition, directly or indirectly, from SLX/AES, SSH ceased doing business and filed for bankruptcy. Wilhelmy and the SLX/AES Proposed Class have valid defenses against SSH and against SLX/AES but SLX/AES failed and refused and continues to fail and refuse to discharge Wilhelmy's and the SLX/AES Proposed Class' obligations on the Notes.

**FIRST CAUSE OF ACTION**

**Violation of Unfair Competition Law (B&P Section 17200, et seq.)**
**(Against all Defendants and DOES 1 through 20)**

76. Plaintiffs re-allege and incorporate by reference each and every allegation set forth in paragraphs 1 through 75 above, as though they are set forth in full.

77. Defendants violated and continue to violate the UCL by engaging in and proposing to engage in unfair competition by means of the following unlawful, unfair and fraudulent acts and practices:

a. Knowingly and intentionally omitting from its Note the Holder Rule Notice despite Defendants' knowledge that the Note was a Consumer credit contract for a Purchase Money Loan as those terms are defined in Section 433.1 and that their failure to include the required Notice in the Note is an unfair or deceptive act or practice under the FTC Holder Rule;

b. Knowingly and intentionally ensuring that SSH omitted from its Service

Contract Agreements the Holder Rule Notice despite Defendants' knowledge that failure to include such Notice was an unfair or deceptive act or practice under FTC regulations;

c. As to KeyBank, knowingly, intentionally or recklessly authorizing and/or appointing SSH to act as KeyBank's agent for soliciting loans to Kilgore/Fuller and the KeyBank Proposed Class for educational services KeyBank knew or should known could not and would not be provided;

d. As to SLX/AES, having its employees participate in the Seminars and directly solicit loans to Wilhelmy and the SLX/AES Proposed Class for educational services SLX/AES knew or should known could not and would not be provided;

e. Ratifying SSH's unlawful, unfair and fraudulent acts and practices by making loans to Plaintiffs and the Proposed Classes;

f. Knowingly and intentionally making full or partial payment to SSH of the proceeds of the Loans with the knowledge that SSH had the legal duty to include the Holder Rule Notice in the Service Contract Agreements but failed to do so.

g. Knowingly and intentionally facilitating and enabling SSH's unlawful acceptance from Defendants and/or the Proposed Classes of the full or partial proceeds of the Loans with the knowledge that Defendants' Notes did not include the Holder Rule Notice.

h. Knowingly and intentionally facilitating and enabling SSH's unlawful acceptance from Defendants and/or the Proposed Classes of the full or partial proceeds of the Loans with the knowledge that the Service Contract Agreements did not include the Holder Rule Notice.

i. Knowingly and intentionally facilitating and enabling SSH's unlawful taking and/or receiving from the Proposed Classes the Notes which failed to include the Holder Rule Notice.

Pinnacle Law Group LLP
425 California Street
Suite 1800
San Francisco, CA 94104
(415) 394-5700

j. Knowingly and intentionally facilitating and enabling SSH's unlawful taking and/or receiving from the Proposed Classes the Service Contract Agreements which failed to include the Holder Rule Notice.

k. Knowingly and intentionally disbursing the students' entire tuition before the students could possibly have completed or did actually complete the required training so as to maximize the value of the Notes for securitization purposes and to maximize the students' liability.

78. Plaintiffs and each member of the Proposed Classes have suffered injury in fact and have lost money or property as a result of the Defendants' violations of the UCL as alleged herein.

79. Plaintiffs are entitled under the UCL to a preliminary and permanent mandatory and/or prohibitory injunction as prayed for herein.

WHEREFORE, Plaintiffs pray for judgment and relief against Defendants, and each of them, as set forth below.

**SECOND CAUSE OF ACTION**
**Aiding and Abetting Fraud**
**(Against all Defendants and DOES 1 through 20)**

80. Plaintiffs re-allege and incorporate by reference each and every allegation set forth in paragraphs 1 through 79 above, as though they are set forth in full.

81. Defendants aided and abetted SSH by knowingly, intentionally or recklessly facilitating SSH's fraudulent scheme by providing unlawful, unfair and fraudulent loans to Plaintiffs and the members of the Proposed Classes, the proceeds of which Defendants knew, or should have known, SSH used to further its Ponzi scheme. Defendants further aided and abetted SSH by, among other things:

a. Knowingly and intentionally making full or partial payment to SSH of the proceeds of the Loans with the knowledge that SSH had the legal duty to include the Holder Rule Notice in the Service Contract Agreements but failed to do so;

b. Knowingly and intentionally facilitating and enabling SSH's unlawful

Pinnacle Law Group LLP
425 California Street
Suite 1800
San Francisco, CA 94104
(415) 394-5700

acceptance from Defendants and/or the Proposed Classes of the full or partial proceeds of the Loans with the knowledge that Defendants' Notes did not include the Holder Rule Notice;

c. Knowingly and intentionally facilitating and enabling SSH's unlawful acceptance from Defendants and/or the Proposed Classes of the full or partial proceeds of the Loans with the knowledge that the Service Contract Agreements did not include the Holder Rule Notice;

d. Knowingly and intentionally facilitating and enabling SSH's unlawful taking and/or receiving from the Proposed Classes the Notes which failed to include the Holder Rule Notice;

e. Knowingly and intentionally facilitating and enabling SSH's unlawful taking and/or receiving the Service Contract Agreements which failed to include the Holder Rule Notice.

82. As a direct and legal result of Defendants' aiding and abetting of SSH, SSH was able to perpetrate its fraudulent scheme on Plaintiffs and the Proposed Classes. Plaintiffs are informed and believe and thereon allege that but for Defendants' aid and assistance, SSH would not have been able to successful perpetrate its fraud on Plaintiffs and the Proposed Classes.

83. As a proximate result of the conduct of Defendants in aiding and abetting SSH's fraudulent scheme as alleged herein, Plaintiffs have suffered injury in fact and have lost money and property and are entitled to injunctive relief as set forth below.

WHEREFORE, Plaintiffs pray for judgment and relief against Defendants, and each of them, as set forth below.

**THIRD CAUSE OF ACTION**
**Violation of Racketeering Influenced and Corrupt Organization Act ("RICO")**
**(Alleged by Kilgore/Fuller and the KeyBank Proposed Class Against KeyBank and Does 21-25)**
**(18 U.S.C. 1962 §§ *et seq.*)**

84. Plaintiffs re-allege and incorporate by reference each and every allegation set forth in paragraphs 1 through 83 above, as though they are set forth in full.

85. The corporate group of which KeyBank is a part is an enterprise within the

Pinnacle Law Group LLP
425 California Street
Suite 1800
San Francisco, CA 94104
(415) 394-5700

meaning of 18 U.S.C. §1961(4). Its activities affect interstate commerce.

86. KeyBank devised and implemented the scheme described in paragraphs 44-64. This scheme constitutes a scheme or artifice to defraud, within the meaning of 18 U.S.C. § 1341 and 18 U.S.C. § 1343.

87. As described above, the mails and interstate wires were used for the purpose of executing this scheme and artifice.

88. KeyBank conducted and participated in the conduct of the affairs of the enterprise described above through the scheme described above, in violation of 18 U.S.C. § 1962(c).

89. Kilgore/Fuller and each member of the KeyBank Proposed Class suffered pecuniary injury as a result of these violations.

WHEREFORE, Plaintiffs pray for judgment and relief against Defendants, and each of them, as follows:

**PRAYER FOR RELIEF**

1. For an order and judgment preliminarily and permanently enjoining Defendants and each of them from reporting to any credit agency any default by Plaintiffs or the Proposed Classes under the Notes;

2. For an order and judgment preliminarily and permanently enjoining Defendants and each of them from enforcing the Notes against Plaintiffs and the Proposed Classes or taking any action in furtherance of enforcement efforts;

3. For such other orders or judgments as the Court may consider necessary to prevent the use or employment by Defendants of any practice which constitutes unfair competition under the UCL;

///

///

///

///

///

///

Pinnacle Law Group LLP
425 California Street
Suite 1800
San Francisco, CA 94104
(415) 394-5700

4. For attorneys' fees pursuant to California Code of Civil Procedure §1021.5 and 18 U.S.C. 1964(c);

5. For statutory costs of suit herein; and

6. For such other and further relief as the Court may deem proper.

DATED: June 10, 2008

PINNACLE LAW GROUP LLP

By: [signature]
Andrew A. August, Attorneys for Plaintiffs

PINNACLE LAW GROUP LLP
425 CALIFORNIA STREET
SUITE 1800
SAN FRANCISCO, CA 94104
(415) 394-5700

# EXHIBIT A


February 13, 2008

# Helicopter School Closes, Leaving Students in Lurch

By STEVE FRIESS

LAS VEGAS — A helicopter flight training school run by a prominent Republican fund-raiser in Nevada has declared bankruptcy, leaving students in 18 states responsible for hundreds of thousands of dollars in uninsured student loans.

Now lawyers for several students say they plan to file lawsuits accusing the executive, Jerry Airola, of operating the flight school, Silver State Helicopters, which is based here, as a pyramid scheme that led to the company's closing on Feb. 4.

The closing also forced the layoffs of 750 employees at 33 locations, and the bankruptcy declaration halted a binding-arbitration proceeding meant to settle the complaints of 40 students who filed an earlier lawsuit accusing the company of fraudulent business practices. Those students, along with dozens of others across the nation, are working with lawyers in an effort to pursue refunds of at least some of the tuition of about $70,000 that Silver State charged each student.

Despite having enrolled thousands of students since its founding in 1999, the company had less than $50,000 in assets against $10 million in debt, according to its bankruptcy filing.

A spokesman for Eos Partners, the New York venture capital company that paid $30 million last August to secure a 60 percent interest in Silver State, attributed the closing to dwindling enrollment. "There weren't enough students coming in with the funds to sustain the business," the spokesman, Michael Freitag, said.

Mr. Freitag said a sharp downturn in the student-loan market last fall curtailed the school's ability to secure financing for new students and caused the decline in enrollment.

The attorneys general in Oregon and California are looking into the company's activities.

"We have an interest in protecting students in these schools," said Gareth Lacy, a spokesman for the California attorney general. "With the school going bankrupt, we're not sure there is anything left."

A hearing to examine Silver State's holdings in Federal Bankruptcy Court here, set for Monday, was canceled.

Troy Swezey, 40, a parking valet on the Strip, is one of many students who financed his tuition by taking out private loans arranged by Silver State. The program was especially attractive, Mr. Swezey said, because the loans would not start coming due for two years, theoretically giving students time to get through the 18-month program and land a job. Most flight-school programs are pay as you go; Silver State collected all the money up front.

EXHIBIT A

Mr. Swezey and other students complained that the school never had enough operable aircraft or available flight instructors to allow them to complete the program within 18 months. Mr. Swezey said he enrolled in May 2006 and was far from securing his commercial pilot's license.

"If you hire a painter to paint your house and you give him all the money, why should he quit painting your house in the middle just because he can't get any other houses to paint?" asked Mr. Swezey, whose first loan payment is due in May. He has calculated that the 10.5 percent interest on his 20-year loan means he owes nearly $200,000.

Mr. Airola, who continued as chief executive officer and minority owner of the company after the Eos investment, did not return calls for comment. Days before the bankruptcy declaration, he was a host at a Nevada Republican Party fund-raiser here attended by President Bush.

Lawyers for the students said that what Mr. Freitag described was a classic pyramid scheme in which the company was constantly on the hunt for new capital to pay its prior commitments. They note that in 2006, Inc. magazine named it the 12th-fastest-growing private company in the United States.

"The students were afraid to speak out along the way because they didn't want to be thrown out of the program, and they were afraid they'd lose all their money," said Peter C. Lown, a lawyer in Jonesboro, Ga., who is representing some of the Arizona students.

Jody Pidruzny, who was a financial aid officer and an enrollment officer at the school's headquarters here, said her fiancé completed the program in Washington State in 10 months.

"I was involved when it was a very, very small operation, and I know without a shadow of a doubt it was never intended to be a pyramid scheme," Ms. Pidruzny said. "Our goal was to grow a commercial operation and use the flight schools to employ our graduates in commercial operations. It never got off the ground."

Mr. Airola is not new to controversy in Las Vegas. In 2006, he spent $4 million of his own money to run for Clark County sheriff, but he lost in a landslide when it was revealed that his claims of having been a police officer in California were false.

Nonetheless, Mr. Airola remained a figure in the state's Republican establishment, serving on the transition team of Gov. Jim Gibbons in late 2006. Last month, the governor appointed Mr. Airola to the Nevada Economic Development Advisory Board. A spokeswoman for the Mr. Gibbons said the governor was not rethinking that.

"The governor has no plans to ask Mr. Airola to step down, nor does he plan to return any contributions," the spokeswoman, Melissa Subbotin, said Tuesday.

Meanwhile, Mr. Swezey, who said he cast about for a career for eight years after serving in the Army as a Black Hawk helicopter engineer, is despondent.

"The one thing I missed most about the military was being in the air," he said. "I really wanted this career. I don't know what I'll do now."

Case3:08-cv-02958-TEH Document1-4 Filed06/13/08 Page34 of 82

Helicopter School Closes, Leaving Students in Lurch - New York Times Page 3 of 3

Copyright 2008 The New York Times Company

Privacy Policy | Search | Corrections | RSS | First Look | Help | Contact Us | Work for Us | Site Map

http://www.nytimes.com/2008/02/13/us/13vegas.html?_r=1&ref=education&pagewanted=... 5/12/2008

EXHIBIT A

Testimony before the

U.S. SENATE COMMITTEE ON HEALTH, EDUCATION, LABOR AND PENSIONS

regarding

"Ensuring Access to College in a Turbulent Economy"

March 17, 2008

Testimony presented by:

Deanne Loonin (dloonin@nclc.org)

Staff Attorney

National Consumer Law Center (NCLC) and

Director of NCLC's Student Loan Borrower Assistance Project

NATIONAL
CONSUMER LAW
CENTER

77 Summer Street, 10th Floor
Boston, MA 02110
(617) 542-8010
www.consumerlaw.org

EXHIBIT A

**Testimony of Deanne Loonin before the**

**U.S. SENATE COMMITTEE ON HEALTH, EDUCATION, LABOR AND PENSIONS**

**regarding**

**"Ensuring Access to College in a Turbulent Economy"**

**March 17, 2008**

Mr. Chairman and Members of the Committee, the National Consumer Law Center (NCLC) thanks you for inviting us to testify today on ensuring access to college. We offer our testimony here on behalf of our low-income clients. The National Consumer Law Center is a nonprofit organization specializing in consumer issues on behalf of low-income people. We work with thousands of legal services, government and private attorneys, as well as community groups and organizations, from all states that represent low-income and elderly individuals on consumer issues.[1] NCLC's Student Loan Borrower Assistance Project provides information about student loan rights and responsibilities for borrowers and advocates. We also seek to increase public understanding of student lending issues and to identify policy solutions to promote access to education, lessen student debt burdens and make loan repayment more manageable.[2]

## Introduction: The Sky Is Not Falling

As a society, we face many challenges in improving access to higher education. There is a very troubling gap in access to higher education and college completion rates

[1] In addition, NCLC publishes and annually supplements practice treatises which describe the law currently applicable to all types of consumer transactions, including *Student Loan Law* (3d ed. 2006 and Supp.).
[2] *See* the Project's web site at http://www.studentloanborrowerassistance.org.

EXHIBIT A

based on economic class and race. Despite the widespread availability of student loans, low-income families are still about 32% less likely to send their children to college than families with higher incomes. Further, students from low-income families attend public four-year institutions at about half the rate of equally qualified students from high-income families.

We also face the challenge of expanding access during a time of decreased financial support for public higher education institutions, including community colleges. These problems are exacerbated by skyrocketing college costs and concerns about the preparation levels of high-risk students entering college.

These are all serious concerns, some perhaps appropriately characterized as at a "crisis" level. Access to federal student loans is very clearly not on this list. Despite the current volatility in the credit markets, students and parents should have no problems accessing the existing federal student loan programs. In contrast, there may be some disruption in the availability of private student loans, particularly the highest cost loans. However, this is hardly a crisis. Rather, a tighter market for private student loans, if it occurs, should help pull aside the curtain and show the reality that in the long-run expensive credit does not promote equal access to education. Private loans are not a solution to the problem of rising costs.

To the extent there is a crisis for students today, it is that heavy reliance on loans to finance education means that many students come out of college buried in debt. These problems are exacerbated by draconian collection powers that allow the government to pursue student loan borrowers to their graves and even seize Social Security payments.

EXHIBIT A

## Access to Federal Student Loans is Secure

The overall economic crisis has not, will not and should not affect access to federal loans. A few lenders have recently left the business, but there are still over 2,000 lenders participating in the guaranteed loan programs. The few institutions that have experienced problems have been able to line up new lenders. Even the Pennsylvania Higher Education Authority, in its press release announcing its exit from the federal guaranteed loan program, stated that its decision should have minimal effect on students. Some banks, particularly those that are not reliant on outside investors to raise capital, see an opportunity to move more aggressively into federally backed student lending.

Even if more lenders start pulling out of the federal guaranteed loan programs, there is adequate back-up to protect students. These safeguards include the federal Direct loan program and lender as last resort provisions. If a borrower's current lender leaves the program, the borrower will still be able to get virtually the same loans through the Direct loan program or from other FFEL lenders. Borrowers may have to pay slightly more if some of the current incentives are reduced or eliminated, but the additional costs should be minimal and in many cases offset by reductions in interest rates for subsidized loans. Further, the recent expansion of PLUS loans to graduate and professional students makes federal loans even more available to borrowers.

There is no reason to prop up lenders simply to preserve the status quo. The heavy subsidies in the guaranteed loan program evolved in response to lenders' initial reluctance to participate in the program when it was first created. Times have changed. Federal guaranteed loans have been and will continue to be a profitable business. In addition, the Direct loan program, created in the 1990's, helps ensure that borrowers have other choices.

The Department of Education has shown every indication that it is monitoring the situation and has wisely tried to alleviate panic. Congress should follow their lead. It is destructive to mislead students and their families about a crisis that does not exist.

**The Dangers of Private Student Loans**

Private student loans are made by lenders to students and families outside of the federal student loan program. They are not subsidized or insured by the federal government and may be provided by banks, non-profits, or other financial institutions. The borrowing limits in the federal loan programs, the skyrocketing cost of higher education and aggressive lender marketing have fueled the growth of private student loans. Although still a smaller percentage of overall student loans, the yearly growth of private loans is outpacing that of federal loans. Private loans now comprise about 24% of the nation's total education loan volume.

Private student loans are almost always more expensive than the strictly regulated federal loans. This is especially true for borrowers with lower credit scores or limited credit histories. Private loans also do not have the same range of protections for borrowers that government loans have. Further, borrowers are more likely to borrow unaffordable amounts since, unlike most federal loans, there are no loan limits for private loans.

A main reason for the increased supply of private student loans is the profitability of this business. The private loan market has been profitable primarily because originators sell the loans with the intention of packaging them for investors. The market for securitized student loans jumped 76% in 2006, to $16.6 billion, from $9.4 billion in 2005. Student loan asset-based securities (ABS) accounted for about nine percent of total U.S. ABS issuance in 2005.

Lenders must sell a certain amount of loans in order to generate sufficient pools of loans to sell to investors. As a result, creditors make and sell loans to borrowers, but with the specific goal of selling them to investors. Loan products are thus developed for the repackaging rather than to provide the most affordable and sustainable products for borrowers.

Charging the highest rates and adjusting the rates to the most vulnerable consumers has been a recipe for disaster in the mortgage industry. Similar trends are emerging for private student loans. In some cases, the student loans are so expensive that they are destined to fail. In addition, many borrowers run into unexpected life traumas such as disabilities or divorces that ruin their dreams of upward mobility. Regardless, the student loan debt that was supposed to be an investment in their futures is dragging them down.

We work with borrowers every day to help them address these problems. If you ask our client John D. whether there is a crisis, he would not point to a lack of access to credit, but rather the fact that the credit he did get is ruining his future plans. A few years ago, he took out a federal loan and a high-cost private loan to attend a local proprietary school. John withdrew after one semester because the program the school promised he would be able to take was not being offered. John is 23 years old and suffers from severe depression. He has been unable to recover and go back to school and now faces a lawsuit for collection of his private loans.

You will likely hear similar sentiments from the approximately 2,500 former students of Silver State Helicopters, a Nevada-based for-profit flight school that recently went into bankruptcy. Most of these students received private loans to cover costs and are stuck with incomplete educations from a school that has closed, while also facing demands from lenders insisting on repayment.

EXHIBIT A

Similarly, Patrick K. was 22 years old in 2006, just a semester away from graduating from the University of Rhode Island, when his life changed forever. He suffered a terrible accident, falling down a long escalator and suffering severe brain damage. His parents, doctors and nurses have fought hard to keep him alive, but the prognosis is not good. Patrick is in a minimally conscious state and is incapable of consistent communication, fully dependent upon others for all of the activities of daily life. Patrick's family has struggled to find resources to pay for his care. They are also using up their retirement and other resources to retrofit their home so that it will be accessible for Patrick when they bring him home.

Patrick took out federal loans to finance his education and also worked during the summers to earn money for college. His federal loans were discharged based on permanent and total disability. He also used private loans to help fill the gap. To get a better rate, his mother co-signed on the loans. Because Patrick's Mom co-signed, they were able to get a decent interest rate. The problem is the lack of a safety net when this tragedy occurred.

**NCLC Report on The High Cost of Private Student Loans**

In a March 2008 report, NCLC reviewed twenty-eight private loans issued between 2001 and 2006, looking for warning signs and potential problems.[3] Key findings included:

**1. Pricing**

All of the loans in our survey had variable rates. The lowest initial rate in our sample was around 5% and the highest close to 19%. The average initial disclosed annual percentage rate (APR) for the loans in our survey was 11.5%.

[3] See National Consumer Law Center, "Paying the Price: The High Cost of Private Student Loans and the Dangers for Student Borrowers" (March 2008), available at: http://www.studentloanborrowerassistance.org/uploads/File/Report_PrivateLoans.pdf.

EXHIBIT A

Some of the margins were shockingly high. Multiple loans in our survey had margins of close to 10%. The average margin was about 4.8%. A borrower taking out a loan with a margin of 4.8% at the time the report was written would have an initial interest rate of 7.25% plus 4.8% or 12.05%. As a comparison, the average margin for one-year adjustable rate mortgage loans in 2006 was 2.76%.

None of the loans we examined contained a rate ceiling. A few set floors. These floors are particularly unfair for borrowers in an environment of declining interest rates. Nearly all of the loan notes we examined stated explicitly that the borrower's school was a factor in pricing the loan. Pricing based on institution has raised concerns about possible discrimination against borrowers in protected racial groups.

**2. Origination and Other Fees**

There are no limits on origination and other fees for private student loans. According to the loan disclosure statements we reviewed, there were origination charges in all but about 15% of the loans. For those with origination fees, the range was from a low of 2.8% up to a high of 9.9%. The average in our survey was 4.5%. Most of the lenders in the private student notes we surveyed reserved the right to charge additional fees for other services.

**3. Flexible Repayment Plans**

Private loan creditors may offer flexible arrangements, but they are not required to do so. None of the loan notes we surveyed specifically provided for income-based repayment. A few stated that borrowers would be able to choose alternative repayment plans in certain circumstances. However, the specific criteria and circumstances were not spelled out in the agreements. Only a few mentioned that graduated repayment was

possible. In these cases, the loan contract stated that these plans would be offered only if available. There is no information provided about when such plans are available.

In our experience representing borrowers through the Student Loan Borrower Assistance Project, we have found private lenders to be universally inflexible in granting long-term repayment relief for borrowers. Even in cases of severe distress, the creditors we have contacted have offered no more than short-term interest-only repayment plans or forbearances. This experience holds true for both for-profit and non-profit lenders.

**4. Postponing Payments**

As with flexible repayment, private loan creditors are not required to offer forbearance or deferment options. In most of the loan notes in our survey, the lenders provided an in-school deferment option. However, interest generally accrued during this period and borrowers were given the choice of paying the interest while in school or approving capitalization once they enter repayment.

No forbearance rights were specified in nearly half of the loans in our survey. Creditors may offer these plans, but they do not inform borrowers about available choices ahead of time in the loan notes. All of the lenders who provided forbearances explained that the option was available for no more than six months, regardless of the number of forbearances requested. A number of lenders in our survey disclosed that they would charge fees to process forbearance and deferment requests. The fees were generally up to $50 for forbearances.

**5. Work-Outs and Cancellations**

In our experiences representing borrowers in financial distress, lenders, including non-profit lenders, have not been willing to cancel loans or offer reasonable settlements. The lenders have said they will cancel loans only in very rare circumstances. Private lenders

generally do not discharge student loan debt upon death of the original borrower or co-signer. A number of loans in our study stated explicitly that there will be no cancellation if the borrower or co-signer dies or becomes disabled.

**6. Mandatory Arbitration Provisions**

Sixty-one percent of the loan notes in our survey contained mandatory arbitration clauses. These clauses are just one example of lenders' systematic strategy to limit a borrower's ability to challenge problems with the loans or with the schools they attend. Mandatory arbitration clauses are very controversial and are hallmarks of predatory loans.

**7. Default Triggers**

Borrowers are in default on federal loans if they fail to make payments for a relatively long period of time, usually nine months. They might also be in default if they fail to meet other terms of the promissory note. There are no similar standardized criteria for private loan defaults. Rather, default conditions for private student loans are specified in the loan contracts. In most cases, borrowers will not have a long period to resolve problems if they miss payments on a private student loan. Private loans may go into default as soon as one payment is missed. In many cases, lenders reserve the right to declare defaults if in the lender's judgment, the borrower experiences a significant lessening of ability to repay the loan or is in default on any other loan they already have with the lender, or any loan they might have in the future.

**8. The Holder Notice and Other Borrower Defenses**

In order to minimize risk and make the loans more attractive for investors, private lenders have aggressively sought to limit a borrower's ability to raise defenses to the loan based on violations of the law or that the lender breached the contract or that the consumer does not owe the amount claimed. These rights are extremely important in the private loan

context where many creditors have close arrangements with schools that allow them to market their private loan products. There have been very serious problems with some of these schools, including examples of schools that were not properly licensed or certified, pressuring borrowers to take out private loans.

Some lenders have sought to evade potential liability in these cases. They have done so in a number of ways. Many simply do not include the Federal Trade Commission (FTC) holder notice in the loan notes. [4] Nearly 40% of the loans in our survey followed this potentially illegal approach. Other lenders include the notice but attempt to deny borrowers its benefits by placing contradictory clauses in the notes. In our survey, 90% of the notes that included the Federal Trade Commission (FTC) notice undermined it in some way by attempting to prohibit borrowers from raising defenses.

These efforts to evade liability are harmful to future borrowers as well. Contrary to the basic purpose of the FTC holder notice, the lenders are placing the responsibility to police the schools on the students. Yet students have no recourse if they are given erroneous information by the schools.

**9. Misleading and Deceptive Information About Borrower Bankruptcy Rights**

Student loan creditors have pushed hard to limit the safety net for borrowers who get in trouble. One of the most notable examples is the 2005 Congressional decision to make private student loans as difficult to discharge in bankruptcy as federal loans. This was a severe blow to consumers. The rationale for limiting bankruptcy rights for federal borrowers is also suspect, but is even less reasonable for private loan borrowers. These

[4] The FTC notice states that any holder of a consumer credit contract is subject to all claims and defenses which the consumer could assert against the seller. The notice must be inserted whenever the seller finances a sale or a creditor has a relationship with the seller and that creditor finances the sale. 16 C.F.R. §433.2.

EXHIBIT A

are getting out of the business or more commonly that they will stop making loans to the highest risk borrowers. This has not yet developed into a larger trend and it may be that the lenders will curtail business mostly in poorly performing schools, including many proprietary schools.

This is not only a needed market correction, but an opportunity to curb predatory student lending, which is harming the very students we most want to help get into and succeed in college. Tightening, if it occurs, is likely to shake out loans that never should have been made and that are harming students. It could also force schools and lenders to think twice before pushing these high priced products.

**Policy Recommendations**

Higher education is the gateway to a secure economic future for many Americans. It is no secret that access to higher education is diminished by soaring costs. More and more, students are risking their financial futures by taking out expensive loans to finance education. Unfortunately, market failures and abusive lending practices are stripping the benefits of higher education from millions of students. This is especially true in the private student loan market where there is little regulation despite the high cost of these loans and lack of protections for borrowers.

Below is a policy framework to help preserve access to affordable higher education by addressing problems with private student loans.

Any new student financial assistance legislation should be based on the following principles:

- Eliminate unsustainable loans and develop fair underwriting standards;
- Eliminate incentives for schools and lenders to steer borrowers to abusive loans;

EXHIBIT A

- Improve disclosures so that borrowers can know the true cost of private loan products and understand the difference between private and government loans;
- Require accurate and accountable loan servicing;
- Ensure effective rights and remedies for borrowers caught in unaffordable loans;
- Preserve essential federal and state consumer safeguards; and
- Improve assistance to distressed borrowers.

**Conclusion**

We are in a time of change, not crisis. Change understandably makes people nervous, but it is not a cause for panic, especially since there is no evidence that the changes in the federal loan programs are hurting students and their families.

Rather than responding to economic changes by preserving an imperfect system, it is time to improve access to higher education by fixing what is wrong with student financial aid. This requires recognition that the road to equal access will not be paved with predatory loans.

Thank you for the opportunity to testify today.

SignOnSanDiego.com THE SAN DIEGO UNION-TRIBUNE PRINTTHIS

More Business news

# Left in the lurch

### Lenders expect students to repay private loans even if school goes bankrupt

By Bruce V. Bigelow
UNION-TRIBUNE STAFF WRITER

March 9, 2008

JACIE LANDEROS / Union-Tribune

Hector Leon was a freshly divorced father with two small children when he decided in 2006 to enroll in a helicopter flight school offered at El Cajon's Gillespie Field by Nevada-based Silver State Helicopters.

The flight school required all students to pay the full amount of their $69,900 tuition up front. Leon said Silver State made it easier by arranging a private student loan for the full amount, with payments deferred until six months after graduation.

"When I heard their ads, which said you could make upwards of $150,000 to $180,000 a year, I thought it was the way to get a better income and provide a better life for my two kids," the San Diego resident said.

But Leon's helicopter dreams began to spin out of control when he learned on Super Bowl Sunday that Silver State had ceased operations and was filing for bankruptcy liquidation in Las Vegas.

The privately held company has refused to comment since itsFeb. 4 Chapter 7 filing, when it issued a brief statement that blamed its abrupt liquidation on "a rapid, unprecedented downturn in the U.S. credit markets."

The credit squeeze "severely curtailed the availability of student loans" Silver State said, "and resulted in a sharp and sudden downturn in new student enrollment."

By some accounts, Silver State's bankruptcy was triggered after a major lender informed the company it would no longer make loans to its students.

Now Leon and some 2,500 other Silver State students nationwide are facing a double bind not of their making: fighting for scraps of their paid tuition in Silver State's bankruptcy while battling lenders who insist the students are still on the hook for repaying the loans. "My first reaction was a sick feeling," said Leon, 36.

To consumer rights advocates, the situation is reminiscent of a wave in trade school scams and student loan abuses in the

EXHIBIT A

1980s and early 1990s. They suggest Silver State may be an early casualty as credit woes squeeze lenders and pose problems that may be especially painful for students at postsecondary vocational schools and private, for-profit educational institutes.

CHARLIE NEUMAN / Union-Tribune
A bankruptcy notice was taped to the door at Silver State Helicopters, which required students to pay tuition upfront.

"The new twist this time around is that most of them have these private student loans," said Deanne Loonin, a staff attorney at the National Consumer Law Center in Boston. Students today "don't have the same protections and remedies" available 20 years ago, when most education loans were federally backed, Loonin said.

For one thing, the federal Bankruptcy Act of 2005 made it far more difficult for individuals to discharge a student loan in personal bankruptcy.

A California law established to protect students at private postsecondary and vocational schools expired June 30, 2007. Gov. Arnold Schwarzenegger vetoed legislation to renew the program, calling the existing statutes "fundamentally flawed."

At the time the law expired, California had about 2,400 postsecondary schools, including technical-training institutes, cosmetology, culinary and truck-driving schools, as well as educational chains operated by Corinthian Colleges, Career Education Corp. and others.

Since then, there has been little if any state oversight.

The company at the center of the latest controversy was founded in 1999 in Henderson, Nev., by Jerry Airola, who rapidly expanded Silver State's business to at least 33 flight schools nationwide. In addition to its school in El Cajon, the company operated in six other California cities: Long Beach, Camarillo, Chino, Los Banos, Oakland and Sacramento.

CHARLIE NEUMAN / Union-Tribune
Local Silver State students are among those battling lenders who insist that the students are on the hook for repaying their loans.

Many, if not most, of Silver State's students received private student loans to cover all or part of their $70,000 enrollment. But because Silver State did not participate in federal education aid programs, its students were ineligible for federally guaranteed student loans.

After Silver State's bankruptcy, many students learned that private student loans usually cannot be discharged if their school goes out of business – unlike federally guaranteed education loans.

Shortly after the bankruptcy, San Diego-based Student Loan Xpress, which worked closely with Silver State's California flight schools, indicated it had no plans to write off its loans to Silver State borrowers.

In a statement, Student Loan Xpress urged students to contact Silver State's bankruptcy attorney to file individual claims for a refund on the "unearned" portion of their paid tuition.

"We also encourage those students whose tuition was financed by SLX to contact us to implement mutually satisfactory repayment plans," the lender said.

Students may have little recourse, but Elena Ackel of the Legal Aid Foundation of Los Angeles offered one

EXHIBIT A

sliver of hope, known as "the FTC rule."

The rule, based on a Federal Trade Commission regulation, gives consumers the right to legally raise a financial claim against a lender in cases where a seller and lender have a business arrangement, Ackel said. It applies to private, for-profit schools and educational lenders.

To Loonin, Silver State exemplifies the sort of hidden risks the credit crunch has forced into the open as the cost of education has skyrocketed in the United States.

She views private student loans as one of the biggest hazards because they aren't subject to the rate caps that fix the interest rates on most federally backed loans at 6.8 percent.

In a recent study of 28 representative loans, Loonin found the average initial rate was 11.5 percent, and the highest was nearly 19 percent. Most had origination charges that added, on average, 4.5 percent to the loan amount.

Private loans, which were once used chiefly by graduate students, have grown dramatically, from about 5 percent of all student loans a decade to nearly 25 percent today, Loonin said.

In 2005-06, students took out $17.3 billion in private loans, compared with $1.3 billion a decade earlier, according to the College Board.

The dramatic growth in private student loans is due chiefly to the enormous profitability of the lightly regulated industry, Loonin said.

As in the subprime mortgage market, one of the biggest factors driving profitability has involved packaging student loans and selling them to hedge funds, mutual funds and other investors as "asset-based securities."

Selling "securitized" student loans has been a key source of revenue for many lending companies, especially those not affiliated with banks.

In a recent report issued by the National Consumer Law Center, Loonin and co-author Julia Devanthery found the market for such securitized student loans jumped from $9.4 billion in 2005 to $16.6 billion in 2006 – a 76 percent increase.

But Wall Street lost its appetite for such deals as investors' bets on securitized subprime mortgages began turning into disastrous losses last year. The resulting credit squeeze has prompted many lenders to make drastic cutbacks and sever their ties with financially troubled schools, which apparently is what happened at Silver State.

Some lenders also have raised their loan requirements, left less-profitable loan programs and, of course, increased their interest rates and fees.

"It all helps unmask the larger problem, which is that students are having trouble affording the cost of education," Loonin said. "We've masked that problem by throwing all these predatory loans at them."

She contends that many postsecondary schools mislead students through aggressive marketing that makes exaggerated promises about high-paying careers without disclosing the exorbitant costs of their classes or the burdensome nature of private student loans.

Like a receding tide, the industry's cutbacks have exposed some hazards that students face. But nowhere has this reef been exposed more clearly than in Silver State's bankruptcy.

In the hierarchy of bankruptcy law, students rank as unsecured creditors who stand near the end of the line

of people who hope to get their money back. Silver State has said in its filings that it does not expect any proceeds will be left over from its liquidation to reimburse such creditors.

Still, Michael Berger, a Beverly Hills bankruptcy lawyer who is intervening on behalf of hundreds of students in California and elsewhere, said there are fraudulent aspects of the case he intends to challenge.

"We have students who got their loans funded the day before the bankruptcy, the day of the bankruptcy and the day after the bankruptcy," Berger said.

He also asserted that federal investigators and attorneys general in several states, including California, have launched inquiries into Silver State's operations.

Meanwhile, Leon and other students say they are learning details about their loans – such as higher interest rates – that they knew nothing about before now.

Leon said the interest rate on the $69,900 loan he signed in 2006 was supposed to be 10 percent. But after looking over his paperwork, Leon discovered that his rate had jumped to 14 percent and that another lender, American Education Services, was servicing his loan.

Another Silver State student, Tony Vaca of Long Beach, said as many as 70 Silver State students in California also have discovered to their surprise that someone had co-signed their student loans, presumably to help them qualify. But the co-signer's name was not familiar to any of them – and they all had the same co-signer.

Vaca and Leon said they plan to attend a key creditors meeting in Silver State's bankruptcy case that is set for tomorrow afternoon in Las Vegas, and they plan to fight however they can.

"A lot of students are just sort of throwing up their hands ... not knowing that those $70,000 student loans are going to be following them around for the rest of their lives," Vaca said.

---

▪ **Bruce Bigelow:** (619) 293-1314; bruce.bigelow@uniontrib.com

**Find this article at:**
http://www.signonsandiego.com/news/business/20080309-9999-lz1b9lenders.html

☐ Check the box to include the list of links referenced in the article.

© Copyright 2007 Union-Tribune Publishing Co. ? A Copley Newspaper Site

EXHIBIT A

NEW AMERICA FOUNDATION

THE HIGHER ED WATCH BLOG

## Fueling Sham Trade Schools

Stephen Burd • May 1, 2008 • 1:20am

We have written a lot recently about Silver State Helicopters, a Nevada-based company that left the 2,500 students who attended its flight academies in the lurch when it shut its doors without warning on Super Bowl Sunday and filed for bankruptcy liquidation.

As we noted yesterday, Silver States' entire existence depended on the willingness of loan companies -- in this case, the infamous Student Loan Xpress and the Pennsylvania Higher Education Assistance Agency (PHEAA) through its national brand American Education Services -- to make and service high-cost private loans to help students cover the $70,000 cost that they were required to pay up front to attend the unlicensed and unaccredited flight schools. Unfortunately, Silver State students are now stuck repaying these private loans for training they did not ultimately receive.

Silver State is hardly an isolated case.

There has been in recent years a proliferation of unlicensed and unaccredited trade schools that do not participate in the federal student aid programs and therefore go largely unregulated. Their growth has been fueled by lenders that have willingly and irresponsibly "partnered" with these institutions to provide expensive private loans to the at-risk students these schools tend to attract. The lenders have then turned around and, like subprime mortgage lenders, securitized the loans, shifting the risk of the loans onto unsuspecting investors.

**Reviving Trade School Scams**

These practices first came to light several years ago when dozens of unaccredited computer training schools unexpectedly shut down, leaving their students without training and with heavy private loan debt. Just like Silver State, these schools (owned by now-defunct chains such as Ameritrain, Solid Computer Decisions, and The Academy Schools, among others) had forged sweetheart deals with the loan giants Sallie Mae and Key Bank to provide their students with tens of thousands of dollars of private loans to cover the full cost of tuition upfront before any classes were provided.

Consumer lawyer Tom Domonoske exposed these deals in an article entitled "The Finance Industry Fuels Revival of Trade School Scams," which ran in late 2003 in the trade journal *The Consumer Advocate* but received little attention at the time. In the article, Domonoske explained how the easy availability of private loans helped disreputable schools thrive by allowing them to attract students without having to worry about being regulated by the federal government.

In the late 1980's and the early 1990's, the federal government was forced to take emergency actions to crack down on an explosion of fly-by-night trade schools set up solely for the purpose of reaping profits from the federal student aid programs. To avoid another student loan-proprietary school debacle, policymakers began requiring schools that participate in the federal student loan program to demonstrate, among other things, that they are financially stable. The schools must show that they do not pose a danger of closing precipitously.

But disreputable trade school owners found a way to around these rules -- by staying out of the federal aid programs and pushing private loans to their students. Meanwhile, lenders, Domonoske wrote, have proved more than willing to provide "liquidity" to these sham schools. "[T]he current problem of school closures in the computer training field would not exist if entities like Sallie Mae and Key Bank were applying similar restrictions" to those of the government, Domonoske wrote at the time.

**The Loan Industry's Complicity**

Under pressure from consumer advocates, Sallie Mae eventually agreed to stop serving unlicensed schools. But Key Bank apparently continues to do so. And, in light of the Silver State Helicopters case, other lenders, like Student Loan Xpress and the non-profit state agency, PHEAA, appear to have picked up the slack.

Why would lenders ever agree to make such risky loans in the first place? Don't loan providers pay a price for making loans to students attending sham schools? Not if they securitize the loans and get them off their books. As Domonoske puts it:

> "Key Bank's willingness to fund bad loans seems at first glance to be counterproductive for its own bottom line. However, Key Bank does not intend to hold all the loans during their repayment period; instead it pools and sells the loans to investors. Through a process called "asset-backed securitization," Key Bank obtains full value for the loans by selling them to an investment trust. It sells the loans as if they were honest and legitimate transactions solicited by schools that were acting properly...Consequently, the investors pay full value without a disclosure of the inherent defects in the loan."

In other words, by providing huge private loans to students attending unlicensed, unaccredited schools and then securitizing the debt, the lenders have not

EXHIBIT A

only caused great harm to students but have also deliberately misled investors.

As policymakers consider a bail out the student loan industry from the credit crunch beyond legislation passed in the Senate yesterday, they need to remember that lenders have brought a good part of these problems onto themselves. Lenders have dumped lots of bad private student loans onto the marketplace, knowing full well that much of this debt was likely to go into default. Is it any wonder that investors are now wary of student loans?

**Bookmark/Search this post with:**

Tags: Ed Policy Watch For Profit Colleges Private Loans Sallie Mae

COMMENTS

EXHIBIT A

FIRSTCOASTNEWS.COM ARTICLE

ADVERTISEMENT>>

## Aspiring Pilots Tackle Debt Following Silver State Helicopters Bankruptcy Action

By Roger Weeder
First Coast News

JACKSONVILLE, FL - Students who teamed up with Silver State Helicopters to become pilots are now dealing with mountains of student loan debt.

The flight school at Craig Air Field closed suddenly in early February leaving nearly a hundred aspiring pilots in limbo.

Cameron Ford is one of them. The Middleburg father of three had invested nearly 18 months learning to fly.

"I have 55 hours of flight time and nothing to show for it," said Ford from his home that's currently up for sale.

Ford who is unemployed says the best news he got recently is that he doesn't have to start paying on his student loan, at least not yet.

"It is still building interest, accrues interest at the rate of about 600-800 dollars a month on top of the original $70,000 loan."

Ford says he has yet to join a class action lawsuit that has been initiated by former students of Silver State Helicopters. He says becoming part of that legal action is an option.

Silver State Helicopters came under scrutiny following several fatal crashes across the country including one that happened on the First Coast in the spring of 2007. That accident in Ponte Vedra killed both an instructor and student.

The Las Vegas based flight school has filed for bankruptcy.

The Florida Attorney Generals Office is investigating the school's operations to determine if Silver States Helicopters misrepresented its services to students.

First Coast News



# Students Left Hanging By Silver State Closure

February 5, 2008
*By Meredith Saini,*
*Managing Editor*

---

Shocked by the downfall of Silver State Helicopters, the Nevada-based flight school that declared bankruptcy earlier this week, former students and employees are telling AVweb they face major financial losses. Silver State Helicopters abruptly shut down operations at its 34 nationwide locations on Sunday afternoon, leaving more than 800 employees without jobs and more than 2,500 flight students saddled with millions in debt. Company president and founder Jerry Airola has yet to speak publicly on the event, but a statement released by the company alleges that "a rapid, unprecedented downturn in the U.S. credit markets" curtailed the availability of student loans for the company's students and resulted in a "sharp and sudden downturn in new student enrolment." Tony and Heather Sullivan told AVweb they were at a Super Bowl party when they got the news. Heather was employed as a receptionist and flight dispatcher at Silver State's Houston facility, where her husband was a student. To date Tony has logged just 81 of the 200 hours he signed up to receive, and said he does not know how he is going to complete his training. Tony, who works full time as a human resources manager for a construction company, said he has an outstanding loan through American Education Services (AES) for approximately $70,000, the cost of the 18-month program designed to get students through their private, commercial, instrument and initial flight instructor certificates. Mike Reiber, spokesperson for AES, told AVweb that AES is one of several companies that originated and serviced loans made to Silver State students. "Effective this past Monday we are no longer dispersing money to Silver State Helicopters," he said. "Any disbursements that were sent out are being returned." Reiber said that AES is awaiting direction from Student Loan Xpress, the guarantor of the loans. Student Loan Xpress spokeswoman Jenn Stark said Silver State should pay unused tuition back. "As a result of Silver State Helicopter School's decision to file for bankruptcy protection, we are currently working with its students to ensure that their loans are managed properly until the bankruptcy court decides upon a course of action to assist them." she wrote in an email to AVweb. She said affected students can contact Student Loan Xpress for information, at 888-568-2429, between the hours of 8 a.m.-5 p.m. EST. Silver State Helicopters is a member of the Helicopter Association International (HAI). In an undated membership profile on HAI's website, Silver State lists a fleet of 195 helicopters including 138 two-place Robinson R22s and 43 four-place R44s. HAI president Matthew Zuccaro told AVweb that the loss of such a large flight school will be felt throughout the industry. "It's certainly of concern to us," he said. Jerry Airola founded Silver State Helicopters in 1999 and quickly became known throughout the industry for using aggressive sales tactics to recruit students to the program.

Copyright Aviation Publishing Group. All rights reserved

EXHIBIT A

# THE CONSUMER ADVOCATE

Vol. 9 ♦ No. 4 October - November - December 2003

## "Come Out With Your Hands Up!" — Trade Secrets, Protective Orders and the Smoking Gun

*by Ian Lyngklip*

In This Issue

*"Come Out With Your Hands Up!" — Trade Secrets, Protective Orders and the Smoking Gun*
*Ian Lyngklip* . . . . . . . . . . . . . . . . 1

*From the Editor* . . . . . . . . . . . . . . . . . . 2

*The Financial Industry Fuels Revival of Trade School Scams*
*Tom Domonoske* . . . . . . . . . . . . . 7

*Testimony Before Subcommittee on Financial Institutions and Consumer Credit of the Committee on Financial Services*
*Leonard A. Bennett* . . . . . . . . . .10

Nominating Committee Recommendations . . . . . . . . . . . . . . . 11

Frontline News . . . . . . . . . . . . . . . . . .12

Home Pages. . . . . . . . . . . . . . . . . . . . 14

*TECHNOLAWYER.COM* . . . . . . . . . . .16

Bulletin Board . . . . . . . . . . . . . . . . . . 25

Conference Announcement . . . . . . . 27

National Association of Consumer Advocates
1730 Rhode Island Ave., NW, Suite 805
Washington, D.C. 20036
202-452-1989, fax 202-452-0099
www.naca.net

If you think protective orders are esoteric, ethereal creations of the judiciary and academia, think again. As a consumer advocate, there are important public policy concerns you need to know about, as well as practical realities you need to consider.

Every time a court refuses to compel discovery of "pattern evidence," rejects your request to inspect a predatory lender's procedures, or orders that records remain "confidential" or "sealed" during the litigation, the court is *effectively* granting a protective order. In short, every order that denies an opportunity to conduct discovery is a protective order. These orders are neither esoteric nor ethereal. Rather, protective orders barring discovery put the "smoking gun" beyond the reach of the plaintiff. Likewise, protective orders which seal court records preclude other plaintiffs from using this same "smoking gun" evidence and prevent the public from protecting itself from further harm.

Properly used, protective orders shield parties from abusive discovery, and keep them from running amok in discovery practice. But, most often in consumer litigation these orders stand as the first line of defense of a bad actor who hopes to create a safe harbor for widespread wrongdoing. To an inexperienced attorney, the mere assertion that discovery materials are "confidential" can pollute the litigation with unnecessary motion practice and impenetrable procedure. Protective orders are the things that most often stand between the plaintiff and the "smoking gun" evidence of willful misconduct. If you stipulate to an unwarranted protective order, you agree to limit your ability to obtain and use the very information that you will need to effectively present your case.

If the information you are seeking is worth the battle for the defendant, it is doubly so for the plaintiff. It effects both the settlement value of your case and the ability to present evidence at trial.

By refusing to agree to overly broad orders, you will be able to present a better case, put more pressure on the defendant to settle, show the court during discovery that the defendant's conduct is egregious and unworthy of judicial protection, inform the public of widespread wrongdoing, and ultimately save yourself the cost of fighting for admission of the documents down the road. On the other hand, by agreeing to a protective order, you may keep public from knowing of wrongdoing, render evidence inadmissable, cost your client money, and place yourself in a poor posture for settlement and trial. This article addresses the proper limits on use of protective orders and some strategies to get past the defendant's unwarranted demands.

EXHIBIT A

# From the Editor

*Nancy Barron is a partner in the San Francisco law firm, Kemnitzer, Anderson, Barron & Ogilvie*

This is my 22th issue as your editor. It will be my last for now. Since January 2000, I have enjoyed working with more than 150 of you who have contributed to these pages. I want to thank every single person who has given time and talent to The Consumer Advocate. Just as I took the reins from the able hands of Dick Rubin, I am happy to report that I pass them on to two experienced editors, Deborah Zuckerman and Steve Gardner. Both Steve and Deborah have been a great help to me behind the scenes for years, so I expect the change to be seamless. Please welcome them to the job and send them your ideas and articles. After years of outsourcing layout and production, we now have the fulltime desktop publishing services of the talented Cynthia Reddersen in NACA's Washington, D.C. office. Cynthia will continue to work her magic, I'm sure.

This newsletter is just one way NACA seeks to serve its members. It is authored and edited by volunteers. I believe the process of sharing our knowledge, experience, opinions and ideas is what makes NACA unique. In "sixties" jargon, I sometimes think of it as an enormous legal co-op. The generosity of spirit and professional respect among our members has made our common advocacy stronger, more successful, and a lot more fun.

I have tried to balance our issues with a mixture of news items, legal briefs, policy pieces, legislative testimony, practice pointers and technogical advances in office management. This issue is no different, with a variety of articles which demonstrate the breadth of our common efforts in education, legislation and litigation on behalf of consumers.

Nancy Barron

NACA
National Association of Consumer Advocates
1730 Rhode Island Ave., NW Suite 805
Washington, D.C. 20036
202.452.1989 fax 202.452.0099
www.naca.net

Editor in Chief: Nancy Barron
Design & Production: Cynthia Reddersen

EXHIBIT A

LYNGKLIP: Continued from the Cover

With this in mind, consumer advocates should be aware of the limits, uses and procedure governing these orders.

## How the Problem Arises

Battles over protective orders arise following a plaintiff's request for discovery of the defendant's documents. If the result of those requests would amount to public disclosure of evidence of the corporate wrongdoer's pattern of willful misconduct, the fear of further civil or criminal action will drive the defendant to refuse to produce relevant evidence unless a protective order is entered. The proposed orders may limit the use and disclosure of the documents, seal the court's record, or require that any proceedings involving these documents be kept secret. All the while, the Federal Rules of Civil Procedure do not permit a defendant to use proof of its own wrongdoing or the possibility of further litigation as the justification for sealing the court's record from public scrutiny. As such, the rules - if properly construed - will rarely allow for many of the confidentiality dictates of the corporate wrongdoers. Simply put, protective orders cannot be issued for the sole purpose of hiding a "smoking gun".[1]

With this in mind, consider the following scenario: Upon filing of the lawsuit, plaintiff's counsel will forward discovery requests which - if carefully drafted - should result in the production of the "smoking gun" evidence of wrongdoing and a general practice of malfeasance. In response, the defendant will fail to respond to the discovery. After several weeks of patient waiting, plaintiff's counsel will call to follow up and be told that that answers are in the mail. Upon inspection, plaintiff's counsel learns that *no* documents of any importance or relevance have been produced, and that the defendant has asserted that all damning documets are "confidential" or "trade secrets" and will only be produced under a protectiive order. If only for the purpose of heading off a discovery motion, plaintiff will stipulate to a protective order requiring the documents be held as confidential, not used outside the litigation, and only be submitted to the court if the Plaintiff files a motion under seal requesting to be able to use them. This tactic is simply wrong, as well as unnecessary.

## Rights Affected: Think before you stipulate

Before you agree to a protective order, recognize that these orders severely affect not only your client's rights, but your rights, and those of the public at large. Most often, protective orders will either deny the plaintiff access to discovery or prevent disclosure of the evidence obtained. If the discovery you are seeking is "pattern" evidence of widespread misconduct, then such a protective order will insure that the evidence of misconduct will never see the light of day. Consequently, the effect of a protective order may be to insure that the defendant will continue its wrongful practices, unimpeded by the possibility that its conduct will be remedied through the justice system. By the same token, if the court orders that all materials be sealed permanently, then you effectively limit your own first amendment right to publicly speak about the defendant's misconduct, as well as the public's right to supervise the proceedings.[2]

So, for example, when the defendant *instructs* you that you will need to consent to an iron-clad protective order before you can see all the other certificates of title which it has forged, think twice about whether you wish to forfeit you client's right to put forward evidence obtained through discovery, your right to free speech, and the opportunity of the press to write about the misconduct and the court's handling of your case. At the same time, you limit the right of other plaintiffs who have been harmed to use the evidence from your clients.[3]

If these important constitutional considerations are not enough, consider the cost of these orders to you and your client down the road. Most often, the protective orders proffered by defendants will require that any materials disclosed through discovery must remain confidential and cannot be used in the litigation absent a court order. By agreeing to this, you have guaranteed that your trial preparation time will be consumed with motion practice over the relevancy of the "confidential" documents you have received, because you have effectively stipulated that the documents are presumptively irrelevant or cannot be admitted without a further order of the court. While defendants routinely require protective orders before producing any discovery, there is simply no basis for this procedure in the rules. Stipulating to an overly broad protective order may expedite getting the documents you need in the short run, but in the long run they are costly.

## What is the Court's Authority?

Demands for protective orders often dissolve into unprincipled arguments over what one party does or does not feel like disclosing. The proper limits of the court's authority lie in Rule 26 of the Federal Rules of Civil Procedure and provide an answer to the defendant's

Continued on EXHIBIT A

LYNGKLIP: Continued from Page 3

demand for an overreaching protective order. Given the express limitations on the court's authority, you need not stipulate to a protective order which exceeds the scope of Rule 26 or which improperly limits anyone's constitutional rights.

While Rule 26 provides limits on the court's authority, additional constraints arise from the Constitution. In order to understand the court's authority and its limits, advocates must recognize the inherent tension between discovery rules designed to facilitate trial preparation and the need to have open proceedings as required by the constitution and common law. On the one hand, meritorious lawsuits should not be used as the justification for unwarranted prying into the private affairs of the litigants - a fact of which we are acutely aware when our own client's credit reports and tax returns are subpoenaed or made part of the public record.[4] On the other hand, when the courts uncover widespread wrongdoing, the public's right to access the court's findings becomes a constitutional matter.

That is to say, the courts serve as a branch of the government, which like all others, is open to public scrutiny. As such, the public and press alike have a right to review the activities of the courts to insure their integrity and proper functioning.[5] Evidence elicited from the proceedings belongs to the public at large and may be used in other proceedings. Thus, the courts recognize the public's right of access. At the same time, the courts have been willing to carve out exclusions from this general rule for activities which do involve the disposition of the merits of cases and controversies under Article III of the Constitution.

In order to reconcile this tension, the courts have been willing to recognize that discovery is generally a matter of public record, but not all discovered information will become evidence. While discovery is a part of the Government's legitimate function, and is presumptively subject to open access,[6] any limitations flow from the court's authority under Rule 26 to control and limit discovery using the court's *sound discretion*.[7] Under Rule 26, the courts enjoy discretion to limit requests for and the use of discovery materials which the parties have not yet put before the court for the purpose of determining the merits of the case or approving settlements.[8] Simply put, the parties may request that the court exercise its discretion to limit public access to the discovery phase of litigation where justice so requires. However, once the court begins the review of evidence in the exercise of its Article III powers, that evidence and the proceedings are presumptively public matters, absent some compelling justification.[9]

Once discovery material is set before the court for the purpose of resolving the case or controversy, the public's right to know becomes paramount. This right to know is expressed through the litigant's right to speak publicly about the proceedings, the press's right to access and write about the proceedings, the public's right to supervise the judicial activities of its lifetime tenured judges,[10] the need of the public to understand the operation of the courts,[11] and right of litigants to a public trial. As such, any limitations on the sealing of the court's records from public view becomes subject to constitutional scrutiny which requires a far higher justification than simply limiting the litigant's ability to publicize discovery documents which would not ultimately be admitted into evidence at the trial.[12]

## Requirements for Issuance of a Protective Order

While Rule 26 provides a generously broad set of justifications for the issuance of a protective order, the Rule's requirements must be met.

### Specific and Timely Objection

As with all other discovery matters, the responding party must respond to the discovery in a timely fashion and object to the disclosure in a timely fashion. The failure to raise timely objections to the discovery before it is due waives the objections. At the same time, any such objections must be specific and identify a clear basis for the objections. Generalized, boilerplate objections do not satisfy the discovery rules.[13]

### Timely Motion

Rule 26's procedures for obtaining a protective order are not self-executing. A defendant cannot simply assert that the material sought is not discoverable, thereby seeking to withhold discovery based on an objection without also moving for the protective order. Even if such objections are accompanied by the offer to provide the documents once a protective order is entered, this does not constitute compliance with the rule. A party may not simply agree to make documents available at a later date restrictions which—in its unilateral judgment—it regards as reasonable compliance with discovery.[14]

Continued on Page 5

EXHIBIT A

LYNGKLIP: Continued from Page 4

The fundamental principle of Rule 26 that defendants routinely ignore is that the withholding party must either provide the discovery or move the court to issue a protective order. Consequently, a party who refuses to provide discovery based on the assertion of the need for a protective order has engaged in self help, and usurped the court's authority. It is improper to refuse to provide the required discovery without having received, or at least applied for, a protective order. If a party fails to timely move for a protective order, the order should be denied.[15] The proper time for such a motion is before the discovery is due, rather than after.[16]

### Good Cause

The party seeking the protective order must show good cause for the issuance and maintenance of the order.[17] As with all discovery, generalized blanket objections are not sufficient reason to withhold discovery.[18] Rather, the moving party must articulate "specific facts" showing "clearly defined and serious injury" resulting from the discovery sought; conclusary allegations of harm are not sufficient.[19] However, a party seeking to resist discovery may assert any of the reasons listed in Rule 26(c) as a basis for resisting disclosures. Most often in the context of consumer litigation, the defendant will assert that the documents constitute a trade secret.[20]

Information which allows a business to gain a competitive advantage through exclusive use is a trade secret.[21] While courts may protect against the dissemination of these secrets if obtained through discovery, there is no *absolute privilege* for trade secrets or similar confidential information.[22] Rather, trade secrets must be disclosed if they fall within the general scope of discovery unless the court issues its protective order. Therefore, a party may not unilaterally designate the information as a trade secret.[23]

To the contrary, the party seeking to withhold discovery of trade secrets must first establish that the information is, indeed, a trade secret or other confidential research, development, or commercial information. Additionally, the party must also demonstrate that disclosure of this information might be harmful. Only after the defendant establishes both trade secret and harm does the burden shift to the party seeking discovery to establish that disclosure is relevant and necessary to the action. If the information is necessary to the litigation, the court must then fashion its order by balancing the need for discovery against the possibility of harm.

## Recommendations

In dealing with protective orders, plaintiff's counsel should heed the following caveats rather than simply signing away the right to litigate the case.

- The protective order should be the process of careful negotiation, not simple accession to the desires of the defendant. Review the limitations carefully and make sure the defendant's order complies with the law governing the protective orders. If the defendant could not properly obtain the relief by an adversarial motion, there is no need to stipulate to that relief.

- Never agree to the confidentiality of documents you have not seen. The protective order should have a procedure for designation and objection to the confidentiality of the documents. The agreement should require that the defendant retains the burden of moving to maintain confidentially in the event of disagreement over the designation applied to particular documents. Do not agree to shift the burden to the plaintiff. While you can agree to hold these documents as confidential during the objection procedure, the defendant must have a deadline for moving to keep the documents protected, and the failure to move in a timely manner waives confidentiality.

- Do not agree to seal the court's record at trial. Courts may only seal the record in the most extreme of cases, and in so doing, the public is denied its rights to know of wrongdoing and to supervise the courts. Moreover, during the discovery phase of the trial - long before the parties know how the case will be presented at trial- it is exceedingly unlikely that the court could know whether the documents will need to be sealed from public view. Rather, the protective order should require the defendant to move to seal the record upon notice that a confidential document will be used in a dispositive phase of the case.

- If the defendant refuses to agree to discovery without an unreasonable protective order, bring the issue to the court promptly. The passage of time favors the defendant, so you must act diligently to get the documents and do not waste excessive amounts of time negotiating fruitlessly. Simply narrow the issues of disagreement for presentation to the judge, and only bring those issue in disagreement to the court. The major points for negotiation are whether the trial record is to remain sealed, whether plaintiff can challenge an improper designation of confidentiality, and who will

Continued on Page 6

EXHIBIT A

LYNGKLIP: continued from Page 5

ultimately bear the burden of showing whether or not the documents are confidential.

## CONCLUSION

The issuance of protective orders affects the rights of the parties, their attorneys and the public at large. Therefore, before an advocate agrees to the issuance of a protective order, the attorney should be certain that the protective order is justified by the disclosures, and that the order does not go beyond the bounds of what is proper. Advocates should never agree to allow the court to lend its imprimatur to orders which exceed the court's authority. While corporate wrongdoers may seek to have all of the "smoking gun" documents designated as secrets, many of these documents fail to meet the requirements of Rule 26(c). For the sake of the client, the public and your freedom of speech, the expediency of obtaining the documents should never be allowed to outweigh the requirements of the rule. After all, a spurious claim of trade secrets most often cloaks the smoking gun, and a concealed weapon can be the most dangerous kind.

Ian Lyngklip is a partner in the firm of Lyngklip & Taub Consumer Law Group of Southfield, Michigan. He is a long term member of NACA.

Continued on Page 18

*Coming next issue...*

*NACA's new Membership Pledge and Form*

*Look for it in* **The Consumer Advocate**

## NACA's Board of Directors

Nancy Barron

Paul Bland - Co-Chair

Robert Bramson

Bernard Brown

Thomas Domonoske

Aurora Dawn Harris - Co-Chair

Bob Hobbs

Cathy Lesser Mansfield

Richard Rubin

Mark Steinbach

Michelle Weinberg

Deborah Zuckerman

EXHIBIT A

# The Finance Industry Fuels Revival of Trade School Scams

*by Tom Domonoske*

History repeats itself. Student loan scams are back. As the trade-school problem prevalent in the 1980s and early 1990s returns, it is important for consumer advocates to understand how the financial industry creates and enables the deceptive practice. This article explores the problem and considers what needs to be done about it.

"Unfair and deceptive vocational and correspondence school practices are a tremendous source of frustration, financial loss and loss of opportunity for consumers, particularly low-income consumers hoping to break out of poverty," states NCLC's Student Loan Law manual.[1] Focusing on the widespread abuses of the 1980s and early 1990s, the author continues, "The abuses were fueled by a federal student loan system that created a con artist's dream. Schools were able to pressure vulnerable and low-income consumers into signing documents, obligating them to thousands of dollars. Many schools promised that students would not have to repay loans until they got high paying jobs. The schools then literally took the money and ran, leaving loan collection to third parties and the government." *Id.*

The fuel that created the con artist's dream was the federal student loan program that fed the dollars into the system. The stream of available dollars was both the source of the problem and the solution. After the earlier problems were identified, the federal student loan program was modified to allow for discharge for closed schools, and to require FTC Holder rule language in loans made to for-profit schools under the Federal Family Education Loan program. The image of a stream of dollars functioning as liquid fuel that ignites explosive growth properly captures the financial industry term for the same concept; the availability of funding is called "liquidity." When liquidity is properly controlled, the fuel is used for economic growth, and where it is uncontrolled it fuels economic dysfunction, fraud and abuse. Because of increased liquidity that is now being made available through private, non-federally guaranteed loans, and because that liquidity is not being properly controlled, the trade school problem has returned.

The new version of this problem is most pronounced in the computer training field, and two of the main players providing the necessary liquidity are Sallie Mae and Key Bank. Sallie Mae is commonly associated with the federal government and federally guaranteed student loans, and it enjoys a national reputation. Rather than a governmental entity, Sallie Mae is actually a private corporation with several subsidiaries, and only one of its subsidiaries retains its status as a government-sponsored-entity (GSE). Key Bank is a competitor of Sallie Mae in the business of arranging, pooling, selling and servicing student loans. Because their methods have differed, these two financial entities both achieved the same result: providing large amounts of cash to sham, illegal or incompetent computer training schools that left thousands of consumers with loans to repay for which they received little or no value.

Because of the business arrangements between the computer training schools and entities like Key Bank and Sallie Mae, all students affected by closed computer training schools should easily obtain relief under the FTC Holder Rule. Because Key Bank and Sallie Mae each refused to honor the FTC Holder Rule, victims of the schools were denied the benefit of the FTC Holder Rule. Lawsuits filed in several states are currently challenging the practice of both Key Bank and Sallie Mae. Unlike the prior trade school problem which could be corrected by modifications to the federally guaranteed loan programs, this new problem can only be addressed by challenging the actions of the private entities.

## Extent of the Computer Training School Problem

The availability of private non-federally guaranteed student loans for trade schools has created the same problems as federally guaranteed student loans created in the 1980s. The con artists' dream world exists again, especially in the computer training field. The proliferation of trade schools is a nightmare for state regulators because those offices cannot adequately supervise the industry. Officials with the North Carolina Community College System, which is charged with regulating trade schools, recently identified approximately 300 unlicensed trade schools operating in that state. "'We still cannot track all of them,' says Kenneth W. Chandler, the director for proprietary schools for the system. The system is budgeted at one and a half people to oversee licensing of proprietary schools, and officials say that's not enough to undertake significant investigations."[2] Consequently, state regulators cannot manage the growth of these trade schools and are unable to ensure basic eligibility criteria are met.

The growing number of closed computer training schools has drawn the attention of the state regulators. A

Continued on Page 8

EXHIBIT A

DOMONOSKE: continued from Page 7

2003 survey of the members of the National Association of State Administrators & Supervisors of Private Schools (NASASPS), that included only 23 states, showed that in 2002 over 100 computer training schools closed in their states.[3] Of those closed schools, only 25 schools provided any advance notice of the closing. For the remaining schools, the lack of advance notice meant that students came to a building expecting to attend class and found only locked doors.

The 2003 survey is extremely limited because it does not include states like California, Virginia, North Carolina, and Florida that have suffered extensive computer training school closings. The victims of one closed school in Virginia, Ameritrain, have a website, www.asfb.org (for "Ameritrain Students Fight Back") that also lists some of the closed schools in these other states. Consequently, the total number of closed schools and the total number of students affected by these closings is unknown. In the NASASPS survey, Texas predicts an "increased number of closings until only a small number of the most successful are left." At the time of the survey, Texas had 59 approved schools, of which 10 closed in 2002. Wisconsin and Georgia made the identical prediction.

The problem of school closures in the computer training field is normally associated with the poor economy and the downturn in the information technology field. However, the rise of the private non-federally guaranteed loans for computer training must be understood in relation to the protections provided by the federal guaranteed loan program. As a result of the prior abuses, the federal programs contain eligibility requirements regarding financial and administrative capacities; and it places restrictions on commissions, bonuses, and other incentives offered to school recruiters. In January 2001, a major computer training school, Computer Learning Center (CLC) of Virginia, was forced to close its doors and file for bankruptcy. CLC enrolled more than 3,800 students in about 25 schools around the country and employed 1,900 people. It closed after the Department of Education determined it no longer met fiscal responsibility standards, and after it had ordered it to rebate $187 million for illegal commissions given to admissions officers.[4]

The Department of Education's action against CLC shows why a start-up computer training school, especially an under-funded or an unlicensed school, needs to tap into non-federally guaranteed loans to prey on its victims. Entities like Sallie Mae and Key Bank have been providing sham schools with the liquidity that the federally guaranteed program denies them. Consequently, the current problem of school closures in the computer training field would not exist if entities like Sallie Mae and Key Bank were applying similar restrictions. Instead, both Sallie Mae and Key Bank were providing loans to unlicensed and under-funded schools, and were providing the total tuition amount to the schools before any classes were provided.

In the NASASPS computer training school survey, Maryland accurately described the problem. "Many of the newly approved schools first operated without approval, and they keep reverting to their non-compliant ways. Private lenders continue to exacerbate the situation and create substantial problems. Students are encouraged to enroll and pay for multiple programs to be taken sequentially. Student loans from SLM and Key Bank still are disbursed to the schools in single payments made in advance of training. . . Unapproved training providers also continue to have access to private lending." (As more fully explained below, SLM Financial, a division of Sallie Mae, has modified its payment process since that report appeared).

The computer training schools advertise their ability to tap into the liquidity provided by these private lenders by helping the students obtain their loans. One school's website contains the following:

> "Our education consultants can help Netcom Information Technology students obtain loans from various lenders.
>
> - Sallie Mae IT Training Loan
> - IT Skills Loan program
> - Key CareerLoan for IT
> - NetCom's TFC Loan program
> - WCC Training Fund Program
>
> With our multiple IT loan partnerships from various vendors above, your chances of getting approved for an IT loan increases dramatically.
>
> The quickest and easiest way to get preapproved is online—*Click here now*. Or you can contact one of our educational consultants today for help in financing your IT education. You can use the student loan calculator on the right to get an estimate on your monthly payments." [5]

One of the many computer training schools that closed was Solid Computer Decisions (SCD). In most states SCD was not licensed to operate as a school, and it always illegally promised people jobs if they signed up for the training. Many of SCD's victims were lured to it by job advertisements and never even intended to be enrolling in training or taking out a loan. The unsuspecting job seeker thought she or he was attending a job interview, but that was merely a pretense to subject them to a hard sales pitch. The aggressive sales pitch

Continued on Page 9

EXHIBIT A

DOMONOSKE: Continued from Page 8

was this: to promise the job and a high salary, to explain that training was required, to urge the target not to worry about the cost, to promise the job seeker that SCD could arrange a loan, and to convince the target that the future salary would easily pay the loan. In this way, SCD turned job seekers into debtors and primarily solicited loans for Sallie Mae. After taking more than $21 million in loans from Sallie Mae, SCD simply closed its doors, filed bankruptcy, and left its victims out in the cold. For just this one school, these loans from Sallie Mae should have represented a $21 million investment providing substantial rewards to individuals, communities, and our overall economy. The $21 million potential investment in a stronger economy became instead a $21 million dagger cutting its way through individual finances. A large debt with no benefit can ruin a struggling family and, because the loans are not federally guaranteed, no other protection exists. Rather than job opportunities and economic growth, the credit provided by Sallie Mae to this one school shattered hopes and dreams in more than fifteen states.

If students at computer training schools were receiving valid training at reasonable prices, then the loans would each be a benefit to each student and to the economy as a whole. This type of good investment credit would increase the job skills of all students, and would increase both the earning and spending power of each student. Given the massive job loss in our country in the past two years, increasing the job skills in any community and the earning potential of employees is vital to the strength of our economy. Thus, proper liquidity made available to legitimate training schools is the type of credit that provides strength to our market economy and allows people to improve their situation. Similarly, providing liquidity to sham training schools fundamentally harms our system. The computer training school closures, and their consequences that reverberate throughout our system, are a function of private lenders providing liquidity to bad actors.

### The Sallie Mae System

As one of Sallie Mae's fastest growing divisions, SLM Financial works closely with computer training school to obligate people on Sallie Mae's non-federally guaranteed student loans. SLM Financial, and certain banks involved in the process, use the trade schools to solicit loans. SLM Financial coordinates the entire process and provides all the loan documents to the training schools. The consumer-students interact only with the school, and SLM Financial and those banks then receive the benefit of an enforceable loan.

SLM Financial selects the schools that it will use to increase its portfolio and its contract with the schools allows it to monitor the school's accreditation. SLM

Continued on Page 20

From the Library of NCLC...

**Student Loan Law**

**Collections, Intercepts, Deferments, Discharges, Repayment Plans, and Trade School Abuses**

Millions of Americans, delinquent on their student loans, often because of financial hardship or trade school fraud, feel the full brunt of federal collection:

*Tax Refund Intercepts*
*Administrative Wage Garnishment*
*Seizure of Social Security Benefits*
*Shockingly High Collection Fees*
*Private Collector Harassment*
*Bad Credit Records*

**The Good News**

NCLC's Student Loan Law legal practice manual comprehensively analyzes, for the first time, all the remedies and strategies for students delinquent on their loans.

Everything You Need in this Book & CD-Rom

- Discharge, deferment, forbearance, and loan consolidation forms
- Numerous sample pleadings from requesting an affordable repayment plan to challenging debt collection harassment
- 40-page Financial Aid Guide (2001-2002) in both English and Spanish
- Important Department of Education guidance letters
- Key Federal statues, regulations, and proposed regulations.

$70 398 Pages with 2002 CD-Rom ISBN 1-931697-29-9

**Call NCLC at (617) 542-9595, Ext. 1 To Order**

EXHIBIT A

*Exerpts from Testimony Before the Subcommittee on Financial Institutions And Consumer Credit*

# Fair Credit Reporting Act: How it Functions for Consumers and the Economy

**June 4, 2003**

**by Leonard A. Bennett, on behalf of NACA**

*[After introducing himself and NACA's interest to the committee, Len Bennett focused the argument...]*

...The position of both the financial services industry and the credit bureaus is essentially the same - the FCRA system is perfect and you should not allow preemption to expire. The reality is far from these mis-truths. The Credit Reporting system remains seriously flawed and under present trends will only get worse. And the fear of the preemption sunset is blown out of proportion and would not jeopardize what national standards the FCRA has established.

Unlike some consumer protection statutes, the FCRA is not targeted to protect any particular group of Americans. It protects all of us. Wealthy and those of modest means alike. Husband and wife. Father and Son. It protects those of us in the South as much as those of you from any other region. I practice primarily in Hampton Roads, Virginia. As a result, I have had the privilege to represent countless members of the United States Armed Forces. I represented several consumers in pending cases while they proudly served our country in Iraq. And whether an enlisted or an officer, the law protects each the same. The FCRA's protections do not know party line or ideology. It is a unique statute for a unique problem. The law must protect our privacy. It should help maintain the security of our information. It could help expand a frictionless economy. And ideally it would better guarantee that those who have earned good credit are able to keep the fruits of their efforts and responsibility.

Beyond the importance of the FCRA to consumers, you must also consider its benefits to our economy and American business. In its original adoption of the FCRA, Congress found that "the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system." 15 U.S.C. Section 1681(a)(1). In considering the 1996 Amendments to the Act, Representative Kennedy explained, "[i]f these reports are not accurate, or if they are distributed without a legitimate purpose, then our whole society suffers. Consumers may be unfairly deprived of credit, employment, and their privacy. And businesses may lose out on the opportunity to gain new customers." 140 Cong. Rec. H9809, September 27, 1994. These insights are still true today. Accurate information is critical for a functioning economy. I am a believer in the free market system. The more accurate the information, the better the decisions made by our economy's actors. One of the principals I was taught in my undergraduate years studying the stock and investment markets is a concept titled "the efficient market hypothesis." The idea is that the investment markets will be fluid and frictionless only if perfect and equal information is available to all market participants. The same may be said for the consumer credit markets. Businesses need more accurate and complete information with which to make better lending decisions. Whether for the financing of an automobile, a home, or a department store purchase, sellers and lenders need access to accurate credit information so that they may transact business safely and with lower risk. These include large consumer lenders such as the credit card industry or mortgage lenders. But, it also includes more modest-sized businesses without the large margins for error available to institutional creditors. Credit file inaccuracies are damaging to businesses in both directions. Inaccurate credit reports may misstate the quality of a consumer's credit in a manner which could cause a potential seller or lender to inappropriately extend credit. The rise in consumer bankruptcies is one of the results of this false positive. On the other side of the coin, inaccurate derogatory information will keep businesses from selling and financing goods and services to consumers with otherwise excellent credit. The growing flaws in the credit system are endangering American businesses in both ways. Credit risks are inappropriately getting credit, while responsible consumers are often saddled with inaccurate derogatory histories that keep them from doing the same. The irony of the credit industry's opposition to FCRA improvement is the fact that the industry stands to gain as much as any other participant in this debate.

You have heard or will hear from countless witnesses

Continued on Page 11

EXHIBIT A

TESTIMONY: continued from Page 10

all who express the policy view of their respective organizations or trade groups. Few if any of your witnesses will have any live experience actually using or enforcing the statute. Throughout the history of the consumer credit laws, attorneys such as myself have been titled "private attorneys general" by courts and commentators. It is our role to bring private enforcement actions to ensure compliance with laws such as the FCRA. Without these efforts, the FTC would need an army of regulators to perform the function - a possibility an advocate of limited government such as myself could not accept. You have now met one of the individuals who actually goes into federal court to implement the laws that you enact. I and other members of NACA see the flaws in the FCRA firsthand. We face the walls and obstacles placed in the way of full enforcement by the credit bureaus and their army of lawyers. We face the limitations and restrictions of the FCRA on a daily basis. I would like to take this opportunity to better inform the sub-committee on the mechanics of the FCRA system and some of the flaws within it...♦

*[You can find the full text of this extensive testimony on NACA's website, at this address: http://www.naca.net/BennettFCRATestimony.pdf]*

**National Association of Consumer Advocates**

1730 Rhode Island Avenue, NW
Suite 805
Washington, DC 20036

202-452-1989
FX 202-452-0099

www.naca.net

## NACA Elections

**The NACA Nominating Committee recommends the following candidates for the Board in 2003-2004:**

Paul Bland

Cary Flitter

Laura McDowell

Janet Varnell

  

**The NACA Nominating Committee recommends the following as officers for 2003-2004:**

Paul Bland as Co-Chair

Nancy Barron as Co-Chair

Bob Hobbs as Treasurer

Cathy Mansfield as Secretary

**Vote and Make a Difference!**

EXHIBIT A

Frontline News

## MINORITY AUTO BUYERS BENEFIT FROM NMAC SETTLEMENT

Nissan Motor Acceptance Corp. (NMAC) and minority car buyers recently finalized the settlement of a lawsuit charging that NMAC's credit financing policy resulted in African Americans and Hispanics paying more in finance charges than whites. Consumer and civil rights groups called the settlement a significant step in their efforts to eliminate the industry practice of hidden markups that lead to discriminatory auto lending rates.

The case, *Cason et. al. v. Nissan Motor Acceptance Corp.* was filed in U.S. District Court for the Middle District of Tennessee at Nashville.

The lawsuit, filed in 1998, alleged that car dealers were more likely to increase or "mark up" the interest rate charged to black or Hispanic car buyers. The suit also contended that when a markup was charged, the average markup for black and Hispanic car buyers was greater than for white buyers with similar financial backgrounds.

"This settlement is important as it marks the first time a finance company has stepped up to be part of the solution to discriminatory lending practices in auto financing," commented **Stuart Rossman**, an attorney with the National Consumer Law Center who represented the plaintiffs in this suit. "However," Rossman noted, "NMAC is only one small player in the auto finance industry. We are hopeful that this settlement will serve as a starting point for other lenders as we continue our work to eliminate discriminatory lending practices."



*NACA member Stuart Rossman*

Under the terms of the settlement, NMAC will offer preapproved "no markup" loans based on customer creditworthiness to hundreds of thousands of current and potential black and Hispanic Nissan owners. The company will also limit how much it raises the interest rates charged to car buyers above the minimum acceptable rate (the markup), and will contribute $1 million over the next five years to low-income and minority consumer education programs.

"This settlement provides real value for car buying consumers," said Rossman. "The preapproved loan program together with funding for consumer education gives us an important opportunity to demystify the financing process for car buyers...as a result of this settlement, hundreds of thousands of minority car buyers will be informed of the lowest interest rate they qualify armed with this knowledge, they will now be able to negotiate their finance rate just like they negotiate the car's purchase price."

"Recognizing that disparities exist in the auto financing arena is an important step toward ensuring fair treatment for all consumers, regardless of race and ethnicity. We hope and expect that the NMAC case will be a pioneering example that other companies in the industry will soon follow," said Raul Yzaguirre, National Council of La Raza President.

"America's underserved consumers need to be armed with the realities of automotive financing. The NMAC settlement serves as a proper first step towards acknowledging the inequities within the industry," said Bonita Parker, National Director of Rainbow/Push, 1000 Churches Connected program a national financial literacy program for African American churches.

An important aspect of the settlement is the $1million in grants to national consumer and minority consumer education programs. Through this lawsuit, the plaintiffs sought a major commitment to consumer education around ways to avoid these charges. Funds will be granted to Consumer Federation of America's "America Saves" program, National Council of La Raza's financial education initiative and the Rainbow/Push Coalition's 1000 Churches Connected program.

NACA members **Wyman "Gil" Gilmore** and **Gary Klein** were among the plaintiff's co-counsel in this case.

A set of Frequently Asked Questions regarding the lawsuit and settlement agreement can be viewed at: http://www.nclc.org/initiatives/cocounseling/content/NMACFAQ.pdf

An outline of the settlement agreement can be viewed at: http://www.nclc.org/initiatives/cocounseling/content/outline.pdf

*Continued on Page 13*

EXHIBIT A

# Frontline News

## Mississippi Supreme Court Rules That Major Poultry Producer Cannot Force Family Farmers into Arbitration

The Supreme Court of Mississippi ruled on June 26, 2003 that Sanderson Farms, Inc. (Sanderson)—one of the top seven poultry producers in the United States—wrongfully denied family farmers Roy and Nelda Gatlin of Jones County, Mississippi, the right to have their day in court, when the company terminated the couple's production contract prematurely, then breached its promise to pay half the $11,000 estimated costs for an arbitration hearing.

The Court affirmed by a 6-3 vote the ruling of the Circuit Court of Jones County, which found that Sanderson had violated its own arbitration clause and, in so doing, waived its ability to force the farmers into arbitration. Trial Lawyers for Public Justice (TLPJ) Staff attorney **Michael J. Quirk**, wrote the Gatlins' brief on appeal, arguing that the arbitration clause was unconscionable for imposing significant costs and depriving the farmers of their right to recover punitive damages or participate in class actions.

"Arbitration costs exceeding $10,000 are shocking to the conscience," said Quirk. "The Court's decision tells companies that they cannot spring unexpected and excessive arbitration costs on family farmers to prevent them from getting access to justice."

*Michael J. Quirk, Staff attorney for Trial Lawyers for Public Justice Photo Credit: Herman Farrer*

"The Court's decision, in both the majority and dissenting opinions, shows that arbitration should be used as an alternative method for resolving disputes, not as a weapon for depriving people of a forum for resolving disputes," said J. Dudley Butler of Jackson, Mississippi, co-lead counsel for the Gatlins. "Arbitration is a valuable tool when properly used, but is all too often abused by corporations seeking to insulate themselves from defenses such as fraud, duress, and unconscionability. Arbitration should be permitted only when the parties knowingly and voluntarily agree to it; it should not be imposed through power and chicanery."

Independent farmers Roy and Nelda Gatlin first contracted with Sanderson to raise broiler chickens in 1980, when the couple bought their farm in Jones County, Mississippi. Later, Sanderson authorized them to build two additional broiler houses on their farm, based on their ranking in the top 50% of the company's growers. The Gatlins pledged their farm, which included their home and four broiler houses, as security on a mortgage of over $250,000 so they could perform their contract with the company. In January 1997, Sanderson presented a new 15-year contract to Roy Gatlin, which for the first time contained a mandatory arbitration clause. The arbitration clause provided that costs arbitration were to be divided equally among the parties.

Some time after Gatlin and Sanderson signed the 15-year contract, Gatlin was told that Sanderson would find a way to terminate the contract because of Gatlin's earlier questioning of the company's management procedures. On Christmas Day, 1997, Sanderson called Gatlin and told him to come to its office the next day. Sanderson informed the Gatlins on December 26, 1997 that it was going to terminate their contract effective January 1, 1998, with 14 years remaining on the contract. Sanderson Farms then took its most recent shipment of chickens from the Gatlins and delivered them to another grower. The Gatlins immediately contacted every poultry processing company in their area, but all of them refused to deliver chickens to the Gatlins.

In February 1998, Roy Gatlin filed a demand for arbitration against Sanderson and paid half the $2,750 arbitration filing fee to the American Arbitration Association (AAA), the private legal system chosen by Sanderson Farms. But Sanderson refused to pay any of the filing fee when AAA requested payment of the balance, claiming that its arbitration clause's reference to the "cost of arbitration" did not include the filing fee. Gatlin paid the full $2,750 filing fee to AAA. In July 1999, less than two weeks before the arbitration hearing was to be held, Gatlin received a billing statement from AAA requiring him to pay an additional $8,250 in arbitration costs, including $6,900 in arbitrators' compensation and $1,000 in arbitrators' expenses. Adding this to his prior payments, Roy Gatlin would have been required to pay at least $11,000 even before getting his arbitration hearing. Unable to afford these costs, he was forced to abandon the arbitration.

Continued on Page 24

EXHIBIT A

*NACA is a member-based organization which achieves its effectiveness through the participation of many good people. While the 12-member Board meets monthly or more to further the administration of NACA, discuss allocation of resources, and coordinate policy with the Executive Director, a great deal of exciting work goes on at the committee level. Non-Board members are welcome and encouraged to participate in committee work at every level. Variation in experience and time commitment is the norm, not the exception. Members interested in serving on the*

**Dear NACA Members:**

As we approach our annual conference, I'd like to update you on of NACA's recent activities and plans for the upcoming year. I continue to be amazed by the breadth and depth of our members' accomplishments and excited about our potential for contributing to a nation where consumer justice is not merely a pipedream but a reality.

**Legislative Activities**

On mortgage lending issues, we continue to be actively involved in several ways. The federal Ney Bill attempts to undo all the good work consumer advocates have done in states on predatory lending seems to be dead for this Congressional year. Unfortunately, strong state mortgage legislation is being threatened by the Office of the Comptroller of the Currency (OCC), which has set its sights on preempting all state laws that affect national banks and their operating subsidiaries. We're currently engaged in a coordinated effort to stop the OCC, offering comments on their proposed regulations and are helping with amicus briefs on cases where OCC is attempting to expand its preemptive powers. Finally, and maybe most hopefully, we remain in active conversation with Fannie Mae and Freddie Mac about developing model state predatory lending legislation that we all can support. It is my optimistic belief, that because these companies have a special federal charter that gives them an important public purpose (although all too often they have to be reminded of this), we have a great opportunity to make this model legislation happen. Equally important, I remain hopeful that we can move these companies to adopt business practices that will strongly influence other businesses in the consumer marketplace.

We continue to be actively engaged in the FCRA legislative battle, where industry is seeking to prevent states from providing their citizens with additional credit reporting and financial privacy protections. A bad bill has passed the House, but we remain hopeful because we count among our potential allies, powerful Senators Shelby and Sarbanes. Additionally, we remain a central player in the morass that is RESPA reform. What started out as our attempt to force HUD to proactively fix the yield spread premium problem (after they harmed consumers and their advocates with their infamous 2001 Opinion Letter), has turned into a free-for-all as various industry groups are fighting tooth and nail amongst themselves to preserve their piece of the real estate settlement goldmine (again for more details see www.naca.net). We remain in there fighting for "fair and balanced" RESPA reform (I know enough lawyers so I feel safe in using that term), but with an administration not often sympathetic to the needs of American consumers, I remain extremely nervous about what HUD will ultimately do.

Because of the enormous potential of our organization to wage these important battles, we are now beginning to explore whether we need to hire a staff person to work exclusively on our legislative agenda. I am particularly interested in raising the political profile of what we all know to be the current biggest threat to consumer justice: mandatory arbitration. If we can develop a stable funding source (and with all your help, the possibilities are there), I believe this is something we can and will make happen.

**Conferences**

Because we seriously listen to your feedback, we have decided that the FCRA and Autofraud conference will be annual events that occur around the same time

*Continued on Page 13*

EXHIBIT A



# Pages

*Board in the future most often begin by serving on one of more committees. Active involvement is clearly an example of getting back what one gives. The experience of working intensively with other seasoned advocates keeps the learning curve steep and the professional edge sharp. Volunteers, interested in working with any of the following committees are invited to email NACA Administrative Director Phyllis Roderer at phyllis@naca.net. —Ed.*

each year. To provide sufficient time between the events, we intend to have the Autofraud Conference in February and the FCRA conference in May. The FCRA steering committee, led by the indomitable Ian Lyngklip, has already begun building on last year's conference and we can expect another great event. Aurora Harris has already begun the planning process for the Autofraud conference to focus on the financing of the car deal.

**Membership Benefits**

One of our central missions is to make NACA membership a valuable resource for all of our members. We are always looking for ways to help our members make their practice of law easier, more enjoyable and more profitable. To this end, you should or will be receiving our first venture into publishing, "Practice of Consumer Law," a joint effort with our close friends at NCLC. This book, free to all our members, has lots of incredibly helpful practical ideas, and if all goes well, will be supplemented on a yearly basis. In addition to this book, we have successfully moved all our discussion groups to our own server. This will enable us to attach important pleadings to our shared messages and allow us to build and develop carefully developed archives of important substantive material. Additionally, thanks to a generous cy pres award to NACA and NCLC from an anonymous member, we together will soon begin building a comprehensive database of information for members practicing Fair Credit law.

Finally, because of your concern about the increase and/or cancellation of malpractice insurance for private consumer lawyers, we have been working diligently to find a way to help our members obtain affordable insurance. While all the details have not been finalized, I am confident enough to announce that we have arranged to make malpractice insurance available to all interested members. We expect to have the opportunity to purchase this insurance by the time of the Annual conference. If you can't wait until then—feel free to contact me now.

**Thank You**

NACA continues to flourish because of the incredible generosity of our members. I'm repeatedly honored when we are told that we have been chosen as a cy pres recipient. In the last month, besides the anonymous cy pres donation, we received word of a wonderful award from Tom Campbell of Campbell and Baker in Birmingham, Alabama. Additionally, we recently received a tremendous cy pres award from Stacy Bardo, Brian Bromberg, Lance Raphael and Paul Sod. Their incredible kindness will allow NACA to fund all the scholarship requests we have received from our members for the Annual Conference.

Thank you all again and I look forward to talking with everyone in Oakland. ◆

Ira

EXHIBIT A

# TECHNOLAWYER.COM:

# NO STRINGS ATTACHED: CUTTING THE CORD WITH A WIRELESS LAW PRACTICE

by Ross L. Kodner

## INTRODUCTION

Those frustrating cables -- they're everywhere! Intertwining and connecting seemingly plug-incompatible gadgets in our laptop cases; tangling purses and briefcases in a snakelike mass of plastic-encased cords; connecting Palms to PCs; going from headsets to cell phones; "conveniently" linking us to printers (when sometimes the cables weigh more than the laptop); stretching to scanners; retracting (or not) from telephones; coiling like a garden hose around the legs of our chairs while connecting us to a network. Arrgh! Enough!

It's time to banish the cable headache once and for all. Wireless technology is the answer. It's hard not to hear about the rise in wireless devices today. From network connections for our laptops and Palms to wireless earphones for our cell phones, wireless e-mail, wireless Internet "hot spots," the practice of "warchalking" sidewalks to note wireless Internet access points in metro areas—we're walking in a wireless wonderland, and just in the nick of time.

What kinds of wireless devices make sense for lawyers? Why, many pragmatic wireless devices and applications exist for lawyers and their staff, for firms of all sizes and for practices of all types. Several key wireless technologies recently have gone past being de rigueur and have morphed into "must haves." What sort of setup makes sense for you? Different methods for wireless connections, including WiFi (otherwise known as "Wireless Ethernet") and its short-range cohort, Bluetooth technology, have appealing features that may serve you well.

## WIRELESS NETWORKING

Most law firms with more than one PC have them networked together to share data, programs, and peripherals such as printers and backup systems. Traditionally, this network has involved some kind of interconnecting device (typically referred to as a "hub" or a "switch") and cables to actually connect the device to the PCs. Firms that planned ahead and installed network cable outlets in many places throughout their offices have had the luxury of being able to sit and work, connected to their networks (and via them to the Internet) at any of these "cable points."

But what happens when one of the lawyers wants to sit in the library with laptop in hand and get work done, surf the Net, and so forth? How about the office's kitchen area? What if there aren't any cable points there? The localized nature of cable points has meant there has been no practical way to access from all points in an office the network documents, calendars, the Internet, or even e-mail. And that, today, just isn't acceptable.

Switch gears and consider computing in your home. In more and more families, all members have their own PCs. Add a speedy new cable modem to access the Internet and you end up with a chaotic logjam—everyone wants to access the Net at the same time. Spending hundreds, if not thousands, to run network cabling in an existing home is not an appealing option. In the interest of family harmony, if not just plain convenience, finding a way to wirelessly share printers and Internet connections becomes a necessity.

Wireless networking technology isn't new. For a number of years there have been methods, usually oriented to home users, for connecting PCs without the need for a physical cable connection. Until relatively recently, however, none of these methods has been very workable or reliable ... or affordable. With the advent of a new generation of wireless network technology, based on the virtually ubiquitous Ethernet system for connecting PCs and peripherals, a new era for wireless connectivity has dawned. Many predict that those leveraging some version of 802.11x wireless network technology (often referred to as WiFi) may eventually outnumber the corded set among us.

WiFi, currently available in several numerical flavors, is the most popular wireless networking technology. A cableless derivative of tried-and-true Ethernet network, it is now standard equipment in many laptops, some printers, some Palm-sized devices, and even some LCD projectors. The technology is successful because, well, it actually works. The most common form is called 802.11b. This system sends and receives information via a device called a wireless access point at 11 Mbps (megabits per second: remember to divide by 8 to get "megabytes per second"), with some systems capable of "turbo" mode at double that speed. If you purchased a laptop in the last 18 months that has wireless capability, it likely uses the 802.11b transmission standard. Practical operating

Continued on Page 18

EXHIBIT A

TECHNOLAWYER.COM: continued from Page 16

ranges extend to about 1,000 feet under perfect conditions, but actually more like 200 feet inside a building—more than adequate to take one's laptop outside onto the deck at home or into the office's conference rooms.

A wireless access point is a small box that connects to your existing network. It adds the whole network to communicate wirelessly with the wireless-equipped devices on your network. Some wireless access points, often designed for home use, also incorporate a router to allow shared access to a cable modem or DSL Internet connection and often standard network hub capabilities to interconnect cabled network components. They sometimes include Internet firewall capabilities as well: consider them the multifunction devices of the networking world. Popular makers include Linksys, D-Link, U.S. Robotics, Netgear, Orinoco (Lucent Technologies), Cisco, 3COM, and even Microsoft. Typically, a wireless access point/cable and DSL router/network hub will cost between $90 and $200 for home-oriented units to as much as several thousand for high-capacity, high-security units intended for larger offices.

The next piece of the puzzle is the wireless "card"—the component either built into a PC or printer, or added to one that communicates with the wireless access point. More and more laptops, and even several higher-end Palm-sized devices, have wireless capability (generally following the 802.11b standard) built-in. If not, a wireless PC card can be added to a laptop for between $50 and $150. For desktop PCs, the options are internal PCI cards or external USB wireless adapters, which cost between $50 and $125. It is also possible to connect non-PCs wirelessly -- devices with thernet networkability such as printers, some scanners, and yes, even the new "Internet-enabled refrigerators." This is done with a device called a "wireless bridge," offered for about $100 by companies such as Linksys <http://www.linksys.com>.

Security is always an issue with a network, so it is even more so when all those bits and bytes float through the air. The 802.11b standard uses a security system called WEP (wired equivalent privacy). Unfortunately, this method hasn't lived up to its acronym and has been proven to be penetrable. Even though WEP is only somewhat effective at securing wireless network transmissions, it is still far better to turn it on than not. Also, every wireless network has a special identifier called an SSID. This is essentially an identifying code that is exchanged between the wireless access point and PCs trying to connect with it. It is critical to reset the SSID on a new wireless access point (and on the PCs connecting to it) to something other than the default setting. At a minimum, this can prevent unauthorized wireless-equipped users from "leveraging" your wireless network connections.

The newer 802.11g systems employ far more sophisticated security capabilities—WEP on steroids so to speak. While some clever hacker may someday demonstrate that the security of the "g" system can be broken, it hasn't happened yet. This, along with connection speeds nearly fives times faster, is a compelling reason to invest in a "g" system.

The future of WiFi? More and more companies are embedding WiFi capability into an ever-widening array of devices. Wireless access points in public locations are multiplying rapidly. Hotels are exploiting 802.11b technology to create wireless zones in their properties, which is much less costly than offering high-speed Internet access to guests by installing physical cabling to every guest room. Companies like Wayport are leading the charge in hotels. Many Starbucks locations around the country are offering T-Mobile's version of 802.11b access, with online charges offered daily or by monthly subscription. Services like Boingo <http://www.boingo.com/> offer a flavor of 802.11b at hundreds of access locations nationwide. Laptop maker Toshiba is teaming up with Circle K convenience stores to offer wireless zones. (Hmm ... high-speed Net access, a tank full of unleaded premium, and Twinkies: why does that combination seem so dangerous?) Expect to see more and more 802.11b access points nationwide.

**A LONG VIEW ON A SHORT APPROACH**

WiFi is not the only wireless system for connecting electronic gizmos. A standard called Bluetooth has been in the offing for years and is now coming to fruition. Bluetooth is a short-range transmission system intended for interconnecting personal devices into what some have referred to as a PAN (personal area network). Examples of Bluetooth capabilities include cordless communication between an earphone/headset and a cell phone. Or how about a cell phone and a PDA that "talk" to each other when they're in range and automatically synchronize their contact lists? Consider a Bluetooth-enabled PDA that can print its content to a Bluetooth-equipped laser printer. Bluetooth devices have an effective transmission range of about 30 feet. Future possibilities could include capabilities that would synchronize a PDA's street map software to a future Bluetooth-equipped car's in-dash navigation system.

Another short-range wireless connection approach is infrared (IR) technology. Familiar to many as the system that makes your TV's remote control work, the technology has been available in PCs for some time. Most PDAs have an infrared system. This can be used to beam information between PDAs or to connect PDA and PC, sans cables, to synchronize their information. Some printers also have IR capability, allowing an IR-equipped laptop or PDA to print without a bulky parallel cable or

Continued on Page 26

EXHIBIT A

LYNGKLIP: Continued from Page 6

## Endnotes

1. Hendricks & Moch, Protective Orders: The Industry's Silencer on the Smoking Gun, 73 Mich.B.J. 424 (May, 1994).

2. *United States v. Nixon*, 418 U.S. 683, 710, 41 L. Ed. 2d 1039, 94 S. Ct. 3090 (1974): "privileges contravene the fundamental principle that the public . . . has a right to every man's evidence."

3. *In re Grand Jury Subpoena*, 836 F.2d 1468 (4th Cir. 1988). Protective orders should not be used to conceal wrongful conduct. In addition, a protective order cannot serve as more than a stopgap measure to seal discovery materials. Incriminating information will normally be disclosed at trial even if the information is effectively suppressed prior to that time.

4. *US v. Amodeo*, 71 F.3d 1044 (2nd Cir. 1995) at 1051 recognizing that personal financial information is presumptively private. Accord, *In re Boson Herald, Inc.*, 321 F.3d 174 (1st Cir. 2003). See e.g. *Gattegno v. Price Waterhouse Coopers, LLP*, 205 F.R.D. 70 (D. Conn. 2001).

5. *Siedle v. Putnam Inv., Inc.*, 147 F. 3d 7, 10 (1st Cir.); *In re Providence Journal Co., Inc.*, 293 F. 3d 1 (1st Cir 2002).

6. *FTC v. Standard Fin. Management Corp.*, 830 F2d 404, 408-409 (1st Cir. 1987); *US v. Amodeo*, 71 F.3d 1044 (2nd Cir. 1995); *Video Software Dealers Assoc. v. Orion Pictures Corp.*, 21 F.3d 24, 26 (2d Cir. 1994); *US v. Myers (In re Nat'l Broadcasting Co.)*, 635 F.2d 945 (2nd Cir. 1980); *Brown and Williamson Tobacco Corp. v. FTC*, 710 F.2d 1165 (6th Cir. 1983); *In re. Knoxville News Sentinel Co.*, 723 470 (6th Cir. 1983); *Grove Fresh Distributors, Inc. v. Evefresh Juice Co.*, 24 F.3d 893 (7th Cir. 1994); *In re Continental Illinois Securities Litigation*, 732 F.2d 1302 (7th Cir. 1984); *American Tel. &Tel. C. v. Grady*, 594 F.2d 594 (7th Cir. 1978).

7. *Harris v. Amoco Production Co.*, 768 F.2d 669 (5th Cir. 1985). Courts interpreting F.R.C.P. 26(c) have afforded trial courts much discretion with regard to the granting and fashioning of protective orders. "If the party from whom discovery is sought shows 'good cause,' the presumption of free use dissipates, and the district court can exercise its sound discretion to restrict what materials are obtainable, how they can be obtained, and what use can be made of them once obtained."

**www.naca.net**

...for information
important to you--and your clients!

8. "While District Courts have the discretion to issue protective orders, that discretion is limited by the careful dictates of Fed. R. Civ. P. 26 and 'is circumscribed by a long-established legal tradition' which values public access to court proceedings. *Brown & Williamson Tobacco Corp. v. FTC*, 710 F.2d 1165, 1177 (6th Cir. 1983), *cert. denied*, 465 U.S. 1100, 80 L. Ed. 2d 127, 104 S. Ct. 1595 (1984)." *Bankers Trust, supra.*

9. *Press Enterprise Co v. Superior Court*, 464 U.S. 501, 509-510, 104 S. Ct. 819, 78 L.Ed. 2nd 629 (1984).

10. *US v. Amodeo*, 71 F.3d 1044 (2nd Cir. 1995) at 1048.

11. *Leucadia, Inc. V. Applied Extrusion Tecnologies, Inc.*, 998 F. 2d 157, 161 (3rd Cir. 1993).

12. *US v. Amodeo*, 71 F.3d 1044 (2nd Cir. 1995) a 1048 (comparing the discovery process by which no stone is left unturned to the litigation process through which the irrelevant evidence is discarded).

13. *Cipollone v. Liggett Group*, 785 F.2d 1108, 1121 (3d Cir. 1986); *Burns v. Imagine Films Entertainment*, 164 F.R.D. 589, 592-593 (W.D. N.Y. 1996); *Chubb Integrated Systems v. National Bank of Washington*, 103 F.R.D. 52, 58 (D.C. 1984).

14. *Wagner v. Dryvit Sys.*, 208 F.R.D. 606 (D. Neb. 2001) at 611. *(Citing, See, Laker Airways Ltd. v. Pan American World Airways*, 103 F.R.D. 42, 45-6 (D.C.D.C. 1984)).

15. *Brittian v. Stroh Brewing Co.*, 136 F.R.D. 408, 412 (D.NC 1991); *Nestle Foods Corp. v. Aetna Cas. and Sur. Co.*, 129 F.R.D. 483, 487 (D.NJ 1990).

16. *United States v. Panhandle Eastern Corp.*, 118 FRD 346 (D. DE 1988).

17. *In re "Agent Orange" Prod. Liab. Litigation*, 821 F.2d 139, 145 (2d Cir. 1987); *Glenmede Trust Co. v. Thompson* 56 F.3d 476 (3rd. Cir. 1995) *In re Wilson*, 149 F.3d 249, 252 (4th Cir. 1998). *Harris v. Amoco Production Co.*, 768 F.2d 669 (5th Cir. 1985). *P&G v. Bankers Trust Co.*, 78 F.3d 219, 227 (6th Cir. 1996). *Baxter Intern., Inc. v. Abbot laboratories*, 297 F.3d 544, 548 (7th Cir. 2002). *San Jose*

Continued on Page 19

EXHIBIT A

LYNGKLIP: Continued from Page 18

*Mercury News, Inc. V. United States Dist. Ct.*, 187 F.3rd 1096,1102 (9th Cir. 1999); *General Dynamics Corp. v. Selb Mfg. Co.*, 481 F.2d. 1204, 1212 (8th Cir. 1973); Miscellaneous Dockeet Matter No. 1 v. Miscellaneous Docket, 197 F.3d 922, 926 (8th Cir. 1999); Phillips v. GM, 307 F.3d 1206 (9th Cir. 2002); *In re Standard Metals Corp.*, 817 F.2d 625,628 (10th Cir. 1987); *Farnsworth v. Procter & Gamble, Co.*, 758 F.2d 1545, 1547 (11th Cir. 1985); *Chicago Tribune Co., v. Bridstone/Firestone, Inc.*, 263 F.3d 1304, 1313 (11th Cir. 2001).

18. *Pulsecard, Inc., v. Discover Card Services*, 168 F.R.D. 295, 303 (Kan. 1996). *See, St. Paul Reinsurance Co., Ltd. v. Commercial Financial Corp.*, 198 F.R.D. 508 (N.D. IA 2000).

19. *Avirgan v. Hull*, 118 F.R.D. 252, 254 (D.D.C. 1987). See, *e.g., Waelde V. Merck, Sharp, & Dohme*, 94 F.R.D. 27, 28 (E.D. Mich. 1981) (Movant must make a particularized showing and demonstrate specific examples of competitive harm" where good cause is predicated on claims of confidential trade secrets); *Deford v. Schmid Products Company*, 120 F.R.D. 648, 653 (D. Maryland 1987) (Movant must show that disclosure would cause significant harm to its competitive and financial position, supported by affidavits and concrete examples; conclusory allegations of potential harm are insufficient.); *Zapata v. IBP, Inc.*, 160 F.R.D. 625, 627 (D. Kan. 1995)( "the initial inquiry is whether the moving party has shown that disclosure of the information will result in a 'clearly defined and very serious injury.'" See, *Koster v. Chase Manhattan Bank*, 93 F.R.D. 471, 480 (S.D. N.Y. 1982)). The moving party must also make "a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 102 n.16, 68 L. Ed. 2d 693, 101 S. Ct. 2193 (1981).

20. Under Fed. R. Civ. P. 26(c)(7), the party opposing discovery has the initial burden to demonstrate that the information requested is a "trade secret or other confidential research, development, or commercial information," and also that its disclosure would be harmful to the party's interest in the property. *Sentry Ins. v. Shivers*, 164 F.R.D. 255, 256 ( D. Kan. 1996). In determining whether good cause exists to issue a protective order that prohibits the dissemination of documents or other materials obtainein discovery, "the initial inquiry is whether the moving party has shown that disclosure of the information will result in a 'clearly defined and very serious injury.'" *Zapata v. IBP, Inc.*, 160 F.R.D. 625, 627 (D. Kan. 1995) (quoting *Koster v. Chase Manhattan Bank*, 93 F.R.D. 471, 480 (S.D. N.Y. 1982)). The moving party must also make "a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 102 n.16, 68 L. Ed. 2d 693, 101 S. Ct. 2193 (1981). The burden then shifts to the party seeking discovery to show that the information is relevant to the subject matter of the lawsuit and is necessary to prepare the case for trial. *In re Remington Arms Co., Inc.*, 952 F.2d 1029, 1032 (8th Cir. 1991).

21. Whether a specific disclosure would constitute a trade secret is matter of state law. While some distinctions between the definition between states, most case law looks to the Uniform Trade Secrets Act for the applicable definition of a trade secret.

22. *Federal Open Market Comm. of Federal Reserve Sys. v. Merrill*, 443 U.S. 340, 362, 61 L. Ed. 2d 587, 99 S. Ct. 2800 (1979); *Centurion Indus., Inc. v. Warren Steurer & Assocs.*, 665 F.2d 323, 325 (10th Cir.1981).

23. *Wagner v. Dryvit Sys.*, 208 F.R.D. 606 at 612. (Citing, *Laker Airways Ltd. v. Pan American World Airways*, 103 F.R.D. 42, 45-6 (D.C.D.C. 1984)). ♦

**NACA ISSUES COMMITTEE**

The National Association of Consumer Advocates takes an active role in advocating consumer interests by filing amicus briefs in a number of leading consumer protection cases before the United States Supreme Court and other courts across the country. Whenever possible we will make these amicus briefs available for the benefit of our members on the newly revised website at www.naca.net, stored in PDF format.

**www.naca.net**

**Check it out!**

If you have appellate level experience and would like to participate on the issues committee, contact:

**Paul Bland at PBLAND@tlpj.org**
or
**Ira Rheingold at ira@naca.net**

EXHIBIT A

DOMONOSKE: *Continued from Page 20*

## The Key Bank System

Similar to Sallie Mae, Key Bank provides liquidity to computer training schools without regard to the misrepresentations made by the school or its unlicensed status. Similar to Sallie Mae, Key Bank does not want to be bound by the FTC Holder Rule even though it uses the schools to solicit its loans and to present its loan documents to the students. Key Bank's business plan is very simple: it simply refuses to place the FTC Holder Rule clause in the loan document. Key Bank claims that because the clause is not in any of the loans, none of the loans are subject to any claims based on the schools' misconduct.

Because the FTC regulates the sellers and not banks, the FTC places an affirmative duty on the school not to accept proceeds from a non-compliant loan, rather than placing a duty on the Key Bank not to prepare a non-compliant loan. Because of the relationship between the schools and Key Bank, no dispute exists that the loans from Key Bank are covered by the FTC Holder Rule.[11] Therefore, Key Bank's system places each school in violation of the FTC Holder Rule by not placing the Holder Notice in the contract. At the time each loan is disbursed, Key Bank knows each school is violating federal law by accepting the proceeds, and intends to deny the student the benefit of the FTC holder rule.

Key Bank's legal justification for knowingly placing the schools in violation of the FTC Holder Rule is simply that the FTC does not regulate banks and that Key Bank bears no responsibility for each schools' violation of the Holder Rule. Key Bank simply does not care that each loan is solicited by an entity that is violating federal law, and does not care that the students are being denied this fundamental federal consumer protection.

Similar to Sallie Mae, Key Bank's system disclaims any responsibility for illegal conduct by the schools. If the school is unlicensed or if it makes misrepresentations to trick the students into signing up for classes and taking the loan, Key Bank repeats its mantra that it is not responsible for the actions of the school. Because Key Bank intends to cutoff any liability for the schools' misconduct, it has no incentive to ensure it is providing liquidity to legitimate schools. Instead, contrary to the basic purpose of the FTC Holder Notice, Key Bank places the entire responsibility to police the conduct of the schools on the students. On its computer training loan program website, it informs all students that, "It is your responsibility to determine the quality of the institution and the programs offered."[12]

Given that satisfied customers are more likely to repay loans, Key Bank's willingness to fund bad loans seems at first glance to be counterproductive for its own bottom line. However, Key Bank does not intend to hold all the loans during their repayment period; instead it pools and sells its the loans to investors. Through a process called "asset-backed securitization," Key Bank obtains full value for the loans by selling them to an investment trust. It sells the loans as if they were honest and legitimate transactions solicited by schools that were acting properly. Key Bank does not disclose the loans were based on illegal conduct or that the loans should be subject to all claims and defenses each consumer had against each school. Consequently, the investors pay full value without a disclosure of the inherent defects in the loan.

Thus, Key Bank's complete system is to create a product (a loan pool), through a series of unlawful transactions (school's violating the FTC Holder Rule), and sell that product for as much money as possible to an unsuspecting buyer (an investment trust comprised of duped investors). This is a classic fraud in the marketplace, like selling a car with a rolled back odometer, only done on a large scale through the securitization process. By providing liquidity that fuels the growth of computer training school abuses, Key Bank is harming legitimate training schools that lose potential customers to sham schools, harming the students who are left with loans but no training, and harming investors who buy into the investment trusts without complete disclosure of the violations of law.

Key Bank's practice is very successful because it does not incur the expense of monitoring and curbing the illegal behavior of the schools its uses to solicit its loans. In fact, by placing the schools in violation of the FTC Holder Rule by accepting the proceeds of a Key Bank loan, Key Bank is encouraging the schools to disregard consumer protection laws. By reducing its overhead to produce its product (the loan pool), it gains an advantage in the marketplace. Key Bank is committed to this system, and is aggressively defending the several cases that have been filed in an effort to curb its defiance of the FTC Holder Rule. It claims that its practice is normal banking practice.

## The Efforts to Enforce the FTC Holder Rule

By refusing to honor the FTC Holder Rule, creditors like Key Bank and Sallie Mae exercise tremendous power to harm the lives of victims of these closed schools. Some of the students have been forced into bankruptcy, while others have been forced to refinance their debts to pay the high interest loan for which they received no benefit. If the victims simply assert the FTC Holder Rule and refuse to pay the loan, negative information is reported to their credit that ruins their credit score. By the

*Continued on Page 22*

EXHIBIT A

DOMONOSKE: Continued from Page 21

simple act of reporting the loan debt on each victim's credit, Sallie Mae and Key Bank can coerce payment on these loans. Unless Sallie Mae and Key Bank choose to fully comply with the FTC Holder Rule, these victims will need consumer advocates to take up their cause to enforce their rights.

From interviews with dozens of these victims, finding consumer advocates to assert their rights is extremely difficult. They have tried state Attorney General offices, state Consumer Protection offices, the Better Business Bureau, state and federal legislators, and private lawyers. Given the arbitration clause in the Sallie Mae loans and the absence of the FTC Holder Rule in the Key Bank loans, most of the victims were unable to find private lawyers who were able to help them. The amount of misinformation being given out also hampers their efforts. For example, the official website for Central Piedmont Community College of North Carolina supposedly provides information to victims of SCD. It states:[13]

◆   Since SCD closed and took all of my money with them, am I still expected to pay for my student loan that I received from SLM, and/or Key Bank?

Both financing institutions, Sallie Mae/SLM, and Key Bank, are holding students responsible for paying the loans back under the terms of the original loan agreement.

◆   As a student that did not receive what they paid for, nor what SCD promised, what legal rights do I have?

CPCC in no way is involved in any legal dealings with the closing of Solid Computer Decisions. If a former student of SCD wishes to seek legal action, students are expected to handle that situation personally.

No mention is made of the FTC Holder Rule that is in all the Sallie Mae loans. Furthermore, because it is a state official website, its answer to the question, "Am I still expected to pay for my student loan?" appears to be state approval of the idea that the full loan must still be repaid.

Similarly, by letter dated August 23, 2002, one victim of a closed school received the following information from her United States Senator regarding her obligation to repay a loan for classes she never received. "Your loan, with SLM Financial, is a private loan and therefore does not carry the same rights for borrowers as would a government-backed student loan. Therefore, regardless of your school's actions, you are bound by the terms spelled out in the promissory note signed at loan issuance."[14]   Consequently, even a United States

Senator, who states he had repeated conversations with the Ombudsman for Salle Mae and with the Quality Assurance Division of SLM Financial, was misled about the existence and effect of the FTC Holder Rule in all the Sallie Mae loans.

Even the FTC has been unable or unwilling to make Sallie Mae comply with its own Holder Rule notice. Several victims and the National Consumer Law Center have alerted the FTC about the situation. Despite these efforts, on May 30, 2003, Sallie Mae Servicing sent a letter to the Better Business Bureau in response to a complaint made by a victim of Ameritrain in Georgia. After acknowledging that Ameritrain of Georgia closed before the student could complete her training, the letter stated "Sallie Mae Servicing is unable to accept any reduced amount as payment in full for you account. By signing the promissory note, [you] agreed to pay in full the principal and valid interest that accrues on the account."[15]

Non-litigation efforts to address Key Bank's system have been similarly unsuccessful. State Attorney General offices are told they have no power to regulate a national bank. Because of a forum shifting clause that requires all claims to be brought in the locality of the principal place of business of the holder of the note, and because the holder in a securitized transaction is hard to determine, private lawyers have a difficult time determining where any action should be filed. Consequently, victims of both Key Bank and Sallie Mae have spent months and even years trying to find an advocate to help them.

Lawyers in several states have filed lawsuits against both Key Bank and Sallie Mae on behalf of victims who obtained loans for computer training schools. In addition to raising the FTC Holder Rule issues, the lawsuits also raise claims under various statutes, including the Truth in Lending Act, the Equal Credit Opportunity Act, and state UDAP statutes. Fraud and conspiracy claims are also included. Some of the lawsuits include hundreds of named plaintiffs, some just one or two, and some are filed as class actions. The primary goal is to have Key Bank and Sallie Mae honor the FTC Holder Rule.

For the Key Bank lawsuits, NACA members **Dan Clark** (Florida), **Michael Ferry** (Missouri), **Ron Burdge** (Ohio), and **Dale Pittman** and **Tom Domonoske** (Virginia), have filed a series of cases against Key Bank and the other entities involved in the securitization process. Dan Clark has brought a national class action on behalf of students who were enrolled at Solid Computer Decisions, and most of the cases have been transferred to Ohio under a forum shifting clause. Other lawyers from states like Alabama and Maryland are bringing case and several state Attorney General offices are looking into the issue. Key Bank continues to assert

Continued on Page 23
EXHIBIT A

DOMONOSKE: Continued from Page 22

that its system is normal banking practice and wants to win judicial approval for evading the FTC Holder Rule. If it is successful, all other private lenders can be expected to adopt its system.

For the Sallie Mae lawsuits, Dan Clark, Dale Pittman, and Tom Domonoske have filed a series of cases against Sallie Mae subsidiaries. In each Sallie Mae's lawyers have pursued arbitration and have succeeded in sending some cases to arbitration. At this time, none of the cases have actually proceeded to arbitration because settlement discussions are ongoing. Although Sallie Mae initially acted like Key Bank and claimed the right to continue in its defiance of the FTC Holder Rule, Sallie Mae has now changed its position and is acknowledging some responsibility under the FTC Holder Rule. It states it is willing to cancel loans for classes that were never provided. At issue still is how much responsibility Sallie Mae bears for misrepresentations of the school or for other types of claims against the schools, and whether Sallie Mae is providing that relief to all victims, or just those lucky enough to have found counsel willing to take the case.

## The Effect of Sallie Mae Modifying Its Practices

As Sallie Mae recognizes some responsibility under the FTC Holder Rule for the actions of the schools, it then necessarily responds to how it provides liquidity to computer training schools. Sallie Mae has reported that it no longer provides loans to unlicensed schools and that it no longer provides the full amount of the tuition up front for a sequence of courses. In this way, the goal of the FTC Holder Rule is beginning to be implemented. As the negative effects of providing liquidity to bad actors is captured internally within the financial structure, Sallie Mae has the proper financial incentive to ensure that it is not creating the con artists' dream world that fuels the creation of sham schools. When Sallie Mae fully implements the FTC Holder Rule and recognizes that other claims against the schools, whether based on misrepresentations by the school or violations of state UDAP laws are also claims or defenses to the loans, it can be expected to adopt additional controls on who it funds.

Because Key Bank is still committed to outright defiance of the FTC Holder Rule, it has no incentive adopt any of these controls. As a consequence, sham computer training schools will continue to obtain liquidity from Key Bank to fuel their illegal behavior, and will reduce their use of Sallie Mae. An example of this switch already exists in Alabama with Aspreon Technologies that closed in May of this year. Like many other sham schools, Aspreon operated without a license but projected a huge expansion. After doing approximately $2 million of business in 2002, it announced a projected revenue of $200 million in 2003. It opened up locations outside of Alabama and then suddenly closed. Steve Halsey (Alabama) has identified over 110 students affected by the closure, and of that amount only 5 or 6 are Sallie Mae loans. When Sallie Mae stopped providing the full amount of the loan upfront, Aspreon placed the vast majority of its students with Key Bank, who would provide the full amount of the loan upfront. This ratio of approximately five or six Sallie Mae loans to more than 100 Key Bank loans is exactly the reverse of the clients of Dale Pittman's office. For loans made in 2001 and the first part of 2002, his office has seen approximately 100 Sallie Mae clients for each seven or eight Key Bank clients. As Sallie Mae continues to adopt appropriate controls, the bad actors will increase their reliance on Key Bank or entities who adopt Key Bank's current system.

## Conclusion

Like many of the deceptive business practices consumer advocates face, trade school scams could not, and would not, happen without the essential fuel of easy money. Banks are behind these scandalous practices of empty promises and dream-defeating deception. By providing liquidity that fuels the growth of computer training school abuses, banks, such as Key Bank, which are part of the deceptive system, are harming legitimate training schools that lose potential customers to sham schools, harming the students who are left with loans but no training, and harming investors who buy into the investment trusts without complete disclosure of the violations of law. NACA attorneys are at the forefront of the effort to address these unlawful practices through litigation. The news that Sallie Mae is modifying its practices is one move in the right direction.

Unless and until Key Bank decides or is forced to honor the FTC Holder Rule, it will continue to have no incentive to monitor the computer training schools feeding on the liquidity it offers. The FTC Holder Rule has a simple theory—providing liquidity to bad actors is harmful to the economy. The only hope for the victims of the bad actors that will necessarily proliferate by defiance of the FTC Holder Rule are knowledgeable consumer advocates willing to represent these individuals, whether in court or in arbitration. Entities like Key Bank have plenty of lawyers eager to collect fees to help it implement and profit from its anti?consumer agenda. The corporatists who create these anti-consumer business practices and claim they are normal banking practices are truly different from the advocates who choose to help people harmed by such corporate practices. The corporatists, who are the necessary functionaries to implement such practices, drain the vitality from our economy by skewing the market forces that keep it

Continued on Page 24

EXHIBIT A

DOMONOSKE: *Continued from Page 23*

healthy. The corporatists' agenda is not only anti-consumer, but the intentional spreading of dysfunction throughout the economy is fundamentally anti-American. To achieve the intended benefit of the laws designed to keep the economy strong, consumer advocates must stand up for the basic principle of the FTC Holder Rule, and challenge these practices, both in courts and in arbitration proceedings. As shown by the changes ongoing at Sallie Mae, corporate practices can be brought into compliance with the law, and the change in those practices does have a major effect in the marketplace.

*Tom Domonoske holds a BA from Hastings College of Law. He has worked as a legal aide lawyer, and taught at the University of North Carolina Law School and Duke University Law School where he was a Senior Lecturing Fellow. He is now in private practice in Virginia, and a current member of the NACA Board of Directors.*

## ENDNOTES

1. Deanne Loonin, Student Loan Law, (2d ed.) (National Consumer Law Center) Section 9.1.1, p. 113.
2. http://triangle.bizjournals.com/triangle/stories/2003/02/24/story3.html
3. http://www.nasasps.com/conf-material.html
4. http://www.bizjournals.com/washington/stories/2001/01/29/daily3.html
5. http://www.netcominfo.com/education/studentloans.phtml
6. Case Number 3:03CV099, E. D. of Virginia, Richmond Division, oral statement by John A. Fraser, counsel for SLM Financial.
7. http://www.bizjournals.com/washington/stories/2001/02/05/daily4.html
8. Letter from Colleen K. Hart to Aric D. Williams
9. Letter from Robert S. Lavet to Stephen E. Lawing, Esq.
10. Letter from Colleen K. Hart to Adrian Robinson.
11. 16 C.F.R. 433.2(b) requires the Holder Rule in purchase money loans made by a lender when the lender has a business relationship with the seller or when the seller refers the consumer to the lender.
12. http://www.key.com/templates/t-ps2.jhtml?nodeID=H-1.35.a
13. http://www.cpcctraining.org/computertraining/SCD/-SCD%20Teach%20Out.htm
14. Letter from Senator John Edwards to Adrian Robinson.
15. Letter from James M. Austin, Corporate Borrower Services, Sallie Mae Servicing to Better Business Bureau. ♦

FRONTLINE NEWS: *Continued from Page 13*

"The Mississippi Supreme Court's ruling is truly a thrilling victory for the public interest," said Lawrence E. Abernathy III of Laurel, Mississippi, co-lead counsel for the Gatlins. "Companies cannot force family farmers out of court and into private arbitration, then break their promise to share in the arbitration costs."

TLPJ's key legal brief in *Sanderson Farms, Inc. v. Gatlin* is posted on its website, www.tlpj.org.

## PERSEVERANCE PAYS OFF IN OHIO

**Dean Young & Rocco Yeargin** from the Akron, Ohio, office of Young and McDowall got a verdict in June 2003 against a man who had fraudulently transferred assets to avoid paying a previous judgment. In December 2000, the same law firm had received a judgment of approximately $200,000 against the dealership entity, Rolling Acres Dodge. In the June 2003 trial, the jury awarded $210,000, which will be trebled to $630,000 under Ohio's UDAP statute.

In order to avoid paying the December 2000 judgment against it, the owner of Rolling Acres Dodge set up another corporation, transferred assets, sold cars belonging to Rolling Acres Dodge, put the proceeds into the account of the new company, and eventually sold the dealership and filed for bankruptcy. **Laura McDowall** reports, "We filed this suit against the owner directly, alleging that he violated Ohio's UDAP statute by continuing to engage in consumer transactions while the judgment was unpaid. I would especially like to thank **John Blaufuss**, extraordinary lawyer from Toledo Ohio, who set up this cause of action in a case he handled, which allows us to treble the damages in our case." ♦

*NACA Member John Blaufuss practices consumer law in Toledo, Ohio.*

**www.naca.net**

EXHIBIT A

# BULLETIN BOARD

*IMEDIA AWARD NOMINATIONS ANNOUNCEMENT GOES HERE!*

**Expert Class Action Writer Available!**

Ken Bresler is available as an expert witness on "Plain English," to write notices for class action settlements, and for other plain English services. Ken is a former prosecutor for the Justice Department in Boston, MA and author of "Kissing Legalese Goodbye," as well as the forthcoming "Writing Tips Designed to Stick."

If you would like more information, contact Ken through his website at www.ClearWriting.net. To subscribe to his newsletter on clear writing tips, send an e-mail to subscribe@ClearWriting.net

The newsletter is concise and comes twice a week. Best of all, it's free!

**NACA Conference Materials**

Unable to attend the FCRA and/or Auto Fraud Conference this year but want to purchase the materials?

Call Phyllis Roderer at 202-452-1989 or send her an email: Phyllis@naca.net

Hurry while supplies last.

If you have any items to post to the Bulletin Board, please contact Cynthia Reddersen. cynthia@naca.net

National Association of Consumer Advocates
1730 Rhode Island Avenue, NW
Suite 805
Washington, DC 20036

202.452.1989
202.452.0099 - FAX

EXHIBIT A

TECHNOLAWYER.COM: Continued from Page 17

USB connection. Very convenient to be sure, but it is also very short range, and it requires a direct line of sight between connected device, unlike Bluetooth and WiFi, which are radio frequency transmission systems with no direct line of sight required.

## THE WIRELESS NET

Let's take wireless a step further into the realm of portable Internet Web and e-mail access. While the capabilities of cell-like Net arrangements, as well as paging systems, have been available for quite some time, we are just now seeing fast enough speeds to make the effort worthwhile. Using the platform of 2.5G and 3G cell transmission systems, companies like Verizon are offering relatively high-speed wireless Internet access in a growing number of metro areas around the country. This access really does work and uses a PC card with an antenna. However, it requires another monthly fee, and the coverage areas are currently limited. Expect this approach, with its staggering costly infrastructure, to likely lose out to much more economical wireless WiFi access points in many public locations. But if you need an often-on Internet connection, these systems are worth exploring.

Devices that look either like traditional alphanumeric pagers or like PDAs have become very popular. The most popular items in this category are made by RIM Technologies and use a thumb board to enter text (you type with your thumbs -- although it sounds silly, it's possible to quickly become quite speedy). The name "Blackberry" has become synonymous with these devices that send and receive Internet e-mail and can provide PDA-like functions. <http://www.blackberry.net/>. Blackberry is one of the software systems used by the RIM e-pager devices . Costs range from $300 to $600 for the devices with monthly service fees from $20-$60. A Blackberry competitor of note is the product from Good Technology with service offered by Cingular Wireless. This product is worth a look for its cradle-free real-time synchronization with firms using Microsoft Outlook and Exchange Server software <http://www.good.com/>.

## CONCLUSION

So whether WiFi, Bluetooth, or Infrared, or Wireless Net or the Blackberry e-pager approach, the future of wireless technology is not only bright, but also growing explosively. The lure of a cordless world is one that few can resist and one that all well-connected lawyers should explore.

### ABOUT THE AUTHOR

Ross Kodner, a lawyer, is the founder of MicroLaw, Inc., a legal technology consultancy <http://www.microlaw.com>. He is a member of the GP/Solo Technology & Practice Guide Editorial Board, and was also the recipient of the 1999 TechnoLawyer Legal Technology Consultant of the Year Award as well as 2002's Contributor of the Year Award. You can contact Ross via e-mail <mailto:rkodner@microlaw.com>.

### ABOUT THE TECHNOLAWYER SYNDICATION NETWORK

This article originated in TechnoLawyer, a popular legal technology and practice management resource that consists of a network of free, critically-acclaimed e-mail newsletters, and a searchable Web-based repository of all TechnoLawyer content since January 1997. To join, search, or learn more about TechnoLawyer, visit the following Web site: www.technolawyer.com. ♦

## MISSION STATEMENT

NACA is a non-profit association of attorneys and consumer advocates committed to representing consumers' interests. Our members are public and private sector attorneys, legal services attorneys, law professors and law students whose primary focus is the protection and representation of consumers. NACA also has a charitable and educational fund incorporated under section 501(c)(3).

NACA's mission is to promote justice for all consumers by maintaining a forum for communication, networking, and information sharing among consumer advocates across the country and by serving as a voice for its members and consumers in the ongoing struggle to curb unfair and abusive business practices that adversely affect consumers.

EXHIBIT A

## The National Consumer Law Center announces its 12th Annual Consumer Rights Litigation Conference

**October 24-27, 2003 — Oakland, CA**

Mini-Conference - Saving Homes: Predatory Mortgage Litigation (Intermediate) — October 24
Mini-conference - Getting Started in Consumer Law — October 24
Class Action Symposium — October 26-27
Predatory Lending Strategy Update — October 27

**Special Guest Speakers :**

US Senator Barbara Boxer (D-CA)
Bill Lockyer (California Attorney General)
And many national leaders and prominent litigators in the field of consumer law

***Sessions will include:*** auto fraud, FDCPA, predatory lending, FCRA, student loan abuses, TILA HOEPA, trial practice, credit counseling, furnisher liability, credit reporting, credit discrimination, mortgage servicing, identity theft, and much more that's sure to interest you.

***NACA members save on registration fees!***

**Continuing Legal Education credits**

***Don't miss the NACA annual meeting October 25 during the conference.***

**Download a conference brochure and registration forms from NCLC's Website www.nclc.org**

**The National Consumer Law Center**
**77 Summer Street, 10th Fl.**
**Boston, MA 02110**
**617-542-8010**
**www.nclc.org**

EXHIBIT A

 # APPLICATION FOR MEMBERSHIP

***I wish to become a member of the National Association of Consumer Advocates.***

I represent by my signature below that I am an attorney, law professor, law student, or consumer advocate; that I am committed to advocating the interests of consumers; that I do not profit from or have a substantial part of my work engaged in representing interests opposing consumers; and that I am not currently, nor have I ever been suspended or disbarred by any bar association which has licensed me to practice.

If applying for membership as a Legal Services Attorney Member, I represent that I am currently employed as an attorney for a legal service program.

If applying for membership as a Law Professor Member, I represent that I am a faculty member of a chartered law school.

If applying for membership as a Law Student Member, I represent that I am a student attending a chartered law school.

**Signature of Applicant** ______________________________ **Date**____________
(Please feel free to contact us if you have any questions regarding qualifications for membership)

***I have enclosed a check or signed below to authorize annual NACA membership dues to be debited from my MC, VISA, or AMEX in the amount and level of membership checked below.***

- ☐ *1. Platinum Club Member* — *$5,000.*
- ☐ *2. Gold Club Member* — *2,500.*
- ☐ *3. Benefactor* — *1,250.*
- ☐ *4. Patron* — *550.*
- ☐ *5. Sponsor* — *250.*
- ☐ *6. Member* — *100.*
- ☐ *7. Legal Services Attorney Member* — *50.*
- ☐ *8. Law Professor Member* — *75.*
- ☐ *9. Law Student Member* — *25.*

**Credit Card Authorization**
Type________ Card No.______________________
Signature______________________ Exp._______
Printed Full Name______________________
Firm Name______________________
Street Address______________________
City, State, Zip______________________
Phone______________________
Email Address ______________________

*The term of membership is one year from the date payment is received.*

# NACA

**National Association of Consumer Advocates**
1730 Rhode Island Ave., NW, Suite 805
Washington, DC 20036

First Class
U.S. Postage
PAID
Columbia, MD
Permit No. 334

EXHIBIT A