1   ANDREW A. AUGUST (SBN 112851)
    (aaugust@pinnaclelawgroup.com)
2   KEVIN F. ROONEY (SBN 184096)
    (krooney@pinnaclelawgroup.com)
3   PINNACLE LAW GROUP, LLP
    425 California Street, Suite 1800
4   San Francisco, California 94104
    Telephone: (415) 394-5700
5   Facsimile: (415) 394-5003

6   JAMES C. STURDEVANT (SBN 94551)
    (jsturdevant@sturdevantlaw.com)
7   WHITNEY HUSTON (SBN 234863)
    (whuston@sturdevantlaw.com)
8   THE STURDEVANT LAW FIRM
    A Professional Corporation
9   354 Pine Street, Fourth Floor
    San Francisco, CA 94104
10  Telephone: (415) 477-2410
    Facsimile: (415) 477-2420
11

12  Attorneys for Plaintiffs Matthew C. Kilgore,
    William Bruce Fuller
13

14              UNITED STATES DISTRICT COURT

15           NORTHERN DISTRICT OF CALIFORNIA

16                SAN FRANCISCO DIVISION

17  MATTHEW C. KILGORE, individually        CASE NO.  08-cv-02958 TEH
    and on behalf of all others similarly situated;
18  WILLIAM BRUCE FULLER, individually      NOTICE OF APPEAL TO THE UNITED
    and on behalf of all others similarly situated;   STATES COURT OF APPEALS FOR THE
19  KEVIN WILHELMY, individually and on     NINTH CIRCUIT;
    behalf of all others similarly situated,
20                                          NOTICE OF RELATED APPEAL

21              Plaintiffs,

22      vs.

23

24  KEYBANK NATIONAL ASSOCIATION,
    a national banking association organized
25  under the laws of the United States of
    America and successor in interest to
26  KEYBANK USA, N.A.; KEY
    EDUCATION RESOURCES, a division of
27  KEYBANK, NATIONAL ASSOCIATION;
    GREAT LAKES EDUCATIONAL LOAN
28  SERVICES, INC., a Wisconsin corporation;
    STUDENT LOAN XPRESS, a Delaware

CAND CASE NO. C08-02958 TEH                    1                    NOTICE OF APPEAL
5033.004/00096810

1    corporation; AMERICAN EDUCATION
     SERVICES, form of entity unknown; DOES
2    1-25,

3                    Defendants.

4

5

6           Plaintiffs Matthew C. Kilgore and William Bruce Fuller, ("Plaintiffs"), appeal to the

7    United States Court of Appeals for the Ninth Circuit from 1) the order entered in this case on

8    April 12, 2010, granting Defendants' Motion to Dismiss the Third Amended Complaint without

9    leave to amend, and 2) the final judgment of the district court for the Northern District of

10   California, entered in this case on April 13, 2010 granting Defendants' Motion to Dismiss the

11   Third Amended Complaint, (Attached hereto as collective Exhibit A are copies of the District

12   Court's April 12, 2010 Order Granting Defendant's Motion to Dismiss Third Amended

13   Complaint, Docket No. 146, and the District Court's April 13, 2010 Judgment in a Civil Case,

14   Docket No. 147).

15          ***Plaintiffs further hereby notify the Court of the related matter*** arising from the instant

16   case and presently before the Ninth Circuit: *MATTHEW C. KILGORE, individually and on behalf*

17   *of all others similarly situated; et al., Plaintiffs - Appellees, v. KEYBANK, NATIONAL*

18   *ASSOCIATION, successor in interest to Keybank USA, N.A.; et al., Defendants – Appellants,,*

19   United States Court of Appeal for the Ninth Circuit, Case No. 09-16703.

20          The parties to the judgment and orders appealed from and the names and addresses of

21   their respective attorneys are as follows:

22          **Attorneys for Plaintiffs Matthew C. Kilgore, William Bruce Fuller**
             ANDREW A. AUGUST (SBN 112851)
23           aaugust@pinnaclelawgroup.com
             KEVIN F. ROONEY (SBN 184096)
24           krooney@pinnaclelawgroup.com
             PINNACLE LAW GROUP, LLP
25           425 California Street, Suite 1800
             San Francisco, California 94104
26           Telephone: (415) 394-5700
             Facsimile: (415) 394-5003
27

28   ///

CASE NO. C08-02958 TEH                              2                                NOTICE OF APPEAL
5033.005/00096810

1

2   **Attorneys for Plaintiffs Matthew C. Kilgore, William Bruce Fuller**
    JAMES C. STURDEVANT (SBN 94551)
3   jsturdevant@sturdevantlaw.com
    WHITNEY HUSTON (SBN 234863)
4   whuston@sturdevantlaw.com
    THE STURDEVANT LAW FIRM
5   A Professional Corporation
    354 Pine Street, Fourth Floor
6   San Francisco, CA 94104
    Telephone: (415) 477-2410
7   Facsimile: (415) 477-2420

8   **Attorneys for Defendants KEYBANK, NATIONAL ASSOCIATION and GREAT
    LAKES EDUCATIONAL LOAN SERVICES, INC.**
9   TODD C. TORAL, State Bar No. 197706
    ttoral@nixonpeabody.com
10  STEPHANIE KARNAVAS, State Bar No. 255596
    skarnavas@nixonpeabody.com
11  NIXON PEABODY LLP
    One Embarcadero Center, 18th Floor
12  San Francisco, California 94111-3600
    Telephone: (415) 984-8200
13  Fax: (415) 984-8300

14  **Attorneys for Defendants KEYBANK, NATIONAL ASSOCIATION and GREAT
    LAKES EDUCATIONAL LOAN SERVICES, INC.**
15  W. SCOTT O'CONNELL (pro hac vice)
    soconnell@nixonpeabody.com
16  NIXON PEABODY LLP
    900 Elm Street
17  Manchester, NH 04101-2031
    Telephone: (603) 628-4000
18  Fax: (603) 628-4040

19  DATED: April 21, 2010                    PINNACLE LAW GROUP LLP

20

21                                     By:_____
22                                             Kevin F. Rooney
                                               Andrew A. August
23                                             Attorneys for Plaintiffs

24

25

26

27

28

EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MATTHEW C. KILGORE, *et al.*,

          Plaintiffs,

    v.

KEYBANK, NATIONAL
ASSOCIATION, *et al.*,

          Defendants.

NO. C08-2958 TEH

ORDER GRANTING MOTION
TO DISMISS THIRD AMENDED
COMPLAINT

This matter came before the Court on March 29, 2010, on the motion to dismiss filed by Defendants KeyBank, National Association and Great Lakes Educational Loan Services, Inc. For the reasons set forth below, the motion is GRANTED.

## BACKGROUND

Plaintiffs and putative class representatives Matthew C. Kilgore and William Bruce Fuller ("Plaintiffs") are California residents who enrolled in a helicopter flight academy operated in Oakland, California by Silver State Helicopters, LLC ("Silver State"). The Third Amended Complaint alleges that Plaintiffs – and the class of student loan borrowers they seek to represent – paid Silver State nearly $60,000 in tuition to be trained as commercial helicopter pilots, but failed to complete the educational program before Silver State filed for bankruptcy on February 4, 2008. Plaintiffs financed their tuition by obtaining student loans from KeyBank, National Association and its education lending division, Key Education Resources (collectively "KeyBank"). Plaintiffs allege that KeyBank defied its own risk management policies to partner with Silver State, ignoring red flags – including the school's recent founding, deficient credentials, and poor student placement rates – that should have signaled Silver State's risk of failure. Plaintiffs now seek to enjoin KeyBank and Great

United States District Court
For the Northern District of California

1   Lakes Educational Loan Services, Inc. ("Great Lakes") – which services their loans – from

2   collecting the loans or reporting the loan balances to credit reporting agencies.

3          Plaintiffs instituted this putative class action in Alameda County Superior Court on

4   May 12, 2008, against KeyBank and Great Lakes. Student Loan Xpress, Inc. ("SLX") and

5   American Education Services ("AES") – which allegedly made and serviced loans to Silver

6   State students – were added as defendants in a First Amended Complaint filed four days

7   later. After Plaintiffs filed a Second Amended Complaint ("SAC"), KeyBank removed the

8   action to federal court, and a settlement with SLX led to its and AES's dismissal on October

9   27, 2009.

10         After an unsuccessful mediation, KeyBank and Great Lakes (collectively

11  "Defendants") responded to the SAC on April 24, 2009 by moving to dismiss and to compel

12  arbitration. The Court denied the motion to compel arbitration on July 8, 2009 – a ruling

13  Defendants have appealed to the Ninth Circuit – and continued the motion to dismiss. On

14  August 17, 2009, this matter was stayed except for document discovery and the motion to

15  dismiss. Defendants filed a new motion to dismiss on October 5, 2009, in response to which

16  Plaintiffs amended the complaint. Defendants moved to dismiss the Third Amended

17  Complaint ("TAC") pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(b)(3) on

18  January 11, 2010. Plaintiffs opposed the motion.

19

20  **LEGAL STANDARD**

21         Dismissal is appropriate under Federal Rule of Civil Procedure 12(b)(6) when a

22  plaintiff's allegations fail "to state a claim upon which relief can be granted." In ruling on a

23  motion to dismiss, the Court must "accept all material allegations of fact as true and construe

24  the complaint in a light most favorable to the non-moving party." *Vasquez v. L.A. County*,

25  487 F.3d 1246, 1249 (9th Cir. 2007). Courts are not, however, "bound to accept as true a

26  legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, --- U.S. ----, 129 S. Ct.

27  1937, 1949-50 (2009).

28

*United States District Court*
*For the Northern District of California*

2

**United States District Court**
For the Northern District of California

1    A complaint must contain "a short and plain statement of the claim showing that the

2  pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), in order to "'give the defendant fair

3  notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atlantic Corp. v.*

4  *Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47 (1957)). A

5  Rule 12(b)(6) dismissal "can be based on the lack of a cognizable legal theory or the absence

6  of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police*

7  *Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). To survive a motion to dismiss, a plaintiff must

8  plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S.

9  at 570. Plausibility does not equate to probability, but it requires "more than a sheer

10  possibility that a defendant has acted unlawfully." *Iqbal*, 129 S. Ct. at 1949. "A claim has

11  facial plausibility when the plaintiff pleads factual content that allows the court to draw the

12  reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Dismissal

13  of claims that fail to meet this standard should be with leave to amend unless it is clear that

14  amendment could not possibly cure the complaint's deficiencies. *Steckman v. Hart Brewing,*

15  *Inc.*, 143 F.3d 1293, 1296 (9th Cir. 1998).

16    Rule 12(b)(3) governs a motion to dismiss for improper venue. When "resolving

17  motions to dismiss based on a forum selection clause, the pleadings are not accepted as true,

18  as would be required under a Rule 12(b)(6) analysis." *Argueta v. Banco Mexicano, S.A.*, 87

19  F.3d 320, 324 (9th Cir. 1996). To the contrary, it "is consistent with the Supreme Court

20  standard for resolving forum selection clause cases" for "the district court to consider facts

21  outside of the pleadings." *Id.*

22

23  **DISCUSSION**

24    Plaintiffs bring six causes of actions under California's Unfair Competition Law

25  ("UCL"), Cal. Bus. & Prof. Code § 17200. The claims are all premised on the Federal Trade

26  Commission's "Holder Rule," 16 C.F.R. § 433.2, which "requires purchase money loan

27  agreements (loans supplying money for the purchase of goods or services) arranged by

28  sellers to contain a notice to all loan holders that preserves the borrower's ability to raise

3

United States District Court
For the Northern District of California

1   claims and defenses against the lender arising from the seller's misconduct." *Armstrong v.*

2   *Accrediting Council for Continuing Educ. & Training, Inc.*, 168 F.3d 1362, 1365 (D.C. Cir.

3   1999). Defendants argue that all six of Plaintiffs' causes of action fail to state a claim for

4   relief, and are preempted by the National Bank Act. They also urge the Court to dismiss

5   pursuant to a forum selection clause that calls for an Ohio venue, and argue that Plaintiffs'

6   claims are barred by the economic loss doctrine.

7          The Court begins by examining the Holder Rule and determining whether any of

8   Plaintiffs' six causes of action state plausible claims for relief under the Rule 12(b)(6)

9   standard. For any claims that overcome that hurdle, the Court will then assess whether they

10  must nevertheless be dismissed due to federal preemption. Since the Court finds that all of

11  Plaintiffs' causes of action falter at one of those two steps, it is unnecessary to address

12  KeyBank's other arguments.[1]

13

14  I.   **Plaintiffs' Claims Under the Holder Rule and California's Unfair Competition**

15       **Law**

16         The so-called "Holder Rule" was adopted by the Federal Trade Commission ("FTC")

17  in 1975 to stem the "unfair practice" of separating "the buyer's duty to pay for goods or

18  services from the seller's reciprocal duty to perform as promised" in the financing of

19  consumer sales. 40 Fed. Reg. 53,522 (Nov. 18, 1975). The Rule makes it an "unfair or

20  deceptive act or practice" under section 5 of the FTC Act "for a seller, directly or indirectly,

21  to":

22              (a) Take or receive a consumer credit contract which fails to
                contain the [Holder Notice], or,
23              (b) Accept, as full or partial payment for such sale or lease, the
                proceeds of any purchase money loan (as purchase money loan is
24              defined herein), unless any consumer credit contract made in
                connection with such purchase money loan contains the [Holder
25              Notice].

26

27  ──────────────

28        [1] Defendants also argue that Great Lakes must be dismissed because Plaintiffs fail to
    allege any facts concerning it. The Court need not address this argument as all claims are to
    be dismissed on other grounds.

                                          4

16 C.F.R. § 433.2.[2]  The "Holder Notice" must be written "in at least ten point, bold face, type" and read as follows:

> ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT
> IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH
> THE DEBTOR COULD ASSERT AGAINST THE SELLER OF
> GOODS OR SERVICES OBTAINED [PURSUANT HERETO
> OR] WITH THE PROCEEDS HEREOF. RECOVERY
> HEREUNDER BY THE DEBTOR SHALL NOT EXCEED
> AMOUNTS PAID BY THE DEBTOR HEREUNDER.[3]

*Id.* The onus is therefore placed on the seller to ensure the Holder Notice's inclusion in consumer credit contracts, either by refusing a contract that omits the Notice, or by refusing proceeds of a loan made pursuant to such a contract.[4]  When the Holder Notice appears in a consumer credit contract, a debtor can assert the same defenses against his lender as he could against the seller. "For example, if a used car dealer who fraudulently sells a lemon also arranges the buyer's financing through a bank, the buyer may rely on the dealer's fraud as a defense against repaying the bank loan." *Armstrong*, 168 F.3d at 1365.  No private right of action exists to enforce the Holder Rule, violations of which can only be pursued by the FTC. *See* 15 U.S.C. § 45(a)(2) (section 5 of the FTC Act, empowering the FTC "to prevent persons, partnerships, or corporations . . . from using unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce");

---

[2] A "seller" is a "person who, in the ordinary course of business, sells or leases goods or services to consumers," 16 C.F.R. § 433.1(j), and a "consumer credit contract" is any "instrument which evidences or embodies a debt arising from a 'Purchase Money Loan' transaction or a 'financed sale' as defined in paragraphs (d) and (e) of this section," *id.* § 433.1(i). A "purchase money loan" is a "cash advance which is received by a consumer in return for a 'Finance Charge' within the meaning of the Truth in Lending Act and Regulation Z, which is applied, in whole or substantial part, to a purchase of goods or services from a seller who (1) refers consumers to the creditor or (2) is affiliated with the creditor by common control, contract, or business arrangement." *Id.* § 433.1(d). "Financing a sale" means "[e]xtending credit to a consumer in connection with a 'Credit Sale' within the meaning of the Truth in Lending Act and Regulation Z." *Id.* § 433.1(e).

[3] The bracketed language – "pursuant hereto or" – appears only in the Holder Notice required by 16 C.F.R. § 433.2(a), but not in § 433.2(b). Aside from that difference, the language required by subsections (a) and (b) is identical.

[4] On the same day the Holder Rule was officially promulgated, the FTC also proposed an amendment that would have applied the rule to lenders, as well. *See Heastie v. Cmty. Bank of Greater Peoria*, 727 F. Supp. 1133, 1137 (N.D. Ill. 1989) (reviewing history of amendment). However, the proposed amendment was never adopted.

5

1    *Holloway v. Bristol-Myers Corp.*, 485 F.2d 986, 987 (D.C. Cir. 1973) ("[P]rivate actions to

2    vindicate rights asserted under the Federal Trade Commission Act may not be maintained.").

3              Plaintiffs allege that they and every member of the proposed class executed a "service

4    contract" with Silver State, in which the school "agreed to provide specific education and

5    training for each student to become a commercial helicopter pilot within a specified period of

6    time." TAC ¶ 9.  Class members financed all or part of Silver State's nearly $60,000 per-

7    student tuition by executing promissory notes with KeyBank.  Silver State filed for

8    bankruptcy and shuttered before any of them had completed their promised training, but after

9    KeyBank had disbursed their loans in their entirety.  Plaintiffs contend that the service

10   contracts and the promissory notes are both "consumer credit contracts" under the Holder

11   Rule, and that Silver State was a "seller" required to comply with the Rule.  However, neither

12   the service contracts nor the promissory notes included the Holder Notice, an omission that

13   underlies this action.

14             As the Holder Rule provides no private right of action, Plaintiffs bring their claims

15   under the UCL, which characterizes "any unlawful, unfair or fraudulent business act or

16   practice" as "unfair competition." Cal. Bus. & Prof. Code § 17200.  The statute's coverage is

17   "sweeping, embracing 'anything that can properly be called a business practice and that at

18   the same time is forbidden by law.'" *Rubin v. Green*, 4 Cal. 4th 1187, 1200 (1993) (quoting

19   *Barquis v. Merchants Collection Ass'n*, 7 Cal. 3d 94, 113 (1972)).  The UCL allows civil

20   actions for injunctions to be brought by any "person who has suffered injury in fact and has

21   lost money or property as a result of the unfair competition," Cal. Bus. & Prof. Code

22   § 17204, against "[a]ny person who engages, has engaged, or proposes to engage in unfair

23   competition," *id.* § 17203.  Available relief "may include orders necessary 'to restore to any

24   person in interest any money or property ... acquired by means of such unfair competition.'"

25   *Wells v. One2One Learning Found.*, 39 Cal. 4th 1164, 1189 (2006) (quoting Cal. Bus. &

26   Prof. Code § 17203).

27             Since section 17200 is "written in the disjunctive," it "establishes three varieties of

28   unfair competition – acts or practices which are unlawful, or unfair, or fraudulent." *Podolsky*

6

1   *v. First Healthcare Corp.*, 50 Cal. App. 4th 632, 647 (1996).  Plaintiffs bring claims under

2   each of the prongs.  They claim that KeyBank directly violated both parts of the Holder Rule

3   by omitting the Holder Notice from their promissory notes (Claims 1 and 2), and that it is

4   also liable for aiding and abetting Silver State's violation of the Rule (Claims 3 and 4).

5   Plaintiffs' last two causes of action invoke the unfair and fraudulent prongs of the UCL.

6   Defendants argue that none of the six causes of action succeed in stating a claim.

7

8   **A.   "Unlawful" Prong: Direct Violation of the Holder Rule**

9         "By proscribing 'any unlawful' business practice, section 17200 'borrows' violations

10  of other laws and treats them as unlawful practices that the unfair competition law makes

11  independently actionable." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tele. Co.*, 20 Cal. 4th

12  163, 180 (1999) (internal citations and quotation marks omitted).  "Violations of federal as

13  well as state and local law may serve as the predicate for an unlawful practice claim under"

14  section 17200.  *Munson v. Del Taco, Inc.*, 46 Cal. 4th 661, 676 (2009).  Plaintiffs contend

15  that KeyBank breached both parts of the Holder Rule, by "taking" the promissory notes that

16  omitted the Holder Notice, 16 C.F.R. § 433.2(a), and by providing Silver State with purchase

17  money loan proceeds despite that omission from the notes and service contracts, *id.*

18  § 433.2(b).  Defendants respond that KeyBank cannot have directly violated the Holder Rule,

19  which applies only to "sellers."

20        The Holder Rule has never been subject to close scrutiny by the Ninth Circuit, and

21  other circuits have likewise had little opportunity to explore its scope.  As a result, both

22  parties draw support from opinions by federal district and state courts outside the Ninth

23  Circuit, none of which are binding on this Court.  Plaintiffs rely on *Gonzalez v. Old Kent*

24  *Mortgage Co.*, where a court in the Eastern District of Pennsylvania – after concluding that

25  "contract terms may be implied where public policy so requires" – read the Holder Notice

26  into a contract that omitted it.  No. 99-5959, 2000 U.S. Dist. Lexis 14530, at *13 (E.D. Pa.

27  Sept. 19, 2000).  The court found that "it would turn the law on its head to allow [the

28  defendant mortgage company] to avoid the consequences of [the Holder Notice] by its own

7

United States District Court

For the Northern District of California

1   failure" to include the notice in its loan documents. *Id.* However, the *Gonzalez* court did not

2   acknowledge that the Holder Rule, by its own language, makes only sellers responsible for

3   the inclusion of the notice in contracts. The court also never concluded that the defendant

4   mortgage company's failure to include the notice was unlawful; it only decided to proceed as

5   though the Holder Notice had been included in the loan documents. *Gonzalez* is therefore

6   not only unpersuasive, but also unsupportive of Plaintiffs' position.

7        Plaintiffs' other authorities fare no better. The Common Pleas Court of Allegheny

8   County, Pennsylvania, recognized that the creditor bank had committed "no violation" of the

9   Holder Rule because "the rule, as presently drafted, places a duty only on the seller to insure

10  that the preservation of defenses provisions is included within the loan agreement." *Iron &*

11  *Glass Bank v. Franz*, 9 Pa. D. & C. 3d 419, 427 (Pa. C.P. 1978). Although the court still

12  refused to insulate the creditor "from the seller's wrongdoing," it did so despite its

13  conclusion that no direct violation of the Holder Rule had occurred. *Id. Heastie v.*

14  *Community Bank of Greater Peoria* suffers the same infirmity: the court acknowledged that

15  "part 433 does not apply by its terms to lenders," but found that a lender's addition of a non-

16  responsibility provision contrary to the Holder Notice – which was included in the contract –

17  could be an unfair or deceptive practice under Illinois' Consumer Fraud Act. 727 F. Supp.

18  1133, 1138 (N.D. Ill. 1989). *Heastie* does not demonstrate that KeyBank's conduct was

19  unlawful.

20       The Holder Rule imposes obligations only on the seller. Its language is "explicit in

21  stating the consequences of a failure to include the notice and notably incur a penalty is

22  solely visited upon the seller." *In re Vincent Crisomia, Sr.*, No. 00-35085DWS, 2001 Bankr.

23  Lexis 1469, at *11 (E.D. Pa. Bankr. 2001). "[T]he clear and unambiguous language

24  contained in the regulation places no liability on the part of a lender for failing to include the

25  term in its loan documents." *Abel v. KeyBank USA, N.A.*, No. 1:03 CV 524, 2003 U.S. Dist.

26  Lexis 27175, at *26-27 (N.D. Ohio Sept. 24, 2003). Although a seller violates the Holder

27  Rule by taking a consumer credit contract – or by accepting proceeds of a purchase money

28  loan made pursuant to a contract – that omits the notice, the same cannot be said of a lender

8

1    or creditor. With no obligation to include the Holder Notice in its promissory notes,

2    KeyBank has not contravened any law. KeyBank's actions therefore cannot, by themselves,

3    satisfy the "unlawful" prong of the UCL. These claims are DISMISSED without leave to

4    amend, as Plaintiffs cannot – as a matter of law – allege that KeyBank directly violated the

5    Holder Rule.

6

7    **B.    "Unlawful" Prong: Aiding and Abetting Silver State's Violation of the Holder**

8    **Rule**

9        Plaintiffs' third and fourth claims are also brought under the UCL's "unlawful" prong,

10   but the Holder Rule violation alleged is that of Silver State, with KeyBank's liability

11   premised on aiding and abetting that violation. Defendants contend – incorrectly – that

12   California law precludes actions for "aiding and abetting" under section 17200. California

13   courts have held only that a section 17200 claim "cannot be predicated on *vicarious*

14   liability," which is based on an agency relationship. *Emery v. Visa Int'l Serv. Ass'n*, 95 Cal.

15   App. 4th 952, 960 (2002) (emphasis added). Aiding and abetting a section 17200 violation is

16   actionable and assessed using the same standard for aiding and abetting an intentional tort.

17   *Schulz v. Neovi Data Corp.*, 152 Cal. App. 4th 86, 93 (2007). Liability may be imposed if

18   the defendant "'knows the other's conduct constitutes a breach . . . and gives substantial

19   assistance or encouragement to the other to so act.'" *Id.* (quoting *Fiol v. Doellstedt*, 50 Cal.

20   App. 4th 1318, 1325 (1996)).

21       Plaintiffs allege that Silver State violated both parts of the Holder Rule by receiving

22   the service contracts and accepting the proceeds of KeyBank's loans when neither the service

23   contracts nor the promissory notes included the Holder Notice. *See* 16 C.F.R. § 433.2(a)-(b).

24   Violations of federal regulations may constitute "unlawful" activity under the UCL. *Smith v.*

25   *Wells Fargo Bank, N.A.*, 135 Cal. App. 1463, 1480 (2005). For KeyBank to be liable on an

26   aiding and abetting theory, it must have not only known about the alleged Holder Rule

27   violations, but also provided substantial assistance or encouragement. First, however,

28   Plaintiffs must have stated a plausible claim that *Silver State* violated the Holder Rule –

United States District Court
For the Northern District of California

9

United States District Court
For the Northern District of California

1   which they do. The TAC alleges that the Plaintiffs' service contracts with Silver State, and

2   their promissory notes with KeyBank, are both "consumer credit contracts" – defined by

3   regulation as "[a]ny instrument which evidences or embodies a debt arising from a 'Purchase

4   Money Loan' transaction," 16 C.F.R. § 433.1(i) – and that the Holder Notice was omitted

5   from both.[5] Silver State therefore would have violated the Holder Rule by receiving the

6   service contracts, and by accepting the proceeds of KeyBank's purchase money loans. *See*

7   *id.* § 433.2(a)-(b).

8        The Court therefore turns its attention to whether KeyBank's conduct, as alleged,

9   meets the standard for aiding and abetting. In *Schulz*, the California Court of Appeal ruled

10  that a plaintiff had properly pleaded an aiding and abetting claim under section 17200. 152

11  Cal. App. 4th at 88. The *Schulz* plaintiff alleged that two defendants aided and abetted an

12  illegal online lottery by performing credit card processing and billing services for its

13  operator. The court found the knowledge requirement satisfied by the allegations that the

14  defendants had "reviewed EZ's Web site and 'recognized that the site was an illegal lottery,

15  but also realized that it generated substantial revenue and could be very profitable for

16  [them].'" *Id.* at 94. The defendants also provided "substantial assistance or encouragement"

17  by authorizing "EZ to configure its site to display their respective logos so that consumers

18  could link directly to their sites to process credit card payments." *Id.* The complaint alleged

19  that the defendants realized their participation would not only enable "more persons . . . to

20  participate in the illegal lottery" – thus increasing their revenue – but that it would also "lend

21  an aura of respectability and further encourage participation." *Id.*

22

23

24  [5] Defendants argued for the first time at hearing that Silver State's service contracts
    are not consumer credit contracts. At the motion to dismiss stage, the Court finds Plaintiffs'
25  allegation that the service contracts constitute consumer credit contracts to be sufficient
    without examining the contract to determine whether it "evidences or embodies a debt." 16
26  C.F.R. § 433.1(j). Defendants also asserted – for the first time – that KeyBank's promissory
    notes are not consumer credit contracts, because education loans above $25,000 were exempt
27  from the Truth in Lending Act ("TILA") and Regulation Z at the time Plaintiffs' loans were
    made. *See* 15 U.S.C. § 1603(3). The Court agrees with Plaintiffs that the Holder Rule
28  merely borrows the definitions of "finance charge" and "credit sale" from TILA and
    Regulation Z; it does not import the restrictions to which Defendants refer. *See* note 2, *supra*
    (quoting provisions of OCC regulations).

10

1    Plaintiffs' allegations meet *Schulz*'s threshold for pleading an aiding and abetting

2  claim under the UCL. The TAC alleges that KeyBank was "keenly aware that . . . if it

3  permitted the Holder Rule Notice to be included in the consumer credit transaction

4  documentation, KeyBank would be unable to sell the loans into the secondary market and

5  would necessarily be obligated to return those unused funds to the students if the school

6  closed prior to the students obtaining all of the promised education." TAC ¶ 27. Plaintiffs

7  characterize KeyBank as a sophisticated player, well aware of the Holder Rule and

8  consciously seeking to avoid it. They claim that KeyBank developed strategies to enhance

9  "its ability to aggressively pursue collection of loans made to students scammed by

10  vocational schools," such as "omitting the Holder Rule Notice from its promissory notes"

11  and "ensuring that the contracts between the vocational school partner and its students

12  omitted" the notice. *Id.* ¶ 25. KeyBank had specific knowledge of Silver State's violations

13  because, according to the TAC, it reviewed and approved exemplar copies of its service

14  contract, and disbursed loans to Silver State despite the omission of the Holder Notice. The

15  knowledge requirement is therefore satisfied.

16    As for substantial assistance, the TAC alleges that KeyBank was Silver State's

17  "preferred lender," and that "KeyBank's marketing and sales personnel helped create,

18  review, approve and ratify [Silver State's] marketing and sales presentation, at least as it

19  related to KeyBank's Key Alternative Loan program." TAC ¶ 32. Silver State could not

20  have violated section 433.2(b) – accepting loan funds despite omission of the Holder Notice

21  – had KeyBank not disbursed the loans. The TAC likewise alleges that KeyBank encouraged

22  the violation of section 433.2(a), by reviewing and approving exemplar copies of the service

23  contract, and ensuring the Holder Rule's omission. TAC ¶¶ 25, 49. The pleading establishes

24  substantial assistance or encouragement.

25    By alleging that KeyBank knew of and encouraged Silver State's violations of the

26  Holder Rule, Plaintiffs have stated plausible claims for aiding and abetting Silver State's

27  "unlawful" activity under the UCL.

28

11

C.    "Unfair" Prong

Plaintiffs allege, in their fifth claim, that KeyBank violated the "unfair" prong of the UCL by omitting the Holder Notice from its own promissory notes, by facilitating Silver State's violation of the Holder Rule, and by partnering with Silver State despite numerous red flags about the school's viability. Defendants argue that KeyBank's conduct cannot satisfy the unfair prong because it did not violate the provisions of any statute, regulation, or case law.

The parties advance different standards for determining what is unfair, a discrepancy arising from conflicting California authority on this question. Recognizing the difficulty of determining "whether the challenged conduct is unfair within the meaning of the unfair competition law," the California Supreme Court devised a "more precise test" to avoid reliance on "purely subjective notions of fairness." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tele. Co.*, 20 Cal. 4th 163, 184-85 (1999). The court drew guidance from section 5 of the FTC Act, 15 U.S.C. § 45(a), based on "the similarity of language and obvious identity of purpose" between that statute and the UCL. *Cel-Tech*, 20 Cal. 4th at 185. Requiring "that any finding of unfairness to competitors under section 17200 be tethered to some legislatively declared policy or proof of some actual or threatened impact on competition," the court found conduct to be "unfair" if it "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Id.* at 186-87. In a footnote, however, the court limited the application of its test to actions "by a competitor alleging anticompetitive practices." *Id.* at 187 n.12. Its newly articulated standard expressly did not relate "to actions by consumers or by competitors alleging other kinds of violations of the unfair competition law." *Id.*

*Cel-Tech* has produced confusion among the California appellate courts over whether the clarified definition of "unfair" is properly applied to *consumer* cases. *Compare Gregory v. Albertson's, Inc.*, 104 Cal. App. 4th 845, 854 (Cal. App. 1st Dist. 2002) (reading *Cel-Tech* "to require that the public policy which is a predicate to the action must be 'tethered' to

12

United States District Court
For the Northern District of California

1    specific constitutional, statutory or regulatory provisions" in consumer cases), *with Smith v.*

2    *State Farm Mut. Auto. Ins. Co.*, 93 Cal. App. 4th 700, 720 n.23 (Cal. App. 2d Dist. 2001)

3    ("[W]e are not to read *Cel-Tech* as suggesting that such a restrictive definition of 'unfair'

4    should be applied in the case of an alleged *consumer* injury[.]").  Since the test *Cel-Tech*

5    prescribed was, by the California Supreme Court's own admission, not intended for

6    consumer actions, the natural question was what test to apply in such cases.

7         To resolve the conflict, the Second Appellate Division turned to section 5 of the FTC

8    Act – which the California Supreme Court had identified in *Cel-Tech* as a source of guidance

9    for interpreting the UCL – and adopted its three-factor test for determining unfairness.  For

10   conduct to be unfair under the UCL, "(1) [t]he consumer injury must be substantial; (2) the

11   injury must not be outweighed by any countervailing benefits to consumers or competition;

12   and (3) it must be an injury that consumers themselves could not reasonably have avoided."

13   *Camacho v. Auto. Club of S. Cal.*, 142 Cal. App. 4th 1394, 1403 (Cal. App. 2d Dist. 2006).

14   The California Court of Appeal has continued to endorse that standard since its first

15   articulation in *Camacho, see Davis v. Ford Motor Credit Co.*, 179 Cal. App. 4th 581, 596-98

16   (Cal. App. 2d Dist. 2009), and this is the standard advanced by Plaintiffs.  Defendants seek to

17   apply the *Cel-Tech* standard, arguing that unfair conduct must be tethered to a specific

18   statutory, regulatory, or case authority.  Since the California Supreme Court declared that its

19   *Cel-Tech* standard does not apply in consumer actions, this Court will follow the Court of

20   Appeal's approach in *Camacho*.

21         Plaintiffs are able to satisfy this standard.  Their injury is substantial: Plaintiffs owe

22   tens of thousands of dollars to KeyBank but, due to the omission of the Holder Notice,

23   cannot assert Silver State's failure to provide the bargained-for education as a defense to the

24   collection of their debt.  On oral argument, Defendants suggested that requiring lenders to

25   include the Holder Notice would cause lenders to exit the student loan market for vocational

26   schools and limit the availability of credit to Plaintiffs and similarly situated individuals.

27   Under Defendants' theory, KeyBank's conduct offers a countervailing benefit by making

28   credit more available.  However, the Court cannot conclude on motion to dismiss that such a

13

United States District Court
For the Northern District of California

1    benefit *outweighs* Plaintiffs' injury. Finally, Plaintiffs could not have reasonably done

2    anything to avoid this injury, which was brought on by Silver State's closure – a turn of

3    events they could not have anticipated. Plaintiffs therefore state a plausible claim under the

4    unfair prong of the UCL.

5

6    **D. "Fraud" Prong**

7         Plaintiffs' sixth and final cause of action alleges a violation of the "fraud" prong of

8    section 17200 based on KeyBank's failure to disclose material facts about Silver State's risk

9    of failure. Plaintiffs allege that KeyBank intentionally concealed information from loan

10   customers because it relied on the Silver State loans to offset losses from other failed partner

11   schools and to create publicly offered securities backed by education loans. Defendants

12   argue that Plaintiffs fail to state a claim because KeyBank had no duty to disclose, and the

13   "facts" that went undisclosed were not material.

14        "The fraudulent business practice prong of the UCL has been understood to be distinct

15   from common law fraud." *In re Tobacco II Cases*, 46 Cal. 4th 298, 312 (2009). A UCL

16   claim need not plead the elements of common law fraudulent deception, which "must be

17   actually false, known to be false by the perpetrator and reasonably relied upon by a victim

18   who incurs damages." *Id.* What does need to be pled is the existence of a duty to disclose.

19   "Absent a duty to disclose, the failure to do so does not support a claim under the fraudulent

20   prong of the UCL." *Berryman v. Merit Prop. Mgmt., Inc.*, 152 Cal. App. 4th 1544, 1557

21   (2007). There are four circumstances under which "[n]ondisclosure or concealment may

22   constitute actionable fraud":

23            (1) when the defendant is in a fiduciary relationship with the
             plaintiff; (2) when the defendant had exclusive knowledge of
24            material facts not known to the plaintiff; (3) when the defendant
             actively conceals a material fact from the plaintiff; and (4) when
25            the defendant makes partial representations but also suppresses
             some material facts.
26
     *Heliotis v. Schuman*, 181 Cal. App. 3d 646, 651 (1986).
27
          Plaintiffs do not contend that they and KeyBank had any type of fiduciary
28
     relationship. Even under the remaining three circumstances that may constitute fraud, "some

                                        14

United States District Court
For the Northern District of California

1  relationship" must exist "between the parties [to] give[] rise to a duty to disclose such known

2  facts." *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 337 (1997). Such a relationship "can only

3  come into being as a result of some sort of transaction between the parties." *Id.* Plaintiffs

4  and KeyBank, as "parties entering into [a] contractual agreement," had such a relationship.

5  *Id.* Plaintiffs' theory is that material facts about the viability of Silver State were in

6  KeyBank's exclusive knowledge, thereby triggering KeyBank's obligation to disclose them.

7          This claim falters on two fronts. First, none of the facts that Plaintiffs allege as the

8  basis for fraud could plausibly have been in the "exclusive knowledge" of KeyBank. Such

9  "red flags" as Silver State's lack of affiliation with a college or university, its failure to

10  obtain certification from the Federal Aviation Administration, or its relatively recent

11  founding are not facts known only to KeyBank. Plaintiffs had a relationship with Silver

12  State itself, which could have disclosed such details or responded to inquiries by Plaintiffs.

13  Nor is it plausible that Silver State and KeyBank were the only sources of this information.

14  Such basic facts as the existence of government certifications or the date a corporation began

15  operating are matters of public record. Although the Court recognizes that KeyBank is the

16  more sophisticated party, Plaintiffs cannot establish fraud by alleging facts that could not

17  plausibly have been in KeyBank's exclusive knowledge.

18          Second, other "facts" on which Plaintiffs premise their fraud allegations are not facts

19  at all, but rather opinions about Silver State's viability. For example, Plaintiffs allege that

20  KeyBank was aware that an aviation school expert had predicted Silver State's failure.

21  "[P]redictions as to future events are ordinarily non-actionable expressions of opinion under

22  basic principles of the tort of fraudulent misrepresentation." *Bayview Hunters Point Cmty.*

23  *Advocates v. Metro. Transp. Comm'n*, 366 F.3d 692, 698 (9th Cir. 2004). The failure to

24  disclose predictions or other opinions about Silver State's viability cannot be actionable

25  because they are not facts and therefore do not trigger a duty to disclose. Plaintiffs therefore

26  fail to state a claim under the UCL's fraud prong, which is DISMISSED. As Plaintiffs

27  previously augmented their fraud allegations in response to Defendants' prior motion to

28

15

United States District Court
For the Northern District of California

1   dismiss, the Court concludes that further amendment would be futile and denies leave to

2   amend.

3

4   **II.   Preemption by the National Bank Act**

5         Three of Plaintiffs' six causes of action – two claims for aiding and abetting under the

6   UCL's "unlawful" prong, and one claim under the "unfair" prong – state plausible claims

7   under the Rule 12(b)(6) standard.  However, Defendants further argue that those claims must

8   be dismissed as preempted by federal law, which exclusively governs the terms of credit

9   extended by a national bank such as KeyBank.  Plaintiffs respond that preemption does not

10  reach as far as KeyBank suggests, as laws of general application – like those invoked here –

11  are not preempted by federal law.

12        KeyBank is a national bank created and operated under the National Bank Act

13  ("NBA"), 12 U.S.C. § 1 *et seq.*  Congress enacted the NBA in 1864, "establishing the system

14  of national banking still in place today."  *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 10

15  (2007).  "The Act vested in nationally chartered banks enumerated powers and 'all such

16  incidental powers as shall be necessary to carry on the business of banking.'"  *Id.* at 11

17  (quoting 12 U.S.C. § 24 (Seventh)).  The Supreme Court has, in "the years since the NBA's

18  enactment, . . . repeatedly made clear that federal control shields national banking from

19  unduly burdensome and duplicative state regulation."  *Id.*  While states "are permitted to

20  regulate the activities of national banks where doing so does not prevent or significantly

21  interfere with the national bank's or the national bank regulator's exercise of its powers,"

22  state regulations "must give way" when "state prescriptions significantly impair the exercise

23  of authority, enumerated or incidental under the NBA."  *Id.* at 12.  Among their incidental

24  powers, national banks are charged with "discounting and negotiating promissory notes,

25  drafts, bills of exchange, and other evidences of debt."  12 U.S.C. § 24 (Seventh).

26        At issue here is whether Plaintiffs' state law claims would "significantly impair"

27  KeyBank's exercise of its "enumerated or incidental" powers under the NBA.  If that is so,

28  state law must give way to federal, because the Supremacy Clause enshrines the

16

1   "Constitution, and the Laws of the United States," as "the supreme Law of the Land." U.S.

2   Const. art. VI, cl. 2.  "In determining whether a state statute is pre-empted by federal law and

3   therefore invalid under the Supremacy Clause of the Constitution, our sole task is to ascertain

4   the intent of Congress." *Cal. Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 280 (1987).

5   If Congress, in enacting a federal statute, intended "to exercise its constitutionally delegated

6   authority to set aside the laws of a State," then "the Supremacy Clause requires courts to

7   follow federal, not state, law." *Barnett Bank of Marion County, N. A. v. Nelson*, 517 U.S. 25,

8   30 (1996).

9        State law can be preempted by federal law in three contexts: where "(1) Congress

10  enacts a statute that explicitly preempts state law; (2) state law actually conflicts with federal

11  law; or (3) federal law occupies a legislative field to such an extent that it is reasonable to

12  conclude that Congress left no room for state regulation in that field." *Engine Mfrs. Ass'n v.*

13  *S. Coast Air Quality Maint. Dist.*, 498 F.3d 1031, 1039 (9th Cir. 2007).  The parties agree

14  that only conflict preemption is in play here:  whether federal and state law are "in

15  'irreconcilable conflict.'" *Barnett Bank*, 517 U.S. at 31 (quoting *Rice v. Norman Williams*

16  *Co.*, 458 U.S. 654, 659 (1982)).  Such a conflict may arise where compliance with both

17  statutes is a "'physical impossibility,'" *id.* (quoting *Florida Lime & Avocado Growers, Inc. v.*

18  *Paul*, 373 U.S. 132, 142-43 (1963)), or where the state law "'stand[s] as an obstacle to the

19  accomplishment and execution of the full purposes and objectives of Congress,'" *id.* (quoting

20  *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

21       The Office of the Comptroller of the Currency ("OCC"), as "the agency charged by

22  Congress with supervision of the NBA," "oversees the operations of national banks and their

23  interactions with customers." *Watters*, 550 U.S. at 6.  In its regulations, the OCC attempts to

24  delineate the boundaries of NBA preemption.[6]  "[S]tate laws that obstruct, impair, or

25  condition a national bank's ability to fully exercise its Federally authorized non-real estate

26  lending powers are not applicable to national banks."  12 C.F.R. § 7.4008(d)(1).

27       [6] "Federal regulations have no less pre-emptive effect than federal statutes."
    *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982).  That preemptive
28  effect may only be disturbed if the regulation "is not one that Congress would have
    sanctioned." *Id.* at 154.  Neither party disputes the force of the OCC regulations here.

17

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    Specifically, a "national bank may make non-real estate loans without regard to state law

2    limitations concerning . . . [t]he terms of credit, including the schedule for repayment of

3    principal and interest, . . . payments due, minimum payments, or terms to maturity of the

4    loan[.]" *Id.* § 7.4008(d)(2)(iv). However, the regulations are explicit that state laws

5    governing contracts, torts, and criminal activity are *not* preempted, nor are state laws whose

6    effects are "incidental to the non-real estate lending operations of national banks." *Id.*

7    § 7.4008(e). National banks are expressly barred from engaging in "unfair or deceptive

8    practices within the meaning of section 5" of the FTC Act. *Id.* § 7.4008(c).

9        The broad contours of NBA preemption are not in dispute. States have "the power to

10   regulate national banks" where "doing so does not prevent or significantly interfere with the

11   national bank's exercise of its powers." *Barnett Bank*, 517 U.S. at 33; *see also Bank of Am.*

12   *v. City & County of San Francisco*, 309 F.3d 551, 558-59 (9th Cir. 2002) ("[S]tates retain

13   some power to regulate national banks in areas such as contracts, debt collection, acquisition

14   and transfer of property, and taxation, zoning, criminal, and tort law."). States cannot, on the

15   other hand, "significantly impair" a national bank's "exercise of authority, enumerated or

16   incidental under the NBA." *Watters*, 550 U.S. at 12. "[G]rants of both enumerated and

17   incidental 'powers' to national banks" are "grants of authority not normally limited by, but

18   rather ordinarily preempting, contrary state law." *Barnett Bank*, 517 U.S. at 32.

19       Defendants do not contend that California's UCL is preempted by the NBA. As this

20   Court has previously noted, "California courts have long held that consumer protection laws

21   of general application are not preempted by federal banking laws." *Jefferson v. Chase Home*

22   *Finance*, No. C06-6510 TEH, 2008 U.S. Dist. Lexis 101031, at *29 (N.D. Cal. April 29,

23   2008). Rather, Defendants argue that Plaintiffs' *application* of the UCL – which they are

24   wielding to "modify federal law" and "impose a non-existent obligation on KeyBank with

25   regard to the FTC Holder Notice" – is preempted. Defs.' Mot. at 17. The injunctive relief

26   demanded by Plaintiffs would effectively read the Holder Notice into KeyBank's promissory

27   notes, thereby – according to Defendants – imposing a "state law limitation[]" on its "terms

28   of credit." 12 C.F.R. § 7.4008(d)(2)(iv). Plaintiffs respond that they are simply predicating

18

United States District Court
For the Northern District of California

1    the violation of "a state consumer protection statute of general application" on "a federal

2    consumer protection regulation of general application," neither of which are preempted. Pls.'

3    Opp'n at 20.

4          The Court has already concluded that the Holder Rule does not directly apply to

5    KeyBank; the regulation provides only that a *seller* commits an unfair business practice by

6    omitting the Holder Notice from a consumer credit contract, or by accepting loan proceeds

7    made pursuant to such a contract. KeyBank was not required to include the Holder Notice in

8    its promissory notes. However, Plaintiffs' surviving claims – which are all premised on

9    KeyBank's complicity in Silver State's alleged Holder Rule violation – would compel

10   KeyBank to add the Holder Notice to its consumer credit contracts. For example, Plaintiffs

11   allege that KeyBank aided and abetted Silver State's violation by dispersing loan funds to

12   Silver State – which was therefore "[a]ccept[ing] . . . the proceeds of a[] purchase money

13   loan" made pursuant to a "consumer credit contract" that did not contain the Holder Notice.

14   16 C.F.R. § 433.2(b). KeyBank could only avoid aiding and abetting liability under that

15   theory by including the Holder Notice in its promissory notes, or by not making the loan in

16   the first place.

17         The *relief* Plaintiffs request would also, in effect, read the Holder Notice into

18   KeyBank's promissory notes. Plaintiffs seek to enjoin KeyBank from enforcing its

19   promissory notes with Plaintiffs, or from reporting Plaintiffs to credit reporting agencies.

20   Had KeyBank included the Holder Notice in its promissory notes, Plaintiffs could have

21   defended against KeyBank's collection efforts by claiming Silver State had breached their

22   contract – as inclusion of the Holder Notice "preserves the borrower's ability to raise claims

23   and defenses against the lender arising from the seller's misconduct." *Armstrong v.*

24   *Accrediting Council for Continuing Educ. & Training, Inc.*, 168 F.3d 1362, 1365 (D.C. Cir.

25   1999). The basis for Plaintiffs' claims is their obligation to pay KeyBank for an education

26   that Silver State never delivered. Enjoining KeyBank from collecting on Plaintiffs' loans

27   would impose on KeyBank a remedy premised on Silver State's failure to perform – which,

28   again, amounts to reading the Holder Notice into KeyBank's promissory notes. A

19

United States District Court
For the Northern District of California

1    consumer's rights "come into existence only when the [Holder Notice] is in fact included in

2    the consumer credit contract." *Vietnam Veterans of Am., Inc. v. Guerdon Indus., Inc.*, 644 F.

3    Supp. 951, 964 (D. Del. 1986). Although the Holder Notice was not in KeyBank's

4    promissory notes, Plaintiffs demand a remedy that would grant them the same rights as if it

5    had been.

6          State law cannot obstruct or impair "a national bank's ability to fully exercise its

7    Federally authorized non-real estate lending powers." 12 C.F.R. § 7.4008(d)(1). States are

8    explicitly barred from imposing limits on the "terms of credit" extended by a national bank.

9    *Id.* § 7.4008(d)(2)(iv). KeyBank's promissory notes embody the terms of credit extended to

10   Plaintiffs to finance their education at Silver State. Plaintiffs' theory would deploy state law

11   to alter those terms of credit and bar KeyBank from collecting on Plaintiffs' debts. It is

12   difficult to conceive how Plaintiffs' action can survive in light of its clear interference with

13   powers conferred on KeyBank by federal law.

14         Plaintiffs contend that this Court's decision in *Jefferson v. Chase Home Finance*, No.

15   C06-6510 TEH, 2008 U.S. Dist. LEXIS 101031 (N.D. Cal. April 29, 2008), dictates that

16   there is no preemption here.[7] The plaintiff in *Jefferson* alleged that Chase Home Finance,

17   which serviced the loan he obtained to refinance his home, had misrepresented how it would

18   credit prepayments to his account. Although Chase stated on its payment coupons that

19   undesignated funds would "first pay outstanding late charges and fees, then principal," Chase

20   consistently failed to apply Jefferson's prepayments to the loan principal, placing the prepaid

21   amount instead in "suspense." *Id.* at *5-6. Jefferson asserted, among other causes of action,

22   that Chase's misrepresentation violated all three prongs of the UCL. Chase argued that

23

24   ───────────────

     [7] Plaintiffs also contend that the Supreme Court's decision in *Cuomo v. Clearing
25   House Ass'n*, --- U.S. ----, 129 S. Ct. 2710 (2009), is supportive. However, the Court in
     *Cuomo* addressed an unrelated provision of the National Bank Act, which provides that "[n]o
26   national bank shall be subject to any visitorial powers except as authorized by Federal law"
     and other limited circumstances. 12 U.S.C. § 484(A). The Court found only that the OCC
27   erred in "extending the definition of 'visitorial powers' to include 'prosecuting enforcement
     actions' in state courts." 129 S. Ct. at 2721 (quoting 12 C.F.R. § 7.4000). The term properly
28   refers, the Court held, "to a sovereign's supervisory powers over corporations," including
     "any form of administrative oversight that allows a sovereign to inspect books and records."
     *Id.* Since a state's visitorial powers are not at issue here, this Court does not see how *Cuomo*
     is controlling or even relevant.

                                              20

1    Jefferson's claims were preempted by the NBA, relying on OCC regulations that permit

2    banks to "make real estate loans without [regard to] state law limitations [concern]ing terms

3    of credit, disclosure and advertising, processing and servicing of mortgages, repayments, and

4    rates of interest on loans." *Id.* at *28-29 (citing 12 C.F.R. § 34.4(a)(4), (9), (10), (11), and

5    (12)).

6         The Court found that the plaintiff's claims were not preempted, holding that "laws of

7    general application, which merely require all businesses (including banks) to refrain from

8    misrepresentations and abide by contracts and representations to customers do not impair a

9    bank's ability to exercise its lending powers." *Id.* at *29. In reaching that conclusion, the

10   Court observed that "California courts have long held that consumer protection laws of

11   general application are not preempted by federal banking laws." *Id.* at *29. Plaintiffs

12   highlight this language to argue that their claims – brought under the UCL, a "consumer

13   protection law[] of general application" – cannot be preempted.

14        However, the result in *Jefferson* hinged on the nature of the claim asserted:

15   misrepresentation. "The duty to refrain from misrepresentation falls on all businesses." *Id.*

16   at *37. Barring a national bank from making misrepresentations to customers does not in any

17   way impair the exercise of its enumerated or implied powers; rather, it is precisely the kind

18   of generally applicable duty that cannot be preempted. Indeed, the Court contrasted the

19   misrepresentation claim from others that *would be preempted*:

20              Plaintiff does not claim that California consumer protection laws
                require Chase to service or process loans, include specific content
21              in its disclosures, or handle repayment of loans in any particular
                manner – requirements that would be preempted. *See* 12 C.F.R.
22              § 34.4(a). Instead Plaintiff claims that the laws require Chase to
                refrain from misrepresenting the manner in which it *does* service
23              loans.

24   *Id.* at *36. The hypothetical claims that this Court suggested would be preempted – those

25   requiring that "specific content" be included, or that repayment be handled in a "specific

26   manner" – look remarkably similar to the claims Plaintiffs are now asserting.

27        In *Martinez v. Wells Fargo Bank, N.A.*, a sister court dismissed the plaintiffs' section

28   17200 claims alleging improprieties in the fees charged by a national bank for the plaintiffs'

21

1   home mortgage refinancing.  No. C06-03327 RMW, 2007 U.S. Dist. LEXIS 58758 (N.D.

2   Cal. July 31, 2007).  The court found that determinations of charges and fees were

3   "incidental powers to the express power of engaging in real estate lending" conferred by the

4   NBA, and that claims challenging such fees were therefore preempted.  *Id.* at *10, 16.

5   Allowing the section 17200 claims to advance "would essentially be allowing the

6   superimposition of state law requirements upon the OCC's exclusive superintendence of [the

7   national bank's] exercise of its federally-conferred powers." *Id.* at *16.  The court stressed

8   that it was not concluding "that § 17200 claims are per se preempted by the NBA and

9   regulations thereunder," but found preemption only "to the extent a § 17200 claim seeks to

10  contest the exercise of a national bank's enumerated or incidental authority." *Id.* at *16-17

11  n.6.

12      That is precisely the type of claim before this Court.  Plaintiffs are not asking that

13  KeyBank be held liable for defying its own contracts or committing a tort, nor are they

14  alleging the violation of a state law that directly infringes on its powers as a national bank.

15  Rather, Plaintiffs' theory would deploy the UCL to require KeyBank to comply with a

16  federal regulation that does not itself require KeyBank's compliance.  Abiding by the Holder

17  Rule would directly affect the terms of credit extended by KeyBank, infringing on a power

18  that national banks are meant to exercise free from state authority.  The Court therefore

19  concludes that Plaintiffs' remaining claims are preempted by the National Bank Act.  The

20  remaining causes of action are DISMISSED without leave to amend, as Plaintiffs cannot

21  plead around federal preemption.

22

23  **CONCLUSION**

24      Defendants' motion to dismiss is GRANTED.  Plaintiffs' first, second, and sixth

25  causes of action are dismissed for failure to state a claim, and their third, fourth, and fifth

26  //

27  //

28

Notice of Appeal - Exhibit A - page 22 of 24

United States District Court
For the Northern District of California

1  claims are dismissed based on federal preemption.  The TAC is DISMISSED without leave

2  to amend.

3       The Clerk shall enter judgment and close the file.

4

5  **IT IS SO ORDERED.**

6

7

8  Dated:  4/12/10

9                                   THELTON E. HENDERSON, JUDGE
UNITED STATES DISTRICT COURT

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

23

1

2                          IN THE UNITED STATES DISTRICT COURT

3
                        FOR THE NORTHERN DISTRICT OF CALIFORNIA
4

5

6    MATTHEW C. KILGORE, et al.,                    No. CV 08-02958 TEH

7            Plaintiff,
                                                    JUDGMENT IN A CIVIL CASE
8    v.

9    KEYBANK NATIONAL ASSOCIATION, et al.,

10           Defendant.
                                          /
11

12           ( ) **Jury Verdict.** This action came before the Court for a trial by jury. The issues

13   have been tried and the jury has rendered its verdict.

14           (XX) **Decision by Court.** This action came to trial or hearing before the Court.

15   The issues have been tried or heard and a decision has been rendered.

16           **IT IS SO ORDERED AND ADJUDGED** that the Motion to Dismiss is

17   GRANTED.

18

19   Dated: 04/13/10                               Richard W. Wieking, Clerk

20                                                 By: R.B. Espinosa
                                                   Deputy Clerk
21

22

23

24

25

26

27

28